IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

JOSEPH J. BELILE,

                       Plaintiff,           Civil Action No.
                                           9:15-CV-0198 (LEK/DEP)

     v.

TIMOTHY AMO, *et al.*,

                       Defendants.
_____

APPEARANCES:                     OF COUNSEL:

FOR PLAINTIFF:

JOSEPH J. BELILE, *Pro Se*
No. 14-A-3897
Wende Correctional Facility
P.O. Box 1187
Alden, NY 12953

FOR DEFENDANTS:

HANCOCK ESTABROOK LLP     ZACHARY M. MATTISON, ESQ.
1500 AXA Tower I
100 Madison Street
Syracuse, NY 13221

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro Se* plaintiff Joseph Belile, a prison inmate who is currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), has commenced this action, pursuant to 42 U.S.C. § 1983, claiming that two St. Lawrence County corrections employees violated his civil rights while he was a pretrial detainee confined in the St. Lawrence County Correctional Facility ("SLCCF"). Specifically, plaintiff's complaint alleges that Corrections Sergeant Timothy Amo used excessive force against him, and Corrections Officer Robert Rusaw failed to protect him from that use of force, in violation of plaintiff's constitutional rights.

Currently pending before the court is a motion brought by the defendants requesting the entry of summary judgment dismissing plaintiff's claims. In their motion, defendants argue that there is no evidence in the record from which a reasonable factfinder could conclude either that plaintiff was subjected to excessive force or that defendant Rusaw had a duty to intervene but failed to do so. For the reasons set forth below, I recommend that defendants' motion be denied.

I.    BACKGROUND[1]

Plaintiff is a prison inmate currently being held in the custody of the DOCCS at the Wende Correctional Facility located in Alden, New York. Dkt. No. 25. At the times relevant to his complaint, plaintiff was confined at the SLCCF as a pretrial detainee. Dkt. No. 1 at 4.

On the morning of May 28, 2014, plaintiff was in the shower room in SLCCF's booking area changing into clothes to be worn during his trial in St. Lawrence County Court. Dkt. No. 1 at 4. While he was changing, defendant Amo instructed plaintiff to "hurry up" so that the facility's first court transport would not leave without him. *Id.* As plaintiff emerged from the changing area, he noticed that he had missed the first transport from the facility to court. *Id.* at 5. Plaintiff asked defendant Amo to instruct the transport to wait for him. *Id.* Defendant Amo, who was on the telephone at the time, responded by directing plaintiff to enter a holding cell located near the shower room where plaintiff had changed his clothes, and to wait there until the transport returned to take him to court, stating, "'[G]et in 4 cell & close the fucking cell door.'"[2] *Id.* Plaintiff "took offense to the rude

_____

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]    According to defendant Amo, upon learning that the transport left without him, plaintiff became "upset" and began to "yell and curse." Dkt. No. 26-7 at 1. Plaintiff

and duragatory [sic] manner of Defendant SGT Amo and stated 'dont [sic] talk to me like that you fucking shitbag!'"[3] *Id.*

As instructed, plaintiff entered the holding cell. Dkt. No. 1 at 5. Plaintiff maintains that the door of the holding cell locked behind him.[4] Dkt. No. 26-4 at 10. Defendant Amo, however, states that plaintiff "did not shut the door all the way as to engage the latch." Dkt. No. 26-7 at 2.

The parties' versions concerning the events that followed differ markedly. For their part, defendants maintain that plaintiff "continued to yell and curse about missing the initial transport." Dkt. No. 26-7 at 2; *see also* Dkt. No. 26-9 at 2. Defendant Amo claims that, as a means of "calming the disturbance," he approached plaintiff's cell and gave plaintiff a verbal order "to stop yelling and to sit on the bench[.]" Dkt. No. 26-7 at 2 "As [defendant Amo] approached [the cell], Plaintiff opened the door to confront him," and defendant Amo then "directed [plaintiff] back into [the cell.]" *Id*; *see also* Dkt. No. 26-9 at 2. Because plaintiff "stood his ground with an aggressive stance," defendant Amo pushed him back into the cell

---

denies having yelled or cursed. Dkt. No. 31-1 at 1-2.

[3]    At his deposition, plaintiff testified that, in response to defendant Amo's instruction to enter the holding cell, he said, "'Fuck you, suck my dick. Don't talk to me like that, you fucking asshole[.]'" Dkt. No. 26-4 at 9.

[4]    Plaintiff alleges that the holding cell's door is electronic and can only be opened by computer control, which defendant Rusaw was operating. Dkt. No. 1 at 5; Dkt No. 26-4 at 10.

and continued to verbally direct him to sit on the bench. Dkt. No. 26-7 at 2. When plaintiff refused to comply with those instructions, defendant Amo "walked toward Plaintiff, who stepped toward[s] him[, and t]hen, again[,] [defendant Amo] pushed Plaintiff towards the bench." *Id.* As defendant Amo "walked Plaintiff towards the bench . . ., Plaintiff grabbed [defendant Amo's] shirt by the collar with his right hand and grabbed [defendant Amo's] right bicep with his left hand." *Id.*; *see also* Dkt. No. 26-9 at 2. According to defendant Amo, plaintiff then "leaned backwards onto the bench, bringing [defendant Amo] down," at which point defendant Amo "struck Plaintiff three (3) times in the face to force him to release his grip[.]" Dkt. No. 26-7 at 2; *see also* Dkt. No. 26-9 at 2.

Plaintiff, on the other hand, alleges that, once he was inside the holding cell, he "sat down on the bench by the window and quietly waited" for the next transport to the courthouse. Dkt. No. 1 at 5; *see also* Dkt. No. 26-4 at 9-10. He alleges that approximately two minutes later, defendant Amo hung up the telephone and ordered defendant Rusaw to open the cell door in a "loud tone." Dkt. No. 1 at 5. Alarmed, plaintiff stood up and faced the cell door as defendant Amo walked toward him. *Id.* at 6. Once the cell door was "clicked open," defendant Amo "whipped [it] wide open, and immediately started violently shoving plaintiff[, causing] plaintiff [to lose] his footing, and ended up sitting on the bench by the window again."

*Id.* Defendant Amo then stepped on plaintiff's feet and yelled at him saying, "[n]ot while Im [sic] on the phone scumbag[.]" *Id.*; *see also* Dkt. No. 26-4 at 11. Plaintiff contends that he then "calmly put his right & left hands, palms flat, out & softly touched" defendant Amo's chest "to try to get space and stop [defendant Amo] from stepping on [his] feet." Dkt. No. 1 at 6; *see also* Dkt. No. 26-4 at 12. Defendant Amo then punched plaintiff three times with a closed fist in the face "causing a black & swollen eye with a small laceration which bled[.]" Dkt. No. 1 at 6; *see also* Dkt. No. 26-4 at 12, 13-14. Plaintiff denies defendants' allegation that he grabbed defendant Amo's shirt or bicep during the altercation. Dkt. No. 26-4 at 12-13.

Although defendants have submitted a video recording of the altercation between defendant Amo and plaintiff, it does not contain any audio of the incident. Dkt. No. 28 (filed by traditional means; not available electronically). In addition, the quality of the recording is such that a viewer cannot discern whether plaintiff opened the cell door or defendant Amo did after defendant Rusaw unlocked it using a computer control. *Id.* The video recording does, however, show that plaintiff was not seated in the cell, as he alleges, prior to defendant Amo hanging up the telephone and approaching plaintiff's cell. *Id.* Instead, plaintiff can be seen standing behind the window of the holding cell's door from the time he entered the cell until defendant Amo entered the cell and shoved him backwards. *Id.*

The recording also shows that defendant Rusaw stood in the doorway of the cell during almost the entire incident before entering and assisting defendant Amo in handcuffing plaintiff. *Id.*; *see also* Dkt. No. 1 at 6; Dkt. No. 26-7 at 3; Dkt. No. 26-9 at 2. Finally, the video recording also confirms plaintiff's allegation that defendant Rusaw did not "step in and try to stop" defendant Amo's use of force. Dkt. No. 28. The video, however, is not dispositive as it does not clearly show the sequence of events occurring in the portion of the cell where some of the physical altercation occurred.

As a result of the incident, plaintiff suffered a small laceration or bruise under his left eye that measured one-quarter to one-third of an inch in length. Dkt. No. 26-4 at 15. He was treated by the medical staff at the SLCCF and also underwent an x-ray of his face, which did not reveal any fractures. *Id.* at 14-15.

II.    PROCEDURAL HISTORY

Plaintiff filed his complaint in this action, accompanied by an application for leave to proceed *in forma pauperis* ("IFP"), on or about February 23, 2015. Dkt. Nos. 1, 2. Named as defendants in that complaint are two SLCCF employees, Sergeant Timothy Amo and Corrections Officer Rusaw. Dkt. No. 1 at 1-2. Senior District Judge Lawrence E. Kahn issued a decision and order on May 15, 2015, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), granting plaintiff's IFP request and *sua*

*sponte* dismissing the portion of plaintiff's excessive force claim that was based upon his allegation that defendants applied his handcuffs too tightly after the altercation with defendant Amo, but otherwise permitting the action to go forward. [Dkt. No. 6](#).

On February 8, 2016, following the close of discovery, defendants moved for summary judgment seeking dismissal of plaintiff's complaint on the ground that the record evidence does not reveal the existence of a genuine dispute of material fact with respect to whether defendant Amo used force maliciously and sadistically against plaintiff, or defendant Rusaw failed to protect Belile from harm. *See generally* [Dkt. No. 26-10](#). Plaintiff has since responded in opposition to defendants' motion, [Dkt. No. 31](#), and defendants have filed a reply brief in further support of the motion. [Dkt. No. 33](#). Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553;

*Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

     B.    <u>Excessive Force Claim Asserted Against Defendant Amo</u>

As a pretrial detainee, plaintiff's excessive force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009); *see also Flake v. Peck*, No. 12-CV-0517, 2014 WL 1289582, at *12 (N.D.N.Y. Mar. 31, 2014) (D'Agostino, J., *adopting report and recommendation by* Baxter, M.J.) ("The right of a pretrial detainee to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment, which only relates to convicted prisoners." (emphasis omitted)). The legal standard governing plaintiff's Fourteenth Amendment claim, however, is the same as the one applicable to a convicted inmate's Eighth Amendment excessive force claim. *United States v. Walsh*, 194 F.3d 37, 48 (2d Cir. 1999).

The Eighth Amendment prohibits prison conditions that are "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). The Eighth Amendment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quotation marks omitted); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components – one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).

To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Hudson*, 503 U.S. at 6 (quotation marks omitted); *accord*, *Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases – not "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).

When considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9. Conversely, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

"The objective component [of the excessive force analysis] . . . focuses on the harm done, in light of 'contemporary standards of decency.'" *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see*

*also Blyden*, 186 F.3d at 263 (finding the analysis of the objective element "context specific, turning upon 'contemporary standards of decency'"). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.'" *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force . . . are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

The record evidence now before the court clearly demonstrates the existence of genuine disputes of material fact with respect to whether defendant Amo used force against plaintiff maliciously and sadistically, or in an effort to protect himself or restore order. Plaintiff contends that he

was sitting quietly when defendant Amo approached his holding cell, and did nothing to resist or antagonize Amo, other than to gently place his hands on the sergeant's chest after being pushed twice, and while defendant Amo stood on his feet. Dkt. No. 26-4 at 12-13; Dkt. No. 31 at 4. In contrast, defendants maintain that plaintiff created a disturbance by yelling after he learned he had missed the first transport to the courthouse, and continuing to yell after he entered the holding cell, and that the plaintiff initiated the confrontation through his aggressive actions. Dkt. No. 26-7 at 2; Dkt. No. 26-9 at 1-2.

According to defendant Amo, "[t]he only force that anyone used on Plaintiff during this entire incident were the three strikes that [he] utilized to try to force Plaintiff to release his grip[.]" Dkt. No. 26-7 at 3. Having reviewed the video recording of the incident, it is clear to me that plaintiff went into the holding cell and did not, as he contends, sit on the bench inside the cell, but instead remained standing in front of the cell's window. Dkt. No. 28. Without audio recording, however, I am unable to discern whether plaintiff was talking – or yelling, as defendants allege – while inside the cell. *Id.* The recording shows that defendant Amo entered the cell approximately thirty seconds after the plaintiff and, upon entering, pushed plaintiff toward the back of the cell. *Id.* In light of the dispute between the parties as to whether plaintiff was causing a disturbance, and

the lack of audio recording, the video recording is susceptible of more than one reasonable interpretation regarding whether defendant Amo acted in good faith to restore order under the circumstances, and therefore raises a question of fact more appropriately resolved by a factfinder after trial. *See Mack v. Howard*, No. 11-CV-0303, 2014 WL 2708468, at *12 (W.D.N.Y. June 16, 2014) (finding that whether the video of the defendant showed malicious intent during use of force on the plaintiff was a question of fact).

On a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See Wright*, 554 F.3d at 269 (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury") (citing *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003)). It is worth noting, moreover, that while there is no apparent dispute regarding the nature of plaintiff's injuries, which include only a small laceration or bruise under his left eye and no broken bones to his face, the Second Circuit has counselled that, in the context of an excessive force claim, it is "not whether a certain quantum of injury was

sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Harris v. Miller*, 818 F.3d 49, 65 (2d Cir. 2016) (quoting *Wilkins*, 559 U.S. at 37 (2010)).

In this case, plaintiff maintains that, in response to him yelling at defendant Amo for showing alleged disrespect, defendant Amo stormed into the holding cell, pushed him, stepped on his feet, and punched him multiple times. *See, e.g.,* Dkt. No. 1 at 5-6. If plaintiff's version of the incident is credited, a reasonable factfinder could conclude that defendant Amo maliciously used force against plaintiff. Accordingly, at this juncture, plaintiff's seemingly *de minimis* injury is only marginally relevant and only one factor to be considered. Having concluded that the existence of material issues of fact exist, I recommend that defendants' motion be denied as it relates to plaintiff's excessive force claim.

C.    Failure to Intervene Claim Asserted Against Defendant Rusaw

Plaintiff has also asserted a failure to intervene claim against defendant Rusaw based on that officer's alleged failure to protect plaintiff from defendant Amo's use of force. Dkt. No. 1 at 7. In support of their motion, defendants argue that the encounter between the plaintiff and defendant Amo occurred so rapidly that defendant Rusaw did not have a realistic opportunity to intercede. Dkt. No. 26-10 at 17-18.

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *see also Figueroa v. Mazza*, --- F.3d ----, No. 14-4116, 2016 WL 3126772, at *11 (2d Cir. June 3, 2016). To establish liability on the part of a defendant for violating this duty and failing to protect an inmate from harm at the hands of fellow corrections officers, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer [did] not take reasonable steps to intervene." *Henry v. Dinelle*, No. 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)); *see also Farmer*, 511 U.S. at 842 ("[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.").

A plaintiff asserting a failure to protect claim of the nature now at issue must prove that the defendant actually knew of and disregarded an excessive risk of harm to his health and safety. *Hayes v. N.Y. City Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996). This "reckless disregard" to a plaintiff's health and safety can be proven by evidence establishing "a

pervasive risk of harm to inmates from other[s] . . . and a failure by prison officials to reasonably respond to that risk." *Knowles v. N.Y. City Dep't of Corrs.*, 904 F. Supp. 217, 222 (S.D.N.Y. 1995) (quotation marks omitted).

Defendants' motion is focused upon whether defendant Rusaw had a realistic opportunity to intervene and protect the plaintiff from harm. In this regard, the Second Circuit recently reiterated that the inquiry will turn on several factors, including the duration of the assault, the number of officers present, the relative placement of the officers, the environment in which the officers acted, the nature of the assault, "and a dozen other considerations." *Figueroa*, 2016 WL 3126772, at *13. While the duration of the assault "will always be relevant and will frequently assume great importance," the Second Circuit has rejected attempts by district courts to engraft a "hard-and-fast temporal cutoff" onto the test for determining failure to intervene claims. *Id.*

In this case, the record evidence reflects that defendant Rusaw was present for and witnessed the encounter between defendant Amo and plaintiff. Specifically, plaintiff alleges that defendant Rusaw opened the door to the holding cell for defendant Amo using computer controls, Dkt. No. 1 at 7, and defendant Rusaw acknowledges in his declaration that he witnessed defendant Amo approach plaintiff's cell while he was seated approximately fifteen feet away. Dkt. No. 26-9 at 2-3. In addition, the video

18

recording shows that from the time plaintiff emerged from the shower area, where he was changing his clothes, until the time the defendants exited the holding cell after plaintiff was handcuffed, approximately two minutes elapsed. Dkt. No. 28. In those two minutes, defendant Amo is seen inside plaintiff's cell for approximately one minute, and defendant Rusaw is shown to have arrived at the doorway of the cell only ten seconds behind defendant Amo. *Id.* The recording also shows that defendant Amo continued to use force against plaintiff after defendant Rusaw arrived at the cell. *Id.* While I am mindful that the duration of an assault is always relevant in the context of a failure to intervene claim, as noted above, the Second Circuit has rejected the idea that these claims are dictated by "a hard-and-fast temporal cutoff[.]" *Figueroa*, 2016 WL 3126772, at *13. Instead, courts considering a failure to intervene claim must "keep[] in mind that circumstances other than an assault's duration might bear significantly on an officer's ability to stop it from happening." *Id.*

In this instance, there is evidence suggesting that defendant Rusaw controlled the operation of plaintiff's cell door, was in close proximity to the cell at the time defendant Amo menacingly approached the cell, and was located either in the doorway of or inside the cell during the time that defendant Amo used force against plaintiff. Viewing all of the evidence in the light most favorable to plaintiff, I find that a reasonable factfinder could

conclude that defendant Rusaw had, but failed to avail himself of, a realistic opportunity to intervene and protect plaintiff from defendant Amo's use of force. *See Figueroa*, 2016 WL 3126772, at * 13 (reversing the district court's dismissal of the plaintiff's failure to intervene claim where the district court concluded, as a matter of law, that "'assaults that take place in less than thirty seconds do not offer police sufficient time to intercede in order to prevent the assault'" (alterations omitted)). Accordingly, I recommend that defendants' motion be denied as to the claim asserted by the plaintiff against defendant Rusaw.

IV.    SUMMARY AND RECOMMENDATION

Having reviewed the record evidence, including a video recording of the force used against plaintiff by defendant Amo, I find that plaintiff's excessive force claim, and similarly his claim of failure to intervene, cannot be determined on a motion for summary judgment, in light of the existence of disputed issues of fact that can only be resolved by a factfinder after a trial. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 26) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72;

*Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's

local rules.

Dated:      August 18, 2016
            Syracuse, New York

_____
David E. Peebles
U.S. Magistrate Judge

2016 WL 3126772
United States Court of Appeals,
Second Circuit.

Eli Samuel Figueroa, a/k/a Eli
Samuel, Plaintiff–Appellant,

v.

Donna Marie Mazza, individually and as a Detective
with the New York City Police Department,
Christopher Karolkowski, individually and
as a Detective with the New York City Police
Department, Todd Nagrowski, individually and
as a Detective with the New York City Police
Department, Joseph Failla, individually and
as a Detective with the New York City Police
Department, and Detective Dennis Chan,
individually and as a Detective with the New York
City Police Department, Defendants–Appellees. *

No. 14–4116–cv
|
August Term 2015
|
Argued: October 22, 2015
|
Decided and Amended: June 3, 2016

**Synopsis**

**Background:** Arrestee filed 1983 action against police officers alleging false arrest, excessive force, failure to intervene, unlawful entry, and assault. Following jury verdict for arrestee and mistrial with respect to failure to intervene claims, the United States District Court for the Eastern District of New York, Jack B. Weinstein, J., 59 F.Supp.3d 481, entered judgment as matter of law in officers' favor, and arrestee appealed.

**Holdings:** The Court of Appeals, José A. Cabranes, Circuit Judge, held that:

[1] officers were entitled to qualified immunity from liability on false arrest claim;

[2] officers did not use excessive force in effecting arrest;

[3] question of whether police officers breached their duty to intervene was for jury; and

[4] summary judgment was not warranted on unlawful entry claim.

Affirmed in part and vacated in part.

Kearse, Circuit Judge, concurred in part, dissented in part, and filed opinion.

West Headnotes (26)

[1]  **Federal Courts**
👉 Summary judgment

 **Federal Courts**
👉 Taking case or question from jury; judgment as a matter of law

 **Federal Courts**
👉 Taking case or question from jury; judgment as a matter of law

 **Federal Courts**
👉 Summary judgment

 Court of Appeals reviews de novo district court's grant of summary judgment and its grant of post-verdict judgment as matter of law, construing all facts in nonmoving party's favor. Fed. R. Civ. P. 50(b), 56.

 Cases that cite this headnote

[2]  **Federal Civil Procedure**
👉 Evidence

 In ruling on post-verdict motion for judgment as matter of law, question is not whether nonmovant has managed to collect evidence sufficient to support his cause, but whether he has actually put that evidence before jury charged with deciding dispute; evidence never brought out to enlighten factfinder does not figure in calculus. Fed. R. Civ. P. 50(b).

 Cases that cite this headnote

[3]  **Federal Civil Procedure**

🔑 Scope

**Federal Courts**

🔑 Depositions and discovery

District courts have wide latitude to determine scope of discovery; discovery ruling will warrant relief on appeal only if it constitutes abuse of discretion.

Cases that cite this headnote

**[4]** **Civil Rights**

🔑 Sheriffs, police, and other peace officers

In light of facts known to police at time of suspect's arrest, officers of reasonable competence could have concluded that arrest was justified by probable cause, and thus officers were entitled to qualified immunity from liability on suspect's § 1983 false arrest claim, even though child's mother told officers that she took nude photos of her son to show that boy's father was abusing him, where drug store clerk showed officers photographs that appeared to be proof-of-life photos of kidnapped child to be used to demand ransom and to depict child pornography, officers of reasonable competence could have disbelieved mother's explanation or determined that photos had endangered child's welfare, and officers learned that suspect's phone had been used to place calls to drug store to request that photos be deleted, that suspect was aware of photos, and that suspect had influence over mother. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[5]** **Arrest**

🔑 Grounds for warrantless arrest in general

**Civil Rights**

🔑 Arrest and detention

Existence of probable cause to arrest, even for crime other than the one identified by arresting officer, will defeat claim of false arrest under Fourth Amendment. U.S. Const. Amend. 4.

1 Cases that cite this headnote

**[6]** **Arrest**

🔑 What constitutes such cause in general

Probable cause to arrest exists when arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant person of reasonable caution in belief that person to be arrested has committed or is committing crime. U.S. Const. Amend. 4.

1 Cases that cite this headnote

**[7]** **Arrest**

🔑 What constitutes such cause in general

Probable cause is fluid standard that does not demand hard certainties or mechanistic inquiries, nor does it demand that officer's good-faith belief that suspect has committed or is committing crime be correct or more likely true than false; rather, it requires only facts establishing kind of fair probability on which reasonable and prudent person, as opposed to legal technician, would rely. U.S. Const. Amend. 4.

Cases that cite this headnote

**[8]** **Civil Rights**

🔑 Sheriffs, police, and other peace officers

Defense of qualified immunity shields law enforcement officers from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which reasonable person would have been aware. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[9]** **Civil Rights**

🔑 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Doctrine of qualified immunity aims to give officials room to act with confidence in gray

areas by absolving from personal liability all but plainly incompetent or those who knowingly violate law. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[10]  Civil Rights
      Sheriffs, police, and other peace officers

In context of § 1983 actions predicated on allegations of false arrest, arresting officer is entitled to qualified immunity so long as arguable probable cause was present when arrest was made. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[11]  Civil Rights
      Sheriffs, police, and other peace officers

Arresting officer will find protection under defense of qualified immunity in § 1983 false arrest action unless no reasonably competent officer could have concluded, based on facts known at time of arrest, that probable cause existed. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[12]  Arrest
      What constitutes such cause in general
      Civil Rights
      Sheriffs, police, and other peace officers

Police officer has arguable probable cause to arrest suspect, and thus is entitled to qualified immunity from liability in § 1983 false arrest action, if either (1) it was objectively reasonable for officer to believe that probable cause existed, or (2) officers of reasonable competence could disagree on whether probable cause test was met. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[13]  Civil Rights
      Sheriffs, police, and other peace officers

When plaintiff alleges that law enforcement officer's official conduct renders him personally liable in damages under § 1983, court's inquiry is not whether officer should have acted as he did or whether singular, hypothetical entity exemplifying "reasonable officer" would have acted in same way; instead, it is whether any reasonable officer, out of wide range of reasonable people who enforce laws in this country, could have determined that challenged action was lawful. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[14]  Arrest
      What constitutes such cause in general

Officer making probable-cause determination is not at liberty to ignore evidence tending to exculpate suspect. U.S. Const. Amend. 4.

Cases that cite this headnote

[15]  Arrest
      What constitutes such cause in general

Probable cause does not necessarily disappear simply because innocent explanation may be consistent with facts that officer views as suspicious. U.S. Const. Amend. 4.

Cases that cite this headnote

[16]  Assault and Battery
      Exercise of authority or duty

Lawful arrest is not assault or battery under New York law, provided force used is reasonable.

Cases that cite this headnote

[17]  Arrest
      Use of force

Whether force used to effect arrest is reasonable or excessive turns on careful balancing of nature and quality of intrusion on individual's Fourth Amendment interests against countervailing government interests at stake. U.S. Const. Amend. 4.

Cases that cite this headnote

**[18]** **Arrest**

👉 **Use of force**

In determining whether force used to effect arrest was excessive, court factors that court should consider include need for application of force, relationship between need and amount of force that was used, extent of injury inflicted, and whether force was applied in good faith effort to maintain or restore discipline or maliciously and sadistically for very purpose of causing harm. U.S. Const. Amend. 4.

Cases that cite this headnote

**[19]** **Arrest**

👉 **Use of force**

Police officers did not use excessive force in arresting suspect, where officers did nothing more than grip suspect's shoulders and push him out of his mother's apartment to waiting police car because he lightly resisted by stiffening his legs. U.S. Const. Amend. 4.

Cases that cite this headnote

**[20]** **Civil Rights**

👉 **Use of force in general**

Police officer is under duty to intercede and prevent fellow officers from subjecting citizen to excessive force, and may be held liable for his failure to do so if he observes use of force and has sufficient time to act to prevent it. U.S. Const. Amend. 4.

2 Cases that cite this headnote

**[21]** **Civil Rights**

👉 **Criminal law enforcement;prisons**

Question of whether police officers breached their duty to intervene when another officer assaulted suspect in back of their police cruiser was for jury in suspect's § 1983 action, even though suspect's in-court description of incident indicated that attack lasted well

under 20 seconds and involved only five punches, where suspect never claimed that he was reenacting duration of attack, and separate witness present during event testified that assault went on for at least one minute and as many as two, involved between six and twelve punches, and included not only period of punching but additional period during which unidentified officer screamed obscenities at suspect, grabbed him by neck, choked him, and shook him. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[22]** **Evidence**

👉 **Explanation or Limitation**

Party that admits on witness stand fact damaging to his case is ordinarily free to contradict that fact through testimony of other witnesses and argue that their testimony should be believed over his own.

1 Cases that cite this headnote

**[23]** **Civil Rights**

👉 **Use of force in general**

In failure to intervene action, question whether police officer had realistic chance to intercede will turn on such factors as number of officers present, their relative placement, environment in which they acted, nature of assault, and other considerations.

2 Cases that cite this headnote

**[24]** **Searches and Seizures**

👉 **Expectation of privacy**

Person's ability to assert claim of unlawful entry under Fourth Amendment depends on whether he has legitimate expectation of privacy in invaded place. U.S. Const. Amend. 4.

Cases that cite this headnote

**[25]** **Federal Civil Procedure**

👉 **Sufficiency of showing**

Party may not create issue of fact that will defeat summary judgment by submitting affidavit that contradicts party's prior deposition testimony, but it is permissible to clarify by affidavit ambiguous or incomplete deposition testimony. Fed. R. Civ. P. 56.

Cases that cite this headnote

[26] **Federal Civil Procedure**
👉 Civil rights cases in general

Genuine issues of material fact as to whether suspect had legitimate expectation of privacy in his mother's apartment, and whether mother consented to officers' entry into apartment precluded summary judgment on suspect's unlawful entry claim in his § 1983 action against police officers. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

Cases that cite this headnote

Appeal from the United States District Court for the Eastern District of New York

We consider here whether defendants-appellees are, as the District Court determined, entitled to judgment as a matter of law on plaintiff-appellant's claims for false arrest, excessive force, assault, failure to intervene, and unlawful entry. We conclude that defendants-appellees are entitled to the protection of qualified immunity with respect to the false arrest claims and that they did not use excessive force or commit an assault in arresting plaintiff-appellant. We also conclude, however, that the claims of failure to intervene and unlawful entry present issues of fact that must be resolved by a jury.

Plaintiff-appellant Eli Samuel Figueroa appeals a September 30, 2014 judgment of the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*) entering judgment as a matter of law in favor of defendants-appellees Donna Marie Mazza, Christopher Karolkowski, Todd Nagrowski, Joseph Failla, and Dennis Chan, each a detective with the New York City Police Department.

In the proceeding below, plaintiff asserted claims under 42 U.S.C. § 1983 and state law for false arrest, excessive force, assault, failure to intervene, and unlawful entry, all arising out of his arrest on June 30, 2010. The District Court granted summary judgment as to the claims of unlawful entry. The other claims were tried to a jury. Following a verdict in plaintiff's favor on the counts of false arrest, excessive force, and assault, and a mistrial on the count of failure to intervene, the District Court granted judgment to defendants under Federal Rule of Civil Procedure 50(b). Plaintiff appeals the judgment as to each claim and further asserts that the District Court "abused its discretion" in dismissing unnamed defendants from the case and closing discovery.

We agree with the District Court's disposition of plaintiff's false arrest claims. The trial record establishes that a reasonable law enforcement officer could have concluded that there existed probable cause to arrest plaintiff on the evening of June 30, 2010; accordingly, defendants can claim the protection of qualified immunity. We also conclude, as did the District Court, that the force used in effecting plaintiff's arrest was reasonable as a matter of law, and we find no error in the District Court's dismissal of unnamed defendants or discovery rulings. We thus **AFFIRM** the judgment insofar as it disposed of plaintiff's claims for false arrest, excessive force, and assault, dismissed unnamed defendants, and refused to permit further discovery.

We do not agree, however, with the District Court's disposition of plaintiff's claims for failure to intervene and unlawful entry. The District Court erred in concluding, as a matter of law, that defendants had no realistic opportunity to intervene in an alleged assault on plaintiff by an unidentified police officer and that plaintiff lacked a legitimate expectation of privacy in his mother's apartment. Accordingly, we **VACATE** so much of the judgment as rejected plaintiff's failure-to-intervene and unlawful-entry claims as a matter of law and **REMAND** for such further pretrial proceedings as may be appropriate in the circumstances, or for trial.

**Attorneys and Law Firms**

ROBERT MILTON RAMBADADT (Rosa Barreca, on the brief), The Rambadadt Law Office, New York, NY, for Plaintiff-Appellant.

ELIZABETH S. NATRELLA (Pamela Seider Dolgow, on the brief), for Zachary W. Carter, Corporation Counsel of the City of New York, New York, NY, for Defendants-Appellees.

Before: Kearse, Walker, and Cabranes, Circuit Judges.

**Opinion**

Judge Kearse concurs in part and dissents in part in a separate opinion.

José A. Cabranes, Circuit Judge:

**\*1**  We consider here whether defendants-appellees are, as the District Court determined, entitled to judgment as a matter of law on plaintiff-appellant's claims for false arrest, excessive force, assault, failure to intervene, and unlawful entry. We conclude that defendants-appellees are entitled to the protection of qualified immunity with respect to the false arrest claims and that they did not use excessive force or commit an assault in arresting plaintiff-appellant. We also conclude, however, that the claims of failure to intervene and unlawful entry present issues of fact that must be resolved by a jury.

Plaintiff-appellant Eli Samuel Figueroa ("Samuel") appeals a September 30, 2014 judgment of the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*) entering judgment as a matter of law in favor of defendants-appellees Donna Marie Mazza ("Mazza"), Christopher Karolkowski ("Karolkowski"), Todd Nagrowski ("Nagrowski"), Joseph Failla ("Failla"), and Dennis Chan ("Chan") (jointly, "defendants"), each a detective with the New York City Police Department.

In the proceeding below, Samuel asserted claims under 42 U.S.C. § 1983 and state law for false arrest, excessive force, assault, failure to intervene, and unlawful entry, all arising out of his arrest on June 30, 2010. The District Court granted summary judgment as to the claims of unlawful entry. The other claims were tried to a jury. Following a verdict in Samuel's favor on the counts of false arrest, excessive force, and assault, and a mistrial on the count of failure to intervene, the District Court granted judgment to defendants under Federal Rule of Civil Procedure 50(b). Samuel appeals the judgment as to each claim and further asserts that the District Court "abused its discretion" in dismissing unnamed defendants from the case and closing discovery.

We agree with the District Court's disposition of Samuel's false arrest claims. The trial record establishes that a reasonable law enforcement officer could have concluded that there existed probable cause to arrest Samuel on the evening of June 30, 2010; accordingly, defendants can claim the protection of qualified immunity. We also conclude, as did the District Court, that the force used in effecting Samuel's arrest was reasonable as a matter of law, and we find no error in the District Court's dismissal of unnamed defendants or discovery rulings. We thus **AFFIRM** the judgment insofar as it disposed of Samuel's claims for false arrest, excessive force, and assault, dismissed unnamed defendants, and refused to permit further discovery.

We do not agree, however, with the District Court's disposition of Samuel's claims for failure to intervene and unlawful entry. The District Court erred in concluding, as a matter of law, that defendants had no realistic opportunity to intervene in an alleged assault on Samuel by an unidentified police officer and that Samuel lacked a legitimate expectation of privacy in his mother's apartment. Accordingly, we **VACATE** so much of the judgment as granted judgment to defendants on Samuel's failure-to-intervene and unlawful-entry claims and **REMAND** for such further pretrial proceedings as may be appropriate in the circumstances, or for trial.

## BACKGROUND

### I. The Facts [1]

**\*2**  On June 29, 2010, a Duane Reade pharmacy in Brooklyn received eleven phone calls from an unidentified woman. App. 222, 679-81; SPA 8. [2] The calls, which were fielded by an employee named Esteban Arias, concerned an order for photographs that had been placed at the pharmacy. App. 222, 230-33. The caller "plead[ed]" that Arias locate the order in Duane Reade's system and delete it without developing the photos. App. 222.

Arias tracked down the photos, which apparently had already been developed. He intended to throw them away, as the caller had directed, but hesitated when he discerned their subject matter. App. 232. The photos appeared to have been taken in a public restroom. They depicted a young boy, perhaps two years old, naked and apparently distressed. Some showed close-up images of the boy's genitals and anus. App. 124-30, 222, 1040-57. In each, a date-stamped money order and a copy of the June 25, 2010

*New York Daily News* appeared in the background. App. 124-25, 222.

Arias called the police. Officers responded and viewed the photos themselves. Some, noting the presence of the date-stamped money order and newspaper, suspected that they were so-called "proof-of-life" photos—that is, photos taken to establish that a missing child is still alive, with the aim of securing a ransom. App. 510. Others thought that the photos might be related to sex trafficking, App. 261, or child pornography, App. 222. Concluding that "urgent[ ]" action was needed to locate the child and ensure his safety, App. 260-61, 275, a number of officers (including the five named defendants) from numerous divisions began investigating. By the next day police had viewed security footage from the pharmacy showing that a young woman had ordered the photos on June 26, 2010. [3] App. 244-45.

In the meantime, other officers tried to determine who owned the phone that had been used to call the pharmacy. They learned that on June 28, 2010, a complaint had been lodged with the department under the same phone number. App. 271, 303, 620. The complainant had identified himself as "Eli Samuel."

Samuel had filed the complaint on behalf of a woman named Shirley Saenz ("Saenz") on the ground that Saenz had recently reported to the police suspected child abuse, but her claim had not been taken seriously. App. 595-96. More particularly, Saenz had told police that she thought her son's father was abusing the boy during weekend visits. App. 105, 111-12. Suspecting abuse, she had documented her son's pre-visitation physical condition by taking photos of him while he was unclothed. [4] App. 104. But the police had been of little help, prompting Samuel—a rabbi and spiritual advisor who was providing financial aid and guidance to Saenz, App. 102-03, 536-40—to complain. Samuel's complaint also accused Saenz's mother, Beatrice Saenz ("Beatrice"), of harassment. [5] App. 304, 596.

**\*3** Although this information might have suggested that the Duane Reade photos had not been taken for a nefarious purpose, police continued to investigate the case as a potential kidnapping. App. 416. Detective Nagrowski used the information in Samuel's complaint to locate Beatrice. [6] Along with six members of the Brooklyn South Homicide Task Force (the "Task Force"), he interviewed her at her residence around 8:00 p.m. on June 30, 2010.

App. 270-71, 311. Beatrice told Nagrowski that Saenz was her daughter and, having been shown the photos from Duane Reade, that the child was her grandson. App. 272-74. She went on to say that she had recently kicked Saenz out of her home and that Saenz had joined a cult led by someone named "Eli Samuel." App. 274. According to Beatrice, she had noticed one day that her daughter had sustained a number of bruises. Confronted about her injuries, Saenz had said that Samuel had inflicted them while exorcising demons from her. *Id.* Beatrice also informed Nagrowski that she and Saenz were engaged in a legal battle for visitation rights concerning her grandson, App. 307, and that Saenz was currently living with a friend named Isabel Romero, App. 311-12.

Nagrowski and the other officers proceeded to Romero's apartment. There they found Romero, who told them that Saenz and her child had been in the apartment that morning; at the time, however, she did not know where they were. App. 280, 999.

While Nagrowski and the members of the Task Force were interviewing Beatrice and Romero, other officers were trying to locate Samuel. They tracked the location of his phone to an apartment in Manhattan (which turned out to be Samuel's mother's). App. 417, 619. Officers headed to the apartment around 10:00 p.m. At the same time —having not yet discounted the possibility that Saenz's child had been kidnapped—a hostage negotiator called Samuel's phone. App. 416-18, 620-22.

Samuel answered, and the negotiator asked him about the complaint he had filed with the department. Samuel stated, as he had in the complaint, that Saenz's child was being abused and the police were failing to appropriately respond. App. 621. The negotiator told Samuel that Saenz and her child had been kidnapped and asked him to come to the 72nd Precinct; Samuel responded that they had not been kidnapped and that he would not come to the precinct willingly. He then hung up. App. 621-24.

A short time later, officers knocked on the door of Samuel's mother's apartment. According to Samuel, his mother opened the door a foot or two; Samuel, seeing Detectives Karolkowski and Failla, stepped in front of her and tried to shut it, but Karolkowski forced it open. App. 627-28. According to defendants, Samuel invited them in. App. 428.

Karolkowski and Failla, along with Detective Mazza, entered the apartment, and Karolkowski and Failla approached Samuel. App. 629. Karolkowski "gripped" Samuel's shoulder. *Id.* Without placing him in handcuffs, officers led Samuel out of the apartment and down a flight of stairs to the street. App. 636. Samuel did not fight back, but by his own admission he "resist[ed]," App. 640, by stiffening his legs as the officers "pushed" him along, App. 633. This use of light force caused Samuel no injury. App. 726.

Once outside, the officers placed Samuel in the backseat of an unmarked police car. Failla and Detective Chan were sitting in front. App. 640-41. According to Samuel's trial testimony, an unidentified officer suddenly opened the cruiser's back door, grabbed Samuel, and punched him a number of times. App. 643-44. Samuel reenacted this event during trial. Based on his demonstration, Judge Weinstein stated on the record that the assault lasted between ten and twenty seconds, nearer to ten than twenty. App. 931. But another witness testified that the assault lasted at least one minute and as many as two. App. 562. Neither Failla nor Chan, sitting in front, tried to intercede. App. 643-44.

Shortly after Samuel's arrest, police located the child in the Duane Reade photos. He had not been kidnapped or, indeed, harmed at all; he had been with his mother. The two were found safe late at night on June 30, 2010. App. 505-06. The lone charge against Samuel—endangering the welfare of a child, in violation of N.Y. Penal Law § 260.10—was eventually dropped. *Figueroa v. Mazza*, 59 F.Supp.3d 481, 485 (E.D.N.Y. 2014); Pl.'s Br. 19.

## II. The District Court Proceeding

 **\*4**  Samuel filed suit against the City of New York and a number of individual officers, bringing claims under 42 U.S.C. § 1983 and New York law for Fourth Amendment and state-law violations.[7] As relevant here, he sought relief on four theories: that (1) Mazza, Nagrowski, Karolkowski, Failla, and Chan arrested him without probable cause; (2) Karolkowski and Failla used excessive force (and committed an assault under state law) while arresting him; (3) Failla and Chan failed to intervene when an unidentified officer assaulted him following his arrest; and (4) Mazza, Karolkowski, Failla, and Chan unlawfully entered his mother's apartment without a warrant. *See*

*Figueroa*, 59 F.Supp.3d at 485; Third Am. Compl. at 22-25, Figueroa v. Mazza, No. 11 Civ. 3160 (JBW) (E.D.N.Y. Apr. 25, 2014), ECF No. 107.

Defendants moved for summary judgment. *See* Mem. Supp. Mot. Summ. J., *Figueroa v. Mazza*, No. 11 Civ. 3160 (JBW) (E.D.N.Y. July 31, 2014), ECF No. 146. The District Court granted their motions as to the § 1983 unlawful-entry claims on the ground that Samuel did not reside in his mother's apartment and consequently lacked a reasonable expectation of privacy in the property. Tr. Oral Ruling at 9, Figueroa v. Mazza, No. 11 Civ. 3160 (JBW) (E.D.N.Y. Aug. 21, 2014), ECF No. 220. The remaining claims were tried to a jury, which returned verdicts against all defendants on the § 1983 false arrest claims and against Karolkowski and Failla on the § 1983 excessive force and state-law assault claims. *Figueroa*, 59 F.Supp.3d at 487. The jury failed to reach a verdict on the § 1983 failure-to-intervene claims against Failla and Chan, and a mistrial was declared with respect to those claims only. *Id.*

Following the verdict, defendants moved for relief under Federal Rule of Civil Procedure 50(b). Concluding that the evidence submitted to the jury was insufficient to support a verdict as to any of the claims, including the failure-to-intervene claims on which the jury could not reach a verdict, the District Court granted defendants' motions and entered judgment in their favor.

### III. Samuel's Appeal

Samuel timely appealed the District Court's September 30, 2014 judgment. He contends that the District Court erred in entering judgment as a matter of law in favor of defendants on his claims for (1) false arrest, (2) excessive force and assault, (3) failure to intervene, and (4) unlawful entry. He also challenges a May 1, 2014 order of the District Court denying his request for further discovery.

We find no error in the District Court's decision to deny Samuel further discovery, and we agree with the District Court that defendants were entitled to judgment as a matter of law on Samuel's false arrest, excessive force, and assault claims. We conclude, however, that the District Court erred in (1) granting summary judgment in defendants' favor on Samuel's unlawful-entry claims, and (2) granting Rule 50(b) relief in defendants' favor

on Samuel's failure-to-intervene claims. As to these claims, we vacate the judgment and remand for further proceedings.

## DISCUSSION

**\*5** **[1]** **[2]** We review *de novo* both the District Court's grant of summary judgment and its grant of relief under Rule 50(b), "construing all facts in favor of the nonmoving party." *Runner v. N.Y. Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009). Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of influencing the case's outcome under governing substantive law, and a "genuine" dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The standard for post-verdict judgment as a matter of law is the same as for summary judgment under Fed. R. Civ. P. 56." [8] *Runner*, 568 F.3d at 386 (internal quotation marks omitted); *see* Fed. R. Civ. P. 50(a)–(b).

**[3]** The District Court's discovery order is reviewed with a lighter touch. District courts have "wide latitude to determine the scope of discovery"; a discovery ruling will warrant relief on appeal only if it constitutes an "abuse of discretion." *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008).

### I. False Arrest

**\*6** **[4]** The District Court granted Rule 50(b) relief on Samuel's false arrest claims on the ground that defendants had probable cause to arrest him. We need not determine whether probable cause was indeed present. *See Sudler v. City of New York*, 689 F.3d 159, 168 (2d Cir. 2012) ("We may affirm on any ground supported by the record."). Even if it was not, defendants are entitled to judgment as a matter of law on the basis of qualified immunity because, in light of the facts known to police at the time of Samuel's arrest, an officer "of reasonable competence" could have concluded that the arrest was justified by probable cause. *See Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

**[5]** **[6]** **[7]** The existence of probable cause to arrest —even for a crime other than the one identified by the arresting officer—will defeat a claim of false arrest under the Fourth Amendment. *Devenpeck v. Alford*, 543 U.S. 146, 152–54, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). "Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted). Probable cause is a "fluid" standard that "does not demand hard certainties or mechanistic inquiries"; nor does it "demand that an officer's good-faith belief that a suspect has committed or is committing a crime be correct or more likely true than false." *Zalaski v. City of Hartford*, 723 F.3d 382, 389, 390 (2d Cir. 2013) (citations and internal quotation marks omitted). Rather, it requires only facts establishing "the kind of fair probability" on which a "reasonable and prudent" person, as opposed to a "legal technician[ ]," would rely. *Florida v. Harris*, —— U.S. ——, 133 S.Ct. 1050, 1055, 185 L.Ed.2d 61 (2013) (internal quotation marks omitted).

**[8]** **[9]** Even if we determine that an officer made an arrest without probable cause, our inquiry concerning that officer's individual liability is not at an end. The defense of qualified immunity "shields law enforcement officers from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware." *Zalaski*, 723 F.3d at 388. The doctrine aims to give officials room to act with confidence in gray areas by absolving from personal liability "all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, —— U.S. ——, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting *Malley*, 475 U.S. at 341, 106 S.Ct. 1092).

**[10]** **[11]** **[12]** In the context of § 1983 actions predicated on allegations of false arrest, we have held that an arresting officer is entitled to qualified immunity so long as "arguable probable cause" was present when the arrest was made. *Zalaski*, 723 F.3d at 390 (internal quotation marks omitted). A police officer has arguable probable cause "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or

(b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (internal quotation marks omitted). Put another way, an arresting officer will find protection under the defense of qualified immunity unless "no reasonably competent officer" could have concluded, based on the facts known at the time of arrest, that probable cause existed. *See Malley*, 475 U.S. at 341, 106 S.Ct. 1092.

**[13]** This point merits emphasis. When a plaintiff alleges that a law enforcement officer's official conduct renders him personally liable in damages, our inquiry is not whether the officer *should have* acted as he did. Nor is it whether a singular, hypothetical entity exemplifying the "reasonable officer"—a creature akin to the "reasonable man" of the law of torts, *see* Restatement (Second) of Torts § 283 cmt. c (Am. Law Inst. 1975)—*would have* acted in the same way. It is instead whether *any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that the challenged action was lawful. *See Malley*, 475 U.S. at 341, 106 S.Ct. 1092; *compare Walczyk v. Rio*, 496 F.3d 139, 154 n. 16 (2d Cir. 2007), *with id.* at 169–70 (Sotomayor, J., concurring).

**\*7** Applying this standard, we hold that defendants are entitled to qualified immunity on Samuel's claims of false arrest. We address, first, why it was reasonable for the arresting officers to have concluded that a crime had been committed; and, second, why it was reasonable for them to have concluded that Samuel committed it.

## A. Defendants' Belief that a Crime Had Been Committed

Samuel does not appear to contest—and at all events, we have no trouble concluding—that, early in their investigation, defendants developed evidence sufficient to warrant a reasonable officer in the belief that the child in the Duane Reade photos had been the victim of a crime. Karolkowski testified that he had believed the pictures to be proof-of-life photos—that is, photos taken to establish that a kidnapped person is still alive and can be saved through payment of a ransom. *See* App. 510. Absent some competing explanation for the presence of the newspaper and date-stamped money order—and taking into account the photos' disturbing content—the officers had probable cause to believe that the boy had been kidnapped. We do not understand Samuel to argue otherwise.

Other officers, in the early going, formed the conclusion that the Duane Reade photos were examples of child pornography. *See* App. 222-23. That view was also justified. Though Samuel does not appear to argue to the contrary, we pause to explain why.

Under New York law in effect at the time of the arrest, a person would commit the offense of "promoting a sexual performance by a child" if, "knowing the character and content thereof, he produces, directs or promotes any performance which includes sexual conduct by a child less than seventeen years of age," N.Y. Penal Law § 263.15 (McKinney 2001); a person would commit the offense of "possessing a sexual performance by a child" if, "knowing the character and content thereof, he knowingly has in his possession or control any performance which includes sexual conduct by a child less than sixteen years of age," *id.* § 263.16 (McKinney 1996). As used in each statute, the term "performance" includes photographs, *id.* § 263.00(4) (McKinney 2003), and the term "sexual conduct" includes "lewd exhibition of the genitals," *id.* § 263.00(3). The statute does not define "lewd exhibition of the genitals," but the New York courts have used a six-factor test to determine whether a given exhibition qualifies as "lewd":

> (1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
>
> (2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or a pose generally associated with sexual activity;
>
> (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
>
> (4) whether the child is fully or partially clothed, or nude;
>
> (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; [and]
>
> (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*People v. Horner*, 300 A.D.2d 841, 752 N.Y.S.2d 147, 149–50 (3d Dep't 2002) (quoting *United States v. Dost*, 636 F.Supp. 828, 832 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987)). Not all of the elements described in the foregoing factors need be present for a depiction to qualify. *Id.* at 150. A court must consider "the combined effect of the setting, attire, pose

and emphasis on the genitals and whether it is designed to elicit a sexual response in the viewer, albeit perhaps not the average viewer, but perhaps in the pedophile viewer." *Id.* (internal quotation marks omitted).

**\*8** Applying this standard to the Duane Reade photos, we conclude that the officers who viewed them at the outset of the investigation had probable cause to believe that they constituted child pornography (or, in the language of the New York statute, a "sexual performance by a child"). In a number of the photos, the child's genitals are the primary object of focus; indeed, some photos show nothing else save the child's lower torso and upper thighs. *See, e.g.,* App. 1039, 1047; *cf. United States v. Rivera,* 546 F.3d 245, 249–50 (2d Cir. 2008) (applying the *Dost* factors and observing that the photographic subject was depicted with "his genitals prominent at or about the center of the frame"). In some, the child appears to be unnaturally posed and the shot taken to capture only his genitalia, perineum, and anus. *See* App. 1048-50; *cf. People v. Bimonte,* 187 Misc.2d 677, 726 N.Y.S.2d 830, 836 (N.Y. Crim. Ct. 2001). In each photo, the child is nude. The suggestion *vel non* of sexual "coyness" is, of course, inapplicable in the case of a subject so young, *see Wiegand,* 812 F.2d at 1244 ("The district court noted the unlikelihood of the 10-year-old girl intending any sexual invitation by her pose."), and though officers had no direct way to divine whether the photographer intended the photos to elicit a sexual response in the viewer, the photos' content permitted an inference of such intent.

Thus, when officers first viewed the Duane Reade photos, they were justified in concluding that the photos qualified as unlawful child pornography and that a violation of § 263.15, § 263.16, or both had been committed. Moreover, the determination that an unknown person had produced child pornography would easily have supported a reasonable conclusion that that person had committed a separate offense, that of endangering the welfare of a child, by "knowingly act [ing] in a manner likely to be injurious to the physical, mental or welfare of" the boy in the photographs. N.Y. Penal Law § 260.10(1); *see People v. Pinkoski,* 300 A.D.2d 834, 752 N.Y.S.2d 421, 425 (3d Dep't 2002).

Samuel's principal argument is that, irrespective of what defendants might reasonably have thought at the beginning of their investigation, they had, by the time of his arrest, uncovered new information that vitiated probable cause. More particularly, Samuel argues that when the officers learned from Isabel Romero that Saenz and her child had been together at Romero's apartment on the morning of June 30, it fatally undermined the hypothesis that the child had been kidnapped (and proof-of-life photos taken) days earlier. He also argues that, when officers came to realize that Saenz had taken similar photos in the past for the avowed purpose of demonstrating that the child's father was abusing him, it should have negated any reasonable belief that the images were pornographic. *See* Pl.'s Br. 26-27.

**[14]** Samuel is correct in noting that an officer making a probable-cause determination is not at liberty to ignore evidence tending to exculpate the suspect, *see Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir. 2006), and that the officers were accordingly not entitled to disregard the information from Romero or their knowledge of Saenz's earlier photos. But we nevertheless conclude that, even after learning that Saenz had recently told police that she took nude photos of her son to show that the boy's father was abusing him, officers of reasonable competence could have (1) disbelieved Saenz's explanation and concluded that there was probable cause to think that the photos constituted child pornography, or (2) accepted Saenz's explanation but nevertheless concluded that those responsible for the photos had endangered the welfare of a child. [9]

We turn first to whether the officers who arrested Samuel could reasonably have doubted the truth of Saenz's description of the photos' purpose. Her explanation plainly bears to some degree on the reasonableness of the conclusion that the photos were pornographic in nature. The question is whether that explanation so thoroughly and reliably accounted for the officers' earlier suspicions that it negated any reasonable belief that probable cause existed.

**\*9** **[15]** We conclude that it did not. Probable cause does not necessarily disappear simply because "an innocent explanation may be consistent with" facts that an officer views as suspicious. [10] *Panetta,* 460 F.3d at 395. The officers were not required to accept Saenz's account on faith. Rather, they were entitled to weigh her explanation (along with its context: that Saenz included it in a report to police doubtless lent it some credibility) against the facts on the other side of the ledger.

Those facts were unsettling. As discussed above, the photos, considered by themselves, appeared to be examples of child pornography. A person had called Duane Reade—eleven times—"pleading" that the photographic order be deleted and the photos not developed. SPA 8. From this, a police officer could have inferred that the caller was desperate to ensure that nobody viewed the photos—an inference consistent with the hypothesis that they were contraband.

Of course, such agitation might also have resulted from Saenz's fear that the explicit photos of her son would not remain private, and to that extent her calls to the pharmacy arguably comported with her explanation of the photos' purpose. But other facts known to the officers did not. An officer might have questioned, for instance, why a person legitimately concerned with the child's welfare would have forced him to submit to a series of elaborately staged nude photos when the child was obviously in some distress. *See* App. 1036-57. So too might an officer have asked why a person looking after the child's interests would have stripped him naked in the restroom of a McDonald's, of all places, to participate in the photo session. *See* App. 264-65. Indeed, an officer might well have hesitated to believe that a concerned mother would have delivered such explicit photos of her child to be developed at a pharmacy, where they were likely to be viewed by third parties during processing. All in all, the photos of the child were so disturbing, and the circumstances so bizarre, that it cannot be said that *no* reasonable officer could have rejected Saenz's explanation notwithstanding its arguable consistency with the known facts.

Furthermore, even if defendants had been constrained to accept Saenz's account of the photos' purpose —and thus could not have concluded that they constituted child pornography[11]—a reasonable officer could nonetheless have determined that those responsible for the photos had endangered the child's welfare in violation of § 260.10(1). Viewed without knowledge of the circumstances surrounding their creation, the photos appear to be examples of child pornography. Even if Saenz's subjective intent in creating the photos took them outside the ambit of New York's child pornography statutes (and any and all reasonable officers would have to so conclude), the fact remains that Saenz not only produced, but took to a pharmacy for development,

photos of her child that were by all appearances pornographic.

**\*10** An officer could have concluded that in so doing, Saenz (along with anyone who had aided her) created a serious risk to the child's welfare in violation of § 260.10(1)—even if she did not intend to do so, *see People v. Fernandez*, 126 A.D.3d 639, 5 N.Y.S.3d 436, 436 (1st Dep't 2015) (specific intent to cause injury is not an element of endangering the welfare of a child); *People v. Vega*, 185 Misc.2d 73, 712 N.Y.S.2d 283, 286 n. 3 (N.Y. Crim. Ct. 2000) (same), and even if the risk did not materialize into actual harm, *People v. Simmons*, 92 N.Y.2d 829, 677 N.Y.S.2d 58, 699 N.E.2d 417, 418 (1998) ("Actual harm to the child need not result for liability under [§ 260.10(1) ] to attach ...."). It should have been clear to Saenz that Duane Reade employees would likely see the photos in the normal course of developing them and that, in taking the photos to the pharmacy, she was sharing with perfect strangers a series of images of her son that bore the objective indicia of child pornography. We cannot say that *no* reasonable officer could have concluded that these facts, viewed in the light of governing law, provided probable cause to believe that Saenz had "knowingly act[ed] in a manner likely to be injurious to the physical, mental or moral welfare of" her son. *See* N.Y. Penal Law § 260.10(1); *Pinkoski*, 752 N.Y.S.2d at 422, 425 (reversing trial court's dismissal of indictment and reinstating count of endangering the welfare of a child where the defendant took explicit photographs of her five-year-old daughter and brought them to be developed at a Wal-Mart); *cf. Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 249, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002) (observing that the circulation of images that constitute child pornography causes continuing harm to the children portrayed).

In sum, we conclude that prior to arresting Samuel, defendants could reasonably have concluded that they possessed probable cause to believe that a crime had been committed.

### B. Defendants' Belief That Samuel Committed the Crime
Samuel argues that, even if defendants could reasonably have concluded that Saenz's child had been the victim of a crime, they had no basis on which to conclude that Samuel had committed it. We disagree.

At the time of Samuel's arrest, officers possessed several independent items of evidence linking him to the Duane

Reade photos and the suspected crime (or crimes). First, on the morning of June 29, 2010, someone used Samuel's phone to call Duane Reade—eleven times—to request that the photos of Saenz's son be deleted. App. 222, 679-81. It is true, as the District Court noted, that defendants did not know that Samuel was present when these calls were made (although he was). *Figueroa*, 59 F.Supp.3d at 490. But "for the purpose of qualified immunity and probable cause," we do not deny officers the benefit of "reasonable inferences [drawn] from the facts they possess at the time of a seizure." *Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001). Defendants, knowing that someone had used Samuel's phone to place a number of calls to the pharmacy, could reasonably have concluded that Samuel was in some way connected with the photos and probably had knowledge of the order the caller was attempting to cancel.

The particulars of Samuel's complaint to the police on June 28, 2010—particulars which, as he emphasizes, were known to the officers, Pl.'s Br. 14, 24-25—fortified this conclusion. Samuel had lodged the complaint on behalf of Saenz, the mother of the child in the Duane Reade photos. App. 272-74, 596. Samuel had referred to the police report made by Saenz in which she had disclosed to officers her practice of photographing her son nude; he had also revealed his awareness that explicit photographs of the boy had been taken in the recent past. App. 596-597. This information strengthened the link between Samuel and the photos.

Finally, during an interview with Detective Nagrowski, Saenz's mother Beatrice confirmed the connections between Samuel, Saenz, and the child. Beatrice told Nagrowski that Saenz was the mother of the boy in the photos and that Samuel not only knew Saenz, but was a strong source of malign influence in her life. She claimed that Saenz had become a member of his cult, and Samuel had physically harmed her during the course of an exorcism. App. 272-74. To be sure, defendants were not at liberty to accept these assertions uncritically. Beatrice was, by her own admission, involved in a custody fight with her daughter, App. 307, and Nagrowski was aware that Samuel had filed a complaint with police concerning Beatrice, App. 998. Accordingly, Beatrice had reason to speak ill of Saenz and Samuel, and a reasonable officer might have recognized that this bore on her credibility. But, at a minimum, Nagrowski's interview with Beatrice provided further confirmation that Samuel was closely linked with Saenz and with the child in the Duane Reade photos.

**\*11** We need not decide whether this information, taken as a whole, provided probable cause to conclude that Samuel had committed the crimes discussed above by participating in the creation of the photos or the attempt to have them developed. We decide only that, at the time of his arrest, reasonable police officers could have disagreed on the point. In view of Samuel's close association with Saenz, his knowledge of the explicit photos, and the repeated use of his phone in the attempt to cancel the order at Duane Reade, we cannot say that the officers who participated in his arrest were either "plainly incompetent" or "knowingly violat[ing] the law." *Mullenix*, 136 S.Ct. at 308 (quoting *Malley*, 475 U.S. at 341, 106 S.Ct. 1092). Those officers are therefore entitled to the protection of qualified immunity.

## II. Excessive Force and Assault

[16] The District Court granted Rule 50(b) relief in favor of Karolkowski and Failla on Samuel's excessive force and state-law assault claims, [12] concluding that the force applied by the officers was reasonable as a matter of law. [13] Samuel argues that the Court erred in so concluding. We disagree.

[17] [18] Whether the force used to effect an arrest is "reasonable" or "excessive" turns on "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotation marks omitted). In conducting this balancing, we look to a number of factors, including "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251–52 (2d Cir. 2001) (internal quotation marks omitted).

[19] Here, defendants did nothing more than "grip[ ]" Samuel's shoulders, App. 629, and "push[ ]" him out of his mother's apartment to the waiting police car, App.

633. The officers had need to push Samuel along because he lightly resisted by stiffening his legs, App. 639-40, and their pushing caused him no injury, App. 726. There is no suggestion in the record that this application of light force was actuated by malice or a desire to cause harm. Accordingly, every factor enumerated in *Johnson* weighs against Samuel, who complains basically of the kind of *de minimis* physical contact common to virtually every custodial arrest. *See Graham*, 490 U.S. at 396, 109 S.Ct. 1865 ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). The District Court did not err in overriding the jury's verdict and entering judgment for defendants on these claims.

### III. Failure to Intervene

On Samuel's failure-to-intervene claim, on which the jury failed to reach a verdict, the District Court entered judgment for Failla and Chan. Samuel argues that this was error, and we agree.

[20] A police officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it. *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988). Liability attaches on the theory that the officer, by failing to intervene, becomes a "tacit collaborator" in the illegality. *See id.*

*12 The District Court concluded that, as a matter of law, defendants did not have sufficient time to intercede when an unidentified officer allegedly assaulted Samuel in the back of the police cruiser. In support, it pointed to Samuel's testimony describing the attack. On the stand, Samuel made hand gestures while stating, "boom boom boom boom boom." App. 644. The Court timed this description at roughly ten seconds (perhaps a bit longer, but at all events "well under" twenty seconds). App. 931. When an assault "take[s] place in 'less than thirty seconds,' " wrote the Court, officers who are present lack "sufficient time to intercede in order to prevent the assault." *Figueroa*, 59 F.Supp.3d at 490 (quoting *Sash v. United States*, 674 F.Supp.2d 531, 545 (S.D.N.Y. 2009)).

[21] For three reasons, we conclude that this was error. First, Samuel never claimed that he was reenacting the duration of the attack. He was asked to describe what happened after the officers placed him in a police car. App. 642. In construing the evidence in the light most favorable to Samuel, the District Court should not have interpreted his hand gestures as a formal demonstration or reenactment of the total time frame of the punches.

[22] Second, although Samuel's gestures at trial apparently lasted less than twenty seconds, a separate witness present during the event testified that the assault went on for at least one minute and as many as two. *See* App. 562. Defendants do not argue that Samuel's demonstration qualifies as a judicial admission that conclusively establishes the duration of the alleged assault. *See Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) (defining judicial admissions as "formal concessions in the pleadings in the case or stipulations by a party or counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact" (quoting 2 McCormick on Evidence § 254 (6th ed. 2006))). Nor is there any basis for treating it as such. A party who admits on the witness stand a fact damaging to his case is ordinarily free to contradict that fact through the testimony of other witnesses and argue that their testimony should be believed over his own. Such an argument might cut no ice with the finder of fact, but the matter lies squarely in the jury's province. *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 528 (6th Cir. 2014) (holding that a plaintiff's testimony did not qualify as a judicial admission and observing that a party "should be able to testify honestly to his memory of what happened and still have his lawyer argue that on the evidence as a whole it is more probable than not that the memory was faulty"); *Keller v. United States*, 58 F.3d 1194, 1198 n. 8 (7th Cir. 1995) ("When a party testifying at trial or during a deposition admits a fact which is adverse to his claim or defense, it is generally preferable to treat that testimony as solely an evidentiary admission [rather than a conclusive judicial admission]."); *cf. Keepers, Inc. v. City of Milford*, 807 F.3d 24, 34–35 (2d Cir. 2015) (stating that deposition testimony given pursuant to Federal Rule of Civil Procedure 30(b)(6) does not "bind a corporate party irrevocably to whatever its designee happens to recollect during her testimony"). Here, in holding Samuel to his own testimony, construing that testimony unfavorably, and disregarding more favorable evidence given by a different witness, the District Court strayed into the realm of improper fact-finding.

The District Court again strayed into that realm when stating that the assault consisted of only five punches. *See Figueroa*, 59 F.Supp.3d at 487. Samuel presented eyewitness testimony at trial that the assault involved between six and twelve punches, App. 555, and that it included not only the period of punching but an additional period during which the unidentified officer screamed obscenities at him, grabbed him by the neck, choked him, and shook him, App. 647. To consider the evidence in the light most favorable to Samuel, the District Court should have analyzed the attack as a one-to-two-minute incident, consisting of as many as twelve punches following a period of choking and shaking.

**\*13** These conclusions require us to vacate so much of the judgment as dismissed Samuel's failure-to-intervene claims and remand to the District Court. [14] We pause, however, to address a third error in the District Court's analysis, on the theory that it may prove instructive should Samuel's claims be retried.

**[23]** Having found that the alleged assault on Samuel lasted less than twenty seconds, the District Court granted judgment for Failla and Chan because "[a]ssaults that take place in 'less than thirty seconds' do not offer police officers sufficient time to intercede in order to prevent the assault." *Figueroa*, 59 F.Supp.3d at 490 (quoting *Sash*, 674 F.Supp.2d at 545). We think this bright-line rule unsupportable. Failure-to-intervene claims can arise out of a limitless variety of factual circumstances. In each case, the question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations. Among these considerations, of course, the assault's duration will always be relevant and will frequently assume great importance. *See, e.g.*, *O'Neill*, 839 F.2d at 11–12 (holding that the defendant officer lacked time to intervene because a different officer hit the plaintiff three times in "rapid succession"). But this does not permit distillation of a hard-and-fast temporal cutoff of the kind relied on by the District Court. Instead, courts must evaluate each case on its own facts, keeping in mind that circumstances other than an assault's duration might bear significantly on an officer's ability to stop it from happening. The essential inquiry is whether, under the circumstances actually presented, an officer's failure to intervene permits a reasonable conclusion that he became

a "tacit collaborator" in the unlawful conduct of another. *See id.*

Turning to the facts before us, we conclude that Samuel's failure-to-intervene claims—even assuming that the assault lasted less than twenty seconds—were for the jury to decide. Taking into account all the circumstances and viewing them favorably to Samuel, as required in reviewing a trial court's decision to override the role assigned to the jury, we cannot hold that the assault occurred so quickly that the defendant officers lacked time to intercede as a matter of law. Samuel testified that, at the time he was assaulted, he was sitting in the back of a police cruiser and Failla and Chan were sitting in front. App. 643-44. Nothing in the record suggests that they would have for any reason found it difficult to reach into the backseat, exit the vehicle to assist Samuel, or communicate with the officer who committed the assault. Yet—according to Samuel's testimony—both officers sat passively through the entire event. App. 643-44, 931. In light of the officers' placement relative to Samuel, the apparent absence of any obstacles that might have hindered their ability to intercede, and the assault's stated duration, a reasonable juror could infer that defendants became, by their inaction, "tacit collaborator[s]" in the unlawful conduct alleged.

**\*14** In sum, in entering judgment for defendants on Samuel's failure-to-intervene claims, the District Court erred by engaging in improper fact-finding and by misapplying the relevant legal standard. As to those claims, the judgment will be vacated and the cause remanded.

### IV. Unlawful Entry into Samuel's Mother's Apartment

On Samuel's claim of unlawful entry, the District Court granted judgment for defendants on the ground that Samuel lacked a legitimate expectation of privacy in his mother's apartment. We hold that this was error.

**[24]** A person's ability to assert a claim of unlawful entry under the Fourth Amendment depends on whether he "has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Though a person might subjectively expect privacy in a particular location, that "subjective expectation of privacy is legitimate" only "if it is one that

society is prepared to recognize as reasonable." *Minnesota v. Olson*, 495 U.S. 91, 95–96, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (internal quotation marks omitted).

The Fourth Amendment specifically provides that "the people" shall be secure against "unreasonable searches" in "their" houses, U.S. Const. amend. IV, but it has long been recognized that a person may claim a legitimate expectation of privacy in a dwelling other than his own. The Supreme Court held in *Minnesota v. Olson*, 495 U.S. at 98, 110 S.Ct. 1684, that an "overnight guest" can legitimately expect privacy in his host's home. The Court has never extended this holding to embrace all social guests, but it is clear that "overnight" status is not a precondition to a guest's ability to contest a search of his host's dwelling. *See Minnesota v. Carter*, 525 U.S. 83, 90, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (holding that a guest lacked a legitimate expectation of privacy in his host's apartment because there was nothing "*similar to* the overnight guest relationship in *Olson* to suggest a degree of acceptance into the household" (emphasis supplied)); *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997) ("Although *Olson* establishes that status as an overnight guest *can* give rise to a legitimate expectation of privacy, it does not suggest that such status is required before a guest can have privacy in the home." (citation omitted)).

In determining whether a guest who is not an "overnight guest" may legitimately expect privacy in his host's home, we look to a number of different factors. In *Minnesota v. Carter*, for example, the Supreme Court focused on whether the guest's visit was social or commercial in nature, the length of time the guest spent on the premises, and the presence or absence of a previous connection between the guest and the householder. 525 U.S. at 90–91, 119 S.Ct. 469. Courts have also considered whether the guest possesses a key to the dwelling, is permitted to make use of the premises in the householder's absence, *Fields*, 113 F.3d at 320, or keeps belongings in the host's home, *see United States v. Rhiger*, 315 F.3d 1283, 1287 (10th Cir. 2003). These and related considerations shed useful light on our ultimate inquiry: whether the host has so liberally shared his own privacy interest with his guest that it shelters the guest against unreasonable government intrusion.

**[25]** With these principles in mind, we turn to the particulars of Samuel's relationship with his mother's apartment. During his deposition, Samuel stated that he

was "visiting" his mother on the evening of June 30, 2010 and did not live in her apartment (or, indeed, in the same borough), but he would not say where he *did* live. Dep. Eli Samuel at 18–20, *Figueroa v. Mazza*, No. 11 Civ. 3160 (JBW) (E.D.N.Y. July 31, 2014), ECF No. 148-1. He also stated that he was about to leave the apartment at the time the officers arrived, but he did not say whether he intended to return that night. *Id.* at 24. After defendants moved for summary judgment, Samuel submitted an affidavit— which the District Court did not exclude—supplementing this information. In the affidavit, he stated that for more than a year prior to his arrest, he had been staying at his mother's apartment three nights a week. [15] Decl. Eli Samuel at 2 ¶ 11, *Figueroa v. Mazza*, No. 11 Civ. 3160 (JBW) (E.D.N.Y. Aug. 18, 2014), ECF No. 157-9.

**\*15** **[26]** The District Court concluded that this information, even viewed in the light most favorable to Samuel, did not demonstrate that he possessed a legitimate expectation of privacy in his mother's apartment. In an oral ruling granting defendants' motion for summary judgment, the Court observed that Samuel "was not a resident" of the apartment, "temporarily or any other way," and that "he was about to leave the apartment" at the time of his arrest. Tr. Oral Ruling at 9, *Figueroa v. Mazza*, No. 11 Civ. 3160 (JBW) (E.D.N.Y. Aug. 21, 2014), ECF No. 220. For several reasons, we cannot agree with the District Court's analysis. [16]

First, the Court's emphasis that Samuel did not "reside[ ]" in his mother's apartment was misplaced. A person need not "reside" in a particular dwelling, in the sense of living primarily at that location, to enjoy a legitimate expectation of privacy when he is on the premises. As we have already discussed, a social guest can, under some circumstances, legitimately expect privacy in his host's home. *See Olson*, 495 U.S. at 98, 110 S.Ct. 1684.

Second—though the District Court's oral ruling is not perfectly clear on the point—it appears that the Court might have concluded that because Samuel "was about to leave the apartment" when he was arrested, he did not qualify as an "overnight guest" and thus could not claim a legitimate expectation of privacy in the property. Tr. Oral Ruling at 9, *Figueroa v. Mazza*, No. 11 Civ. 3160 (JBW) (E.D.N.Y. Aug. 21, 2014), ECF No. 220. (The Court might have reasoned that if Samuel was leaving the apartment at 10:00 p.m., the time of his arrest, he was not likely to come back that night.) Even if the Court

correctly concluded that Samuel was not an "overnight guest" as the case law uses the term—a question we need not decide [17]—it nonetheless erred in determining that, as a matter of law, he did not legitimately expect privacy in his mother's apartment.

**\*16** The Fourth Amendment looks with favor on "overnight guests" not because there is something talismanic about a person's intent to stay in a dwelling on a particular night, but because a host's willingness to take in a guest to sleep—slumber being a vulnerable state during which privacy is cherished—indicates that the guest has been accepted into the private sphere of the household. *Carter*, 525 U.S. at 90, 119 S.Ct. 469; *Olson*, 495 U.S. at 99–100, 110 S.Ct. 1684. Construing the record in the light most favorable to Samuel, we conclude that ("overnight guest" or not) he enjoyed a degree of acceptance into his mother's home sufficient to trigger Fourth Amendment protection. Indeed, each factor mentioned in *Carter* weighs strongly in Samuel's favor. His visit was social in nature. He had, in the past, spent a great deal of time at the apartment, sleeping there nearly as frequently as he slept at his own dwelling. He had a close relationship—indeed, a familial one—with the apartment's tenant. We have found no case denying Fourth Amendment standing on similar facts, and have found a number of cases finding Fourth Amendment standing on less convincing facts. *See, e.g.*, *Fields*, 113 F.3d at 321 (concluding that the defendant possessed a legitimate expectation of privacy in an apartment to which he was invited by a guest of the tenant, and where he spent "several hours before being interrupted by [a] police intrusion"); *Rhiger*, 315 F.3d at 1285–87 (finding Fourth Amendment standing in the case of a guest who had known his host for "about two weeks," had slept at the host's home two to four times, and had once entered the home unannounced to take a nap).

Accordingly, we conclude that Samuel's unlawful-entry claims should have survived a motion for summary judgment. [18] We thus vacate so much of the judgment as dismissed those claims and remand to the District Court for such further pretrial proceedings as may be appropriate in the circumstances, or for trial.

### V. Dismissing the Unnamed
### Defendants and Closing Discovery

In an order announced on May 1, 2014, the District Court dismissed from the case all unnamed defendants, reasoning that the case had been pending for several years and that Samuel still had not identified the unnamed individuals. Tr. Proceedings at 46-47, *Figueroa v. Mazza*, No. 11 Civ. 3160 (JBW) (E.D.N.Y. May 1, 2014), ECF No. 119. Samuel states that in this same order, the District Court closed discovery. We are unable to locate any such language in the order, but it is clear that on several occasions the District Court refused Samuel's requests for further discovery of documents. *See, e.g.*, Order at 2, *Figueroa v. Mazza*, No. 11 Civ. 3160 (JBW) (E.D.N.Y. Mar. 3, 2014), ECF No. 87.

Samuel asserts that the District Court erred or "abused its discretion" in entering these orders. He argues that the District Court dismissed the unnamed defendants and closed discovery because counsel for defendants represented that all relevant documents had been produced. *See id.* After the May 1, 2014 order, however, defendants supplemented discovery by producing 200 pages of new documents—most of it in the month before trial. Pl.'s Br. 39. Samuel appears to argue that if he had received these documents earlier, he could have used the information they contained to depose new witnesses and uncover the identity of some unnamed defendants.

This argument is unpersuasive. Samuel does not explain why, in his view, the District Court was wrong to rely on defense counsel's statements that all documents had been turned over. He does not argue, for instance, that at the time it made its rulings the District Court had been made aware of information throwing doubt on the accuracy of counsel's representations. [19] Rather, he appears to suggest that the mere fact of defendants' late production renders the District Court's order infirm. But if the Court had no reason to think that defendants possessed additional documents—and, indeed, had excellent reason (counsel's representations) to think they did not—it cannot now be faulted for closing discovery and moving the case toward a conclusion. Accordingly, we find no error in the District Court's discovery rulings.

### CONCLUSION

**\*17** To summarize, we hold as follows:

(1) Defendants are entitled to qualified immunity with respect to Samuel's false arrest claims, because we cannot say that, in the circumstances obtaining at the time of Samuel's arrest, no reasonable police officer could have concluded that probable cause existed.

(2) The force employed by Detectives Karolkowski and Failla in effecting Samuel's arrest was reasonable as a matter of law.

(3) On the basis of the evidence presented at trial, a reasonable juror could have determined that Detectives Failla and Chan had a realistic opportunity to intervene in the alleged assault on Samuel but failed to do so.

(4) The facts in the summary-judgment record would have allowed a reasonable juror to conclude that Samuel enjoyed a legitimate expectation of privacy in his mother's apartment.

(5) The District Court did not err or "abuse its discretion" when it entered rulings dismissing unnamed defendants from the case and refusing Samuel's requests for further discovery.

Accordingly, we **AFFIRM** the District Court's September 30, 2014 judgment insofar as it (1) granted judgment in defendants' favor on Samuel's claims for false arrest, excessive force, and assault, (2) denied further discovery, and (3) dismissed unnamed defendants from the case. We **VACATE** so much of the judgment as granted judgment in defendants' favor on Samuel's claims for failure to intervene and unlawful entry and **REMAND** the cause to the District Court for such further pretrial proceedings as may be appropriate in the circumstances, or for trial.

KEARSE, Circuit Judge, dissenting in part:

I respectfully dissent from so much of the majority's opinion as rules that "[t]he trial record establishes" "as a matter of law," Majority Opinion, *ante* at 92–93, 99, that the defendant detectives, most of them from the New York City Police Department's 72nd Precinct (or "Precinct"), who arrested plaintiff Eli Samuel Figueroa ("Samuel") on a charge of endangering the welfare of a child, are entitled to qualified immunity with respect to Samuel's false arrest claims, on the basis that a reasonable law enforcement official in their position could have concluded that there existed probable cause to arrest Samuel on the night of

June 30, 2010, giving them "arguable" probable cause. My disagreement has several sources, among them the following: First, the record in this case shows that the defendants' relevant knowledge consisted not just of their observations of the Duane Reade photographs of a nude boy on June 29 but rather included repeated complaints about suspected sexual abuse of the boy, complaints made by Samuel and the boy's mother Shirley Saenz ("Saenz") to the police department—beginning at the 72nd Precinct —over the preceding two weeks. Second, the majority opinion does not, although it claims to, "view the facts in the light most favorable to Samuel," id. at 94 n. 1, which is required in awarding his opponents judgment as a matter of law. Third, the majority appears to ignore the fact that it is granting judgment as a matter of law on the basis of qualified immunity, an affirmative defense. In taking issue with this dissent, the majority focuses on "Samuel's ... false arrest claims" and the evidence "Samuel ... offered ... to support them" and states, "our analysis of Samuel's false arrest claims does not take account of evidence—such as a series of written reports from a Detective Hawkins concerning Saenz's mid-June complaint to police—that was never put before the jury," Majority Opinion at 15 n.8 (emphases added). However, the proper focus for the majority's decision is not whether Samuel presented sufficient evidence on the elements of his false arrest claims (including the absence of probable cause—an absence that the properly instructed jury presumably found proven in finding defendants liable to Samuel on these claims). For the grant of judgment as a matter of law to these defendants on the basis of qualified immunity, the proper question is whether the evidence compels the conclusion that it was objectively reasonable for a police officer in their position to believe there was probable cause to arrest Samuel—an affirmative defense on which defendants have the burden of proof.

**\*18** Fourth, in my view, what should properly be considered on the issue of arguable probable cause in the present appeal includes all relevant evidence in the district court's record, not just the evidence admitted at trial. Although the majority states that "[i]n considering defendants' Rule 50 motion as to [Samuel's] claims, the District Court properly confined its review to the trial record, ... and we must do the same in considering the claims on appeal," Majority Opinion at 99 n. 8, this position suffers a major flaw: The Rule 50 motion granted by the district court was based on the position that Samuel had failed to prove the absence of probable cause as

an element of false arrest, see *Figueroa v. Mazza,* 59 F.Supp.3d 481, 490–91 (E.D.N.Y. 2014); that decision indeed was to be made on the basis of the evidence admitted at trial. But this is not the basis for the majority's grant of judgment as a matter of law. The majority's decision is that defendants are entitled to judgment as a matter of law on the basis of qualified immunity because it views probable cause as "arguable." The qualified immunity defense was never submitted to the jury; there is thus no reason to limit consideration to the evidence that was admitted. Further, the reports by Detective Deborah Hawkins, which the majority chooses not to consider, are in the district court record. (See, e.g., Trial Transcript ("Tr.") 551 (statement of defense counsel to the court: "There are documents that explicitly say—that are listed as plaintiff's exhibits that explicitly say Detective Hawkins looked at the reports from the pediatrician ... and that, in fact, the police department called the pediatrician and said you indicated **in this letter** that you thought that **there might have been some sort of anal penetration**. What made you say that? And he said I don't know, **it's possible.**" (emphases added)).) The Detective Hawkins reports were in fact offered in evidence at trial—by each side—but were excluded (erroneously each time, in my view: erroneously when offered by Samuel, since the reports (a) showed that the pediatrician confirmed to Detective Hawkins Saenz's statement that the doctor himself thought "some sort of anal penetration" was "possible," and (b) confirmed that the police department had in its possession a letter from the doctor to that effect; and erroneously when offered by defendants to show that Hawkins had in fact investigated before reaching a different conclusion).

Finally, even if consideration of defendants' entitlement to the defense of qualified immunity as a matter of law is limited to the evidence that was admitted at trial, there was ample evidence that in the two weeks preceding Samuel's arrest Saenz had complained to the police at the 72nd Precinct and to Detective Hawkins of suspected sexual abuse of her son by the boy's father; evidence that the police and Detective Hawkins were well aware of Saenz's attempts to document her suspicion with before-and-after pictures; evidence that Saenz had informed Detective Hawkins that two doctors had opined that such molestation was possible; and, in the words of defendants' own attorney, evidence "that there are doctor reports that indicate that abuse was happening" (Tr. 550).

There was evidence that Samuel complained to the police department's Internal Affairs Bureau ("IAB") asserting that Detective Hawkins had failed to investigate; in that complaint Samuel detailed Saenz's complaints to the police and her submission to the police of before-and-after pictures; and defendants, prior to arresting Samuel, were indisputably aware of Samuel's IAB complaint. The police department records of these repeated attempts by Samuel and Saenz to get the police to prevent what the boy's mother and doctors thought could be sexual abuse eliminated any objectively reasonable basis for any officer to believe there was probable cause to arrest Samuel for child pornography or child endangerment.

A. The Trial Evidence

It is undisputed that for some two weeks prior to the arrest of Samuel, Shirley Saenz, accompanied by Samuel, had repeatedly complained to the police that, when her son had an overnight visit with his father, the boy was returned to her with bruises and swelling in his anal area and that doctors said it was possible that the boy was being sexually molested. Saenz testified at trial: "[O]n June 5th of 2010, my son came back to me with red anal swelling"; "I took him to Methodist Hospital"; "I showed the doctor, Doctor Farebrothers [sic], and she said it looks like my son was getting molested, so she made a report to the state central registry." (Tr. 58-59; see, e.g., id. at 119 ("the hospital told me on June 5th that it was possible that my son was getting molested").) When her son "continued to come back" from visits with his father "with anal traumas," Saenz complained to the police and began to document the boy's changed condition with pictures of him before and after his visits with his father; she was allowed to take such pictures in the police station. (Tr. 57 ("at the precinct ... the police officer said it was fine to do it like away from the public in the backroom").) Other sets of pictures were taken in the office of the boy's pediatrician; Saenz testified that that doctor too "had told me that it looked like my son was getting possibly anally penetrated and he wrote a letter to the Family Court" (Tr. 58; see also id. at 118–19 ("Doctor Hassan, my son's ped[iatric]ian, said that it was possible my son was getting molested. That's what he said and he wrote it in a letter ....")).

**\*19** On June 15, two weeks before the police department's June 29 receipt of the Duane Reade photos on which they based their arrest of Samuel, Saenz—

accompanied by Samuel—had informed police at the 72nd Precinct and Detective Hawkins at the police department's Brooklyn Child Advocacy Center ("Child Advocacy Center") of her suspicion that her son was being molested by his father, and had given them pictures that like, the Duane Reade photos, were before-and-after pictures of the boy's body. (See, e.g., Tr. 64-65 (testimony of Saenz); 533-37, 541-42 (testimony of Samuel).) Saenz testified:

> I went to the 72nd Precinct. I told them that I was taking the photographs on the advise [sic] of my attorney and according to Social Service laws 415, 416, 419, and then I told them that I was concerned that my son could have been getting molested and they didn't let me write a report. They just took a copy of everything that I had, like the hospital record, the photographs and they faxed it over to Brooklyn Child Advocacy Center and they made copies and I spoke with—spoke with Lieutenant Jaime Ortiz .... And there was like another officer there, and they actually put me on the phone with Detective Deborah Hawkins ....

(Tr. 64-65 (emphases added).) In that telephone conversation, Saenz told Detective Hawkins "I think my son is getting molested, this is what the doctor said ...." (Tr. 65; see also id. at 542 (testimony of Samuel that 72nd Precinct officers faxed to Detective Hawkins "[t]he doctor's report—before-and-after doctor's report").)

On June 16, Saenz went to the Child Advocacy Center and met with Detective Hawkins, who had received the materials—including the photos—sent to her by the officers at the 72nd Precinct. Saenz testified that when Detective Hawkins asked "why do you think your son is getting molested. I told her it was based on what my doctor said, based on what the hospital said." (Tr. 66.)

Saenz testified that Detective Hawkins would not allow her to make a formal complaint of child abuse. Saenz complained that the police department and Detective Hawkins, "didn't do anything." (Tr. 59.)

On June 28, Samuel telephoned IAB, identified himself, and complained that Hawkins had not allowed Saenz to file a child-abuse complaint against the boy's father. (See Tr. 544-48.) Samuel's IAB complaint was "[v]ery detailed" (Tr. 547) as to Saenz's efforts, including her showing the police the pictures she had taken to document her concerns. He provided addresses and telephone numbers for the boy's father, as well as for Saenz's mother Beatrice Saenz ("Beatrice"), about whom Samuel also complained.

Defendants plainly were aware of the contents of Samuel's June 28 complaint to IAB: It was only by means of information in that complaint that they located Beatrice, whom they interviewed prior to arresting Samuel. And, as the majority opinion notes, in all other respects "defendants do not contest that all relevant officers had knowledge of Samuel's complaint and Saenz's report at all relevant times," Majority Opinion at 95 n. 5 (emphasis added); see id. at 96 n. 6.

### B. The "Arguable Probable Cause" Standard Is Not Met

When determining whether actual probable cause existed, we "look to the totality of the circumstances" as to what the officers knew at the time of the arrest; we "must consider those facts available to the officer at the time of the arrest and immediately before it," bearing in mind that "an officer may not disregard plainly exculpatory evidence." Fabrikant v. French, 691 F.3d 193, 214 (2d Cir. 2012) (internal quotation marks omitted) (emphases mine); see also Hunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (qualified immunity does not protect "the plainly incompetent" (internal quotation marks omitted)). "Review for probable cause should encompass plainly exculpatory evidence alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." Stansbury v. Wertman, 721 F.3d 84, 93 (2d Cir. 2013) (internal quotation marks omitted) (emphasis mine).

**\*20** In determining whether there was "arguable" probable cause, for purposes of qualified immunity, our focus is no narrower; "we examine the same evidence under the same circumstances," id. at 89 n. 3, for arguable probable cause does not "mean 'almost' probable cause," Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007). Rather, the test for arguable probable cause is

"whether it was objectively reasonable for the officer to conclude that probable cause existed." Id.

The majority acknowledges that "an officer making a probable-cause determination is not at liberty to ignore evidence tending to exculpate the suspect ... and that the officers [here] were accordingly not entitled to disregard ... their knowledge of Saenz's earlier photos," Majority Opinion at 102. The majority finds arguable probable cause, however, on the basis that "officers of reasonable competence could have ... disbelieved Saenz's explanation"—apparently referring to her reason for taking photos of her unclothed son—and that "[t]he officers were not required to accept Saenz's account on faith," Majority Opinion at 102 (emphases added). This would be far more persuasive if defendants were considering an explanation given after-the-fact and if ample support for Saenz's "account" were not already in police records weeks before receipt of the Duane Reade photos. As the police had no contact with Saenz between their June 29 receipt of the Duane Reade photos and Samuel's June 30 arrest, the reference to a Saenz "explanation" apparently refers to Saenz's proffers of such photographs earlier. But police department records clearly documented that Saenz had submitted such photos to the police in mid-June in an effort to provide evidentiary support for her suspicions of child abuse by the boy's father. And whether or not her suspicions were correct, it is undisputed that Saenz repeatedly told Detective Hawkins that both the boy's pediatrician and Doctor Fairbrother at Methodist Hospital had stated that it was possible that the boy had been subjected to some type of anal penetration.

Officers of course are not required to take a complainant's assertions "on faith," and defendants here certainly were not required to believe that Saenz's son had in fact been abused by his father. But nor were defendants entitled to conclude without any investigation that Saenz's repeated communications of her concerns to the police department were a sham. And the most obvious line of inquiry would have quickly shown that her concern was genuine. As defendants "at all relevant times" "had knowledge of Samuel's complaint and Saenz's report," Majority Opinion at 95–96 nn. 5–6, the most obvious course would have been to inquire of Detective Hawkins, who was most sharply criticized in Samuel's complaint to IAB about the handling of Saenz concerns. Had they inquired, defendants would have learned that Detective Hawkins's

file included a copy of the letter from the pediatrician indicating that he thought that there might have been some sort of anal penetration (see Tr. 542 (72nd Precinct officers faxed to Detective Hawkins "[t]he doctor's report—before-and-after doctor's report")). Further, if defendants had read Detective Hawkins's reports, they would have seen that the pediatrician reiterated to Detective Hawkins that "it's possible" that "there might have been some sort of anal penetration" (Tr. 551 (statement of defense counsel)).

**\*21** This record—whether or not Detective Hawkins's reports are considered—does not allow defendants to prevail on a defense of arguable probable cause, for they were not entitled to ignore the record of Saenz's efforts, with Samuel's assistance, to protect her son. Defendants knew of the complaints to—and about— Detective Hawkins. If they asked what was in Detective Hawkins's files or what her investigation had turned up, they could not "disbelieve[ ]" Saenz's "explanation" except by arbitrarily ignoring this clearly exculpatory evidence that resided in the relevant police records. And if they failed to inquire, their investigation clearly was not competent. Qualified immunity does not protect "the plainly incompetent." Hunter, 502 U.S. at 229, 112 S.Ct. 534 (internal quotation marks omitted).

The majority's view that a reasonable officer could have concluded that the photos constituted crimes of child pornography or child endangerment on the theory that Saenz was willing to share nude pictures of the boy "with perfect strangers," to wit, the "Duane Reade employees [who] would likely see the photos in the normal course of developing them," Majority Opinion at 103, improperly draws inferences contrary to Samuel and the record. The Duane Reade surveillance tape that police officers reviewed on June 30 showed that Saenz in fact had attempted to have the pictures—taken with a digital camera—printed not by Duane Reade employees but rather by a Duane Reade computerized self-service printer. The photos were eventually retrieved from the printer by a Duane Reade employee only because the self-service system had malfunctioned. Saenz's thwarted attempt to print the pictures herself in no way indicated a willingness to have them seen by strangers.

In my view, in light of these facts that were known to the police, and were known or available to defendants prior to Samuel's arrest, no reasonable officer could have

concluded that there was probable cause to believe that the crime of either child pornography or child endangerment had been committed.

I note that the majority does not actually specify the crime as to which it concludes defendants had arguable probable cause to arrest Samuel; if they had arguable probable cause as to any crime, even if there was not agreement among the defendants as to which crime, they were entitled to that defense, cf. Devenpeck v. Alford, 543 U.S. 146, 152-56, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). For the reasons stated above, I see no basis for arguable probable cause as to child pornography or child endangerment. Nor was there a basis to arrest Samuel for kidnaping. Although the majority opinion suggests that defendants, having viewed the June 25 Duane Reade photos, did not know Saenz's son was not being held as a "kidnap[ ]" victim until "[s]hortly after Samuel's [June 30] arrest," Majority Opinion at 96–97 (emphasis added), they in fact knew he was not being so held before Samuel was arrested. Police records show that at 9 p.m. on June 30, defendant Todd Nagrowski and other officers interviewed Saenz's roommate, who told them, inter alia, that she had left Saenz and the boy asleep in the living room that morning. As the majority concedes, defendants were "not entitled to disregard th[is] information from [Saenz's roommate]," Majority Opinion at 102. Thus, when Nagrowski and others proceeded to arrest Samuel after 10 o'clock that night, defendants had no reason to believe there had been a kidnaping.

Finally, even if there had been arguable probable cause to believe a crime had been committed, there was no evidence to warrant a person of reasonable caution in the belief that the crime had been committed by Samuel. The police had no evidence that Samuel had any role in the taking of the Duane Reade pictures, or was present when they were taken, or participated in the attempt to have them printed. The police reviewed the Duane Reade surveillance tape of the person attempting to have the pictures printed; that person was a woman. The 11 telephone calls to Duane Reade thereafter, asking that the pictures not be printed, were all made by a woman. In addition, the photos included an image of a dated money order, and the police were able to obtain a surveillance picture of its purchase; they saw that the purchaser of the money order was also a woman.

**\*22** The only objective evidence the police had of any conduct by Samuel in connection with the Duane Reade photos was that he had accompanied Saenz when she gave similar pictures to the police in an effort to prevent further harm to her son, that he complained to IAB when the police refused to assist Saenz in that effort, and that he apparently loaned the woman who called Duane Reade his phone.

Given the totality of the circumstances, including the documentation in the police files as to Saenz's intense communications with the police about her suspicion that her son was being abused, accompanied by her report of multiple doctors' statements and a copy of least one doctor's written opinion that her suspicion could be correct—all of which defendants knew or should have known—I dissent from so much of the majority opinion as rules that defendants are entitled to qualified immunity on Samuel's false arrest claims as a matter of law.

### All Citations

--- F.3d ----, 2016 WL 3126772

---

#### Footnotes

\*   The Clerk of Court is directed to amend the official caption to conform with the caption above.

1   We view the facts in the light most favorable to Samuel. See Runner v. N.Y. Stock Exch., Inc., 568 F.3d 383, 386 (2d Cir. 2009).

2   References to "App." are to plaintiff-appellant's appendix. References to "SPA" are to the special appendix.

3   Police had also ascertained that the photos had been taken in the restroom of a McDonald's restaurant. App. 264-65.

4   In April 2010, a judge of the Kings County Family Court, having learned that Saenz was taking explicit photographs of her son for this purpose, had directed that she stop the practice lest she be "prosecuted for child pornography" and lose custody of the child. App. 150-54. But this was not known to the officers at the time of Samuel's arrest and was not relied on by the District Court in ruling on defendants' Rule 50 motion. Figueroa v. Mazza, 59 F.Supp.3d 481, 491 (E.D.N.Y. 2014).

5   With one exception, discussed below in note 6, defendants do not contest that all relevant officers had knowledge of Samuel's complaint and Saenz's report at all relevant times. See Defs.' Br. 33.

6    Though defendants suggest otherwise, *see* Defs.' Br. 15; App. 309, it appears that, at the time Nagrowski interviewed Beatrice, he was aware that Samuel had lodged a complaint against her, *see* App. 998.

7    Title 42 of the United States Code, section 1983, creates a private right of action for damages against a person who, acting under color of state law, deprives another of a right secured by the laws of the United States. *Rehberg v. Paulk*, ––– U.S. ––––, 132 S.Ct. 1497, 1501, 182 L.Ed.2d 593 (2012). It provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

> 42 U.S.C. § 1983.

8    We pause to note that, although the standard applied is the same in each case, Rule 50 motions and summary-judgment motions are decided on different evidentiary records. Because "summary judgment motions are usually made before trial," they are "decided on documentary evidence." *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505 (internal quotation marks omitted). It follows from the purpose of the summary-judgment device—to determine whether there exists a genuine issue of material fact for trial—that any evidence considered on summary judgment must be reducible to admissible form. *See* Fed. R. Civ. P. 56(c)(2); *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001). By examining such documentary evidence as could be admitted at trial, a court adjudicating a summary-judgment motion determines whether any reasonable juror could, if presented with that evidence at trial, find for the nonmovant.

> The Rule 50 inquiry differs. Because "[Rule 50] motions are made at trial," they are decided not on what evidence *could have been* admitted, but on "the evidence that *has been* admitted." *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505 (emphasis supplied) (internal quotation marks omitted); *see Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004) ("[O]nce a trial has occurred, the focus is on the evidence that was actually admitted at trial, not on the earlier summary judgment record."). What we care about at the Rule 50 stage is not whether the nonmovant has managed to collect evidence sufficient to support his cause, but whether he has actually put that evidence before the jury charged with deciding the dispute. Evidence kept hidden under a bushel, never brought out to enlighten the factfinder, does not figure in the calculus.

> For that reason, we are unable to endorse our dissenting colleague's view that "[the record that] should properly be considered on the issue of arguable probable cause [as to Samuel's false arrest claims] ... includes all relevant evidence in the district court's record, not just the evidence admitted at trial." Dissenting Op. at 113. Samuel brought his false arrest claims to trial and, at trial, offered evidence to support them. In considering defendants' Rule 50 motion as to those claims, the District Court properly confined its review to the trial record, *see Figueroa*, 59 F.Supp.3d at 486–87, and we must do the same in considering the claims on appeal. Accordingly, our analysis of Samuel's false arrest claims does not take account of evidence—such as a series of written reports from a Detective Hawkins concerning Saenz's mid-June complaint to police—that was never put before the jury, but on which our dissenting colleague thinks it appropriate to rely. *See* Dissenting Op. at 113–14.

9    In light of these conclusions, we need not determine whether a reasonable officer could have determined that, notwithstanding Romero's statement that she had seen Saenz and her child on June 30, 2010, there was probable cause to believe that the boy had been kidnapped.

10   We discuss below whether Saenz's explanation was indeed "innocent" or must necessarily have been viewed as such by a reasonable officer.

11   We will assume that if a reasonable officer were to view these photos knowing why they were produced, he would be forced to conclude that they are not pornographic, *see Horner*, 752 N.Y.S.2d at 149 (reviewing court must consider "whether the visual depiction is intended or designed to elicit a sexual response in the viewer" (internal quotation marks omitted)), and that, accordingly, an officer required to accept Saenz's explanation of the photos' provenance could not reasonably have determined that § 263.15 or § 263.16 had been violated.

12   These claims pertain to the conduct of defendants in apprehending Samuel within his mother's apartment and escorting him outside. They do not relate to the incident during which Samuel allegedly was punched while sitting in the police cruiser; the officer who is said to have perpetrated that assault has never been identified.

13   A lawful arrest is not an assault or battery under New York law, provided the force used is reasonable. *See Cunningham v. United States*, 472 F.Supp.2d 366, 381 (E.D.N.Y. 2007) (collecting New York cases).

14   Failla and Chan do not argue that, if a constitutional violation indeed occurred, they are entitled to qualified immunity.

15   A party may not create an issue of fact that will defeat summary judgment by submitting an affidavit that contradicts the party's prior deposition testimony, but it is permissible to clarify by affidavit ambiguous or incomplete deposition testimony.

*Maxwell v. City of New York*, 380 F.3d 106, 109 (2d Cir. 2004). Nothing in Samuel's affidavit contradicts the testimony he gave at his deposition.

16    As is true of Samuel's failure-to-intervene claims, defendants do not argue that they are entitled to qualified immunity on the unlawful-entry claims if their conduct violated the Fourth Amendment.

17    The cases do not define the phrase. In *Olson*, for instance, the defendant had slept in the searched dwelling the night prior to the search (which occurred late in the afternoon). *Olson*, 495 U.S. at 93–94, 97 n. 6, 110 S.Ct. 1684. But for "several days" before that, he had been sleeping someplace else, *id.* at 97 n. 6, 110 S.Ct. 1684, and the Court did not discuss whether he had ever slept in the relevant dwelling before or had planned to sleep there the night after the search occurred. (The facts suggested that the defendant had not planned to sleep in the dwelling a second night: the police had been told that he planned to "leave town." *Id.* at 93, 110 S.Ct. 1684.) The Supreme Court nevertheless characterized the defendant as an "overnight guest" and held that he was entitled to claim the protection of the Fourth Amendment in his hosts' home. We need not determine what this says about whether Samuel—who often stayed in his mother's apartment, but might not have stayed there the night before his arrest and might not have planned to stay there the night of his arrest—was an "overnight guest." Nor do we think such an exercise would be particularly useful. As discussed below, a person's status as an "overnight guest" matters because sleeping in a dwelling says much about one's connection with the property and one's expectations while present there; the law can take account of these considerations without drawing hard lines concerning what kind of guest counts as an "overnight" one.

18    Defendants also argue that, even if Samuel enjoyed a legitimate expectation of privacy in his mother's apartment, this portion of the judgment can stand because the trial record shows that Samuel's mother consented to defendants' entry. We disagree. The officers so testified, but Samuel testified that his mother did nothing more than open the door a foot or two before Samuel stepped in front of her. App. 627-28. If Samuel is believed, his mother did not consent to defendants' entering her apartment. *See United States v. Vasquez*, 638 F.2d 507, 527 (2d Cir. 1980) (concluding that merely opening a door when officers knock is not consent).

19    Samuel does not appear to have sought additional discovery *after* the new documents were produced. *See* Pl.'s Br. 39-40; Pl.'s Reply Br. 47-50.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1289582
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Justin FLAKE, Plaintiff,
v.
Howard PECK, et al., Defendants.

No. 9:12–cv–00517 (MAD/ATB).
|
Signed March 31, 2014.

**Attorneys and Law Firms**

Justin Flake, Attica, NY, pro se.

Lemire, Johnson & Higgins, LLC, Gregg T. Johnson, Esq., of Counsel, Malta, NY, for Defendant.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** Plaintiff, formerly a pretrial detainee at the Washington County Jail, brings this action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights under the First, Eighth, and Fourteenth Amendments of the United States Constitution. *See* Dkt. No. 1. Presently before the Court is Defendants' motion for summary judgment. *See* Dkt. No. 34. In a Report–Recommendation and Order dated February 21, 2014, Magistrate Judge Andrew T. Baxter recommended that the Court grant Defendants' motion for summary judgment. *See* Dkt. No. 43. None of the parties has objected to Magistrate Judge Baxter's Report–Recommendation and Order.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846,

\*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec 'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

**\*2** In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either

does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y., 322 F.3d 139, 143 n. 5 (2d Cir.2003)* (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell, 289 F.Supp.2d 289, 295 (N.D.N.Y.2007)* (quoting *Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)*) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell, 289 F.Supp.2d 289, 295 (N.D.N.Y.2007)* (quoting *Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir.1983)*). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond, 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)*). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin, 902 F.Supp. 424, 429 (S.D.N.Y.1995)* (citing *Cary v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991)*).

Having carefully reviewed Magistrate Judge Baxter's February 21, 2014 ReportRecommendation and Order, the parties' submissions and the applicable law, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should grant Defendants' motion for summary judgment, and dismiss this case. *See* Dkt. No. 43.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Baxter's February 21, 2014 Report–Recommendation and Order is **ADOPTED in its entirety** for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 34) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**\*3 IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In his civil rights complaint plaintiff alleged that, while he was incarcerated in the Washington County Jail ("WCJ") as a pretrial detainee, defendants used excessive force against him, confined him in unconstitutional conditions, denied him access to the law library, denied him his right to freely practice his religion, improperly searched his cell and deprived him of his property, denied him equal protection, filed false disciplinary reports against him, and denied him due process. (Compl.) (Dkt. No. 1).

After the court's initial review of the complaint, Judge Mae A. D'Agostino dismissed some of plaintiff's claims and ordered defendants to respond to the others. [1] (Dkt. No. 7). There are three claims remaining in this action: (1) the use of excessive force on two occasions; (2) unconstitutional conditions of confinement; and (3) denial of the right to attend religious services on two occasions. [2] (*Id.* at 20).

Presently before the court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 34). Plaintiff has responded in opposition to the motion. (Dkt. No. 37). Defendants have filed a reply. (Dkt. Nos.40). For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint in its entirety as against all remaining defendants.

# I. *Facts*

## A. Excessive Force [3]

### 1. Cell Incident—November 10, 2010

Plaintiff states that he was incarcerated in the WCJ from July 17, 2010 until January 25, 2011. Plaintiff states that on September 24, 2010, he was assigned to a cell in "B–Pod," where he remained until October 30, 2010. (Compl. at 19, ¶ 1). [4] On October 30, 2010, plaintiff was moved to cell # 11 in D–Pod ("D–11"), [5] and on November 4, 2010, he was moved to D–8. Plaintiff states that on November 4, 2010, he was told that he was being moved to make room for Protective Custody inmates. (*Id.*)

Plaintiff alleges that on November 10, 2010, he was asked to move back to cell D–11, but that he was concerned about this move because D–11 "was cold and there was no heat." (Compl. at 19, ¶ 2). Plaintiff claims that he asked Officer Tripp if he knew why plaintiff was being moved again, but Officer Tripp did not know the answer, and plaintiff asked to speak with a sergeant. (*Id.*) Plaintiff states that he made sure to tell Officer Tripp to let the Sergeant know that plaintiff was not "refusing" to move, he only wished to "discuss" the issue. Officer Tripp told plaintiff that a sergeant would be down to speak with him soon. (*Id.*)

Sergeant VanArnum came down to D–Pod with Officers Fisher and Elliot. Plaintiff states that when he tried to speak with defendant VanArnum, the defendant refused and told plaintiff to pack his things. (Compl. at 19, ¶ 3). Plaintiff began packing, while defendants VanArnum, Elliot, and Fisher all stood in his cell. (Compl. at 20, ¶ 3). Plaintiff states that he began moving his property to a table outside of the cell, but that it was crowded in his cell with all the defendants standing inside. Plaintiff states that on the fourth trip back into the cell from the table, he walked between Sergeant VanArnum and Officer Elliot. (Compl. at 20, ¶ 4) As plaintiff walked by Sergeant VanArnum, plaintiff's shoulder "did contact Sergeant VanArnum's arm." (*Id.*)

**\*4** Plaintiff alleges that although the contact was "inadvertent," and occurred only because plaintiff had to squeeze in between the two officers, Sergeant VanArnum reacted by wrapping his arms around plaintiff's upper body, and Officer Elliot grabbed plaintiff's legs, pulling plaintiff down to the floor. (Compl. at 20, ¶ 6). Plaintiff states that as the defendants were trying to pull plaintiff down to the floor, he tried to "back out of the cell so that this could all be captured on video camera." (*Id.*) Officer Fisher pulled plaintiff back into the cell, and as he did, plaintiff turned, tripped over someone's foot, and fell to the ground, hitting his back on the "cell's seat." Sergeant VanArnum fell to the floor "at the same time," causing him extreme pain. Plaintiff alleges that Officer Elliot continued to hold his legs, while Officer Fisher held on to plaintiff's waist area. Plaintiff claims that Sergeant VanArnum placed his knee on plaintiff's chest, his right hand holding plaintiff's forearm, and his left hand was placed on plaintiff's neck, causing plaintiff to choke. (*Id.*)

Plaintiff states that as the defendants held plaintiff down, Sergeant VanArnum told plaintiff that he was "tired of plaintiff submitting grievances and that plaintiff was going to follow the rules." However, after they held plaintiff down for "a while," they told plaintiff they were going to let him up. After he got up, plaintiff continued to move his property, without incident. Plaintiff alleges that he asked Sergeant VanArnum if he could see a doctor because of his back injury, but defendant VanArnum refused. However, another sergeant, who came on duty for the next shift, escorted plaintiff to the medical department. Plaintiff was examined and prescribed Ibuprofen and another medication that he could not remember. (Compl. at 20–21, ¶¶ 7–8).

During plaintiff's deposition, he testified that he mistakenly bumped into Sergeant VanArnum as plaintiff lowered his shoulder in an attempt to maneuver around the guards. Plaintiff stated that he tried to apologize, but that the defendants reacted before he was able to speak. (Pl.'s Dep. at 29, 33–34). [6] Plaintiff testified that as he was falling to the floor, he hit his back on the metal seat in the cell, and that Sergeant VanArnum fell on top of him. (Pl.'s Dep. at 29–30). At the deposition, plaintiff stated that after they fell, Sergeant VanArnum was holding plaintiff's neck so tightly that plaintiff felt like he was choking. [7] However, when plaintiff told the Sergeant that he was choking, the defendant let go immediately. (Pl.'s Dep. at 30). Plaintiff also admitted that he was swearing at the guards during the entire incident, and that he was squirming, but only because he needed to breathe, not because he was resisting. (Pl.'s Br. at 31–32). Plaintiff also testified that after the defendants told plaintiff to "calm

down," they let him up, and he continued to move his belongings without further incident. (Pl.'s Dep. at 32).

**\*5** Plaintiff testified that, although defendant VanArnum initially denied plaintiff's request to see the doctor after the incident, plaintiff ultimately waited only "a couple of hours" to get medical attention. When he did see the nurse, he told her that "he fell on stool hitting his back and was choked...." (Def.s' Ex. M at 19) (Dkt. No. 34–14). There were "no bruises," just two "small scratches" on his neck, and no open areas or wounds. (*Id.*) He was prescribed Motrin. (*Id.*) On December 15, 2010, a doctor also prescribed Motrin for plaintiff's back pain. (*Id.* at 18). On December 17, 2010, plaintiff refused his Motrin. (*Id.* at 17).

Defendant VanArnum has submitted an affidavit in support of defendants' summary judgment motion. ("VanArnum Aff.") (Dkt. No. 34–30). Defendant VanArnum is a Corrections Sergeant, whose responsibility is maintaining the safety and security of both the inmates and the staff at WCJ. (VanArnum Aff. ¶ 2). In addition, defendant VanArnum is responsible for inmate movement and activities; making periodic rounds of assigned areas of the jail; conducting searches for contraband; overseeing WCJ's "internal grievance procedures;" and preparing reports as necessary. (*Id.*)

Defendant VanArnum's description of the incident is slightly different than plaintiff's, but has many of the same elements. Defendant VanArnum first points out that, because of plaintiff's bad behavior and unwillingness to follow facility rules, he spent most of his time in the Special Housing Unit ("SHU") at WCJ. (*Id* . ¶ 5). On November 10, 2010, Officer Tripp called Sergeant VanArnum to assist in moving plaintiff back to D–11. (*Id.* ¶ 6). Defendant VanArnum went to plaintiff's cell with Officers Elliot and Fisher. At that time, plaintiff told defendant VanArnum that he wanted to stay in cell D–8, which had a view of the communal television. [8]

Defendant VanArnum stated that, after he gave plaintiff the opportunity to speak, he directed him to pack up his things and move to D–11, which incidentally did not have a view of the television. (*Id.*) Defendant VanArnum stated that, although he continued to move his property, plaintiff became increasingly loud and verbally combative. Plaintiff "intentionally" brushed up against defendant VanArnum's shoulder. Defendant VanArnum instructed

plaintiff that if he did that again, the conduct would be viewed as a sign of aggression. Despite this warning, a few minutes later, plaintiff bumped into defendant VanArnum again. At that point, defendant VanArnum states that the officers brought plaintiff to the ground in a controlled manner. When plaintiff stated that he would comply with further orders, the officers let him stand under his own power. As plaintiff walked down to D–11, "he threatened to sue all WCJ staff present." (*Id.*)

Defendants Elliott and Fisher have also submitted affidavits in support of their motion. ("Elliott Aff.", "Fisher Aff.") (Dkt.Nos.34–17, 34–18). Defendant Elliott stated that he witnessed plaintiff bump defendant VanArnum a second time after being told that a second bump would be considered an act of aggression. (Elliott Aff. ¶ 6). Defendant Elliott states that he does not recall seeing plaintiff hit his back on the stool, and he does not recall seeing defendant VanArnum with his knee on plaintiff's chest [9] or choking him. [10] (*Id.*)

**\*6** Defendant Fisher's affidavit gives the same description of the November 10, 2010 incident as that given by defendants VanArnum and Elliott. (Fisher Aff.) (Dkt. No. 38–18). He states that plaintiff was brought to the floor in a "controlled manner." He also did not recall plaintiff hitting his back on a metal chair on the way to the floor, nor did he recall defendant VanArnum with his knee on plaintiff's chest or choking him. (Fisher Aff. ¶ 4) (Dkt. No. 34–18). After the officers gained control of plaintiff, and he agreed to comply with further orders, he gathered the rest of his belongings and moved to the new cell "under his own power and without further incident." (*Id.*) Defendant Fisher sustained an injured knee and had to seek medical attention as a result of the incident.

Defendant Fisher completed a report, contemporaneous to the incident. (Def.s' Ex. C at 10). In his report, defendant Fisher states that plaintiff bumped into defendant VanArnum after being told that a second bump would be considered an act of aggression "and responded to as such." (*Id.*) When plaintiff bumped into Sergeant VanArnum a second time, defendants Fisher and Elliott assisted in taking plaintiff to the ground, where they "gained control of the situation," and then "Sgt. VanArnum instructed [plaintiff] to get the remainder of his belongings out of cell 8." (*Id.*) Sergeant VanArnum instructed Officer Tripp to place plaintiff in Administrative Segregation in D–11. Defendant Fisher

noted that plaintiff was placed into D–11 with no further incident, and that Fisher was going to be examined by medical personnel due to a knee injury sustained during the incident. (*Id.*)

### 2. Law Library Incident—December 22, 2010

Plaintiff states that on December 22, 2010, he went to the Law Library at 9:30–10:00 a.m. (Compl. at 21, ¶ 9). When he arrived, he returned one book and asked if he could borrow a copy of the Jailhouse Lawyer Manual ("JLM"). Defendant Peck denied this request, and as a result, plaintiff asked defendant Peck to print out a section of the minimum standards for County Jails. (*Id.*) When defendant Peck complied with plaintiff's request, plaintiff took the page, and circled where it stated that inmates from SHU were allowed to borrow material from the law library. (Compl. at 21, ¶ 10; Pl.'s Dep. at 41). Plaintiff then handed the marked document back to defendant Peck in order to prove that plaintiff was correct. (*Id.*)

In the complaint, plaintiff alleged that he "asked [Peck] why he was denying plaintiff's request for the JLM." Plaintiff told Peck that he wished to speak with a sergeant. (Compl. at 21, ¶ 10). Sergeant Little arrived to speak with him. After plaintiff tried to explain to Sergeant Little that plaintiff should be able to take the book back to his cell, Sergeant Little said that she did not care what the rules said, because Officer Peck had determined that plaintiff could not have the book. (*Id.* ¶ 11). Sergeant Little also told plaintiff that his time in the library was "up" because Officer Peck wanted plaintiff to go back to his housing unit. (*Id.* ¶¶ 11–12).

**\*7** During his deposition, plaintiff testified that defendant Peck became angry when plaintiff showed him these "minimum standards," and Peck told plaintiff to pack up his things and go back to his cell. (Pl.'s Dep. at 42). Plaintiff admitted that he "denied going back because [he] didn't do nothing [sic]." (*Id.*) In the complaint, plaintiff alleged that he tried to explain to defendant Little that plaintiff had just arrived and "shouldn't be going back [to his cell]." Defendant Little then "pushed the pin," and Officer M. Minor and T. White responded [11] (Compl. at 22, ¶ 12). In the complaint, plaintiff alleges that Officer Peck "forced" plaintiff's hands into the handcuffs, and Sergeant Little ordered plaintiff back to his cell. (Compl. at 21–22, ¶ 12). Plaintiff states that he "protested" because he needed his library time, however, Officer White forced

plaintiff up out of his seat. [12] (Compl. ¶ 13; Pl.'s Dep. at 42).

Plaintiff claims that the officers forced him to walk faster than he could with the "ankle brace," [13] and that he fell because of that. In the complaint, plaintiff alleges that defendants White and Minor picked plaintiff up and carried him the rest of the way to his cell. During his deposition, plaintiff testified that they "basically drag me a little bit ... [a]nd they pick me up in the hallway," carrying him all the way back to his cell. (Compl. ¶ 13; Pl.'s Dep. at 42). During his deposition, plaintiff admitted that he was cursing at the officers when they were carrying him back to the cell. (Pl.'s Dep. at 56).

When they got back to his cell, the officers propped plaintiff up with his face against the bars, and Officer White forced his forearm into plaintiff's neck while they took off his shackles. (Compl. at 22, ¶¶ 13–14; Pl.'s Dep. at 43). In the complaint, plaintiff stated that he tried to move his head because the bars were hurting his face. (Compl. at 22, ¶ 14). Plaintiff testified that defendant White had his "left arm on the top of my back," and that he punched plaintiff "one good time" in the lower back with his right hand. (Pl.'s Dep. at 43). Plaintiff asked Sergeant Little if she saw "that," but she told him she did not notice the blow. [14] (*Id.*) Plaintiff asked to go to the medical department, and the nurse came to see him an hour later. [15] (*Id.* at 44). Plaintiff claims that he was in extreme pain, but he had no bruises on his back from the alleged punch. (*Id.*) Plaintiff alleged that the punch aggravated the injury that he received on November 10, 2010. (Compl. at 22, ¶ 16).

Again, defendants' version of what happened is slightly different than plaintiff's explanation. When defendant Peck refused to allow plaintiff to take the JLM out of the library, plaintiff became combative and asked to speak with a Sergeant. (Peck Aff. ¶ 5). Defendant Little arrived and informed plaintiff that he would not be able to borrow the book. Plaintiff became loud, and defendants Peck and Little asked plaintiff to leave the library, but he refused. (*Id.*) Defendant Little then called three corrections officers, known as "rovers" for assistance. Officers White, M. Minor, [16] and Jansson arrived to assist. Plaintiff sat in a chair and refused to move. Defendant Peck stated that he placed one handcuff on plaintiff while plaintiff held onto the chair. The officers

lifted plaintiff to his feet, but he went limp, dropped to the ground, and refused to move, so they had to carry him out of the library. (*Id*.) Defendant Peck did not see what happened after they left the library because he could not leave his post. (*Id.*)

**\*8** Defendant White stated in his affidavit that he heard plaintiff say that the officers were going to have to use force to get him to leave. (White Aff. ¶ 7) (Dkt. No. 3). The plaintiff was lifted out of his chair, but willfully dropped to the ground on his stomach. The officers carried plaintiff back to his cell. When they arrived at the cell, plaintiff was ordered to face the wall so that his restraints could be removed, but plaintiff suddenly jerked his head back in an attempt to strike defendant White. (*Id.*) In response, defendant White placed his forearm to the back of the plaintiff's head to prevent injury. When plaintiff's handcuffs were eventually removed, he refused orders to enter his cell and held onto the "cage" near his cell. Plaintiff was "removed" from the cage and placed in his cell. However, once he was in the cell, he removed his shirt and charged toward defendant White, while continuing to threaten all the officers. Defendant White states that he never struck or punched plaintiff during this incident. (*Id.*)

Defendant Little has also filed her affidavit in support of summary judgment, describing the law library incident. (Little Aff.) (Dkt. No. 34–24). She stated that when she arrived at the law library, plaintiff was agitated and would not listen to the officers. (Little Aff. ¶ 5). Defendant Little stated that, after defendant Peck placed one handcuff on plaintiff's wrist, she placed the handcuff on plaintiff's other wrist. Plaintiff began to scream *" 'use of force! use offorce!' "* (*Id.*) (italics in original). When plaintiff continued to resist, defendant Little called the rovers. Plaintiff was verbally combative with the officers. Officers White and M. Minor lifted plaintiff out of his chair, but after a few steps, plaintiff intentionally dropped to the ground. Officers White and Minor then lifted plaintiff from under each shoulder while Officer Jansson lifted plaintiff's legs and carried him back to the cell, with Officer Little following them. When they arrived at plaintiff's cell, he continued to be verbally abusive, and he was placed facing the wall, where his restraints were removed. He then refused to walk into his cell and held onto the cage. He was removed from the cage and placed into his cell by the officers, but took off his shirt, and turned toward Officer White, threatening to *" 'fuck him up.' "* (*Id.*) (italics

in original). Defendant Little states that she never saw Officer White strike plaintiff. (*Id.*)

In her affidavit, defendant Rivers/Schuyler [17] states that she was monitoring the control room on December 22, 2010 and witnessed plaintiff's escort from the law library to his cell. (Rivers/Schuyler Aff. ¶ 4). The defendant states that she never saw the staff use more force than minimally necessary to physically restrain plaintiff, and that she did not see defendant White strike plaintiff as he claims. (*Id.*)

After the law library incident on December 22, 2010, plaintiff complained of back pain again and was seen by the nurse. (*Id.* at 16). On January 3, 2011, plaintiff was examined by a physician, who noted some lower back tenderness, but negative straight leg raising and intact deep tendon reflexes. (*Id.* at 14). The doctor prescribed Motrin and Flexeril, but stated that he did not believe that any additional medication or a second mattress was indicated. (*Id.* at 10–11, 14) At his deposition, plaintiff testified that he was still taking medication for his back two years later. (Pl.'s Dep. at 36–37).

## B. Conditions of Confinement [18]
**\*9** Plaintiff alleges that from November 10, 2010, until he left WCJ in January of 2011, his cell was "extremely cold." (Compl. at 22–23, ¶¶ 1–4). Plaintiff alleges that the clothing that he was provided was insufficient to keep him warm, and that it was impossible for him to write, do legal work, and sleep. (Compl. at 23, ¶ 2). Plaintiff stated that even if he bundled up in all the clothing that he had, it was still not sufficient to keep him warm. (*Id.*) Plaintiff claims that he requested heat and extra blankets "several times a day from November 10, 2011 until ... January 25, 2011." (Compl. at 23, ¶ 3). Plaintiff states that he filed two grievances, one on November 11, 2010, and another on December 6, 2010, but was unable to obtain relief. (Compl. at 22, 23, ¶¶ 1, 4).

Plaintiff also alleges that on December 14, 2010, Sergeant Jamieson told plaintiff that he would be moving from SHU C–6 to SHU C–10. (Compl. at 26, ¶ 1 (bottom of page)). When plaintiff returned from the barber shop, his property had already been moved, and when plaintiff was escorted to C–10, he noticed that his belongings were all on the "dirty" floor. The cell was extremely dirty, there were urine and feces stains around the toilet and sink, and the mattress was soiled. Plaintiff states that he asked

Sergeant Jamieson and Officer Jackson whether plaintiff could clean his cell, but the Sergeant refused. (*Id.*)

Plaintiff alleges that after Sergeant Jamieson and Officer Jackson refused to allow plaintiff to clean his cell, the Sergeant turned the water off to plaintiff's sink and toilet. (Compl. at 27, ¶ 2). Plaintiff alleges that he filed a grievance on December 17. He asked for his water to be turned on again on December 18, but his request was denied. (Compl. at 27, ¶ 3). Plaintiff also claims that he was denied his personal property during this period of time, including his legal work, and re-alleges that this cell was cold. [19] Plaintiff claims that the water to his toilet and sink was turned off for 8 days, and that when he reminded Sergeant Jamieson, the sergeant said "well, too bad." (Compl. at 27, ¶ 4). Plaintiff states that he filed grievances on December 20 and 27, 2010 because his water had been off since December 14, 2010. (Compl. at 27, ¶ 5). Plaintiff also alleges that he filed another grievance on December 28, 2010 because he was denied a blanket by "jail officials on the 8am–3pm shift...." (Compl. at 27, ¶ 6). During his deposition, plaintiff first testified that the water was off for two weeks. (Pl.'s Dep. at 62). However, plaintiff then conceded that the water was turned on occasionally so that he could flush the toilet, but he maintained that he did not "drink" for a couple of weeks. (Pl.'s Dep. at 63).

Defendants added some pertinent facts to the issue of plaintiff's water and cell location. In a statement submitted to the Commission on Correction after the appeal of one of plaintiff's grievances, defendant Lascar stated that on December 11, 2010, plaintiff, while still in C–6, began a "screaming match" with an inmate from the minimum security dormitory. (Def.'s Ex. H at 14) (Dkt. No. 34–9). Defendant Lascar resolved the situation, but on December 12, 2010, he received another call, stating that plaintiff had flooded his cell and was in the process of flooding the hallway by filling cups of water and throwing them under the cell door. (Def.'s Ex. I at 4) (Dkt. No. 34–10).

**\*10** Defendant Lascar and defendant Breeyear went to plaintiff's cell, and defendant Breenyear turned off the water. Officer Bump applied hand restraints on plaintiff and brought him outside the cell while defendants Lascar and Breeyear put his belongings in plastic bags so they would not get wet. [20] (*Id.*) Plaintiff was told that after he mopped and dried the area, he would get his property back. (*Id.*) While plaintiff initially agreed, he suddenly

began to insist on the return of his property and getting the water turned on. When defendant Elliott attempted to reason with plaintiff, he tipped an entire bucket of water over onto the floor. Plaintiff ultimately got his property back later the same day. (*Id.*)

On December 14, 2010, plaintiff began shouting at the minimum security inmates again, creating another disturbance. (Jackson Aff. ¶ 5) (Dkt. No. 34–20). It was decided that plaintiff should be moved away from the inmates with whom he was arguing. (*Id.*) Plaintiff's property was moved while plaintiff was out of the cell, getting his hair cut. When plaintiff was escorted to the new cell (C–10), he requested a spray bottle with cleanser, but defendant Jackson observed that the cell was clean and denied the request. (*Id.*) Defendant Jackson stated that at approximately 10:45 p.m., he noticed water running into the hall in front of plaintiff's cell. Plaintiff had plugged his toilet and flooded his cell. Defendant Jackson contacted Sergeant Jamieson, who ordered the plaintiff's water be temporarily turned off at 10:50 p.m. (*Id.*)

Plaintiff claims that on December 15, 2010, he was denied a shower by Officer A. Rivers/Schuyler. Plaintiff claims that defendant Rivers/Schuyler told plaintiff that he was being refused a shower because Sergeant VanArnum informed her that "plaintiff does not get anything while plaintiff is in SHU." (Compl. at 28, ¶ 1 (top of page)). Plaintiff claims that he told defendant Rivers/Schuyler that he had not had a shower in four days. (Compl. at 28, ¶ 2 (top of page)). During his deposition, plaintiff stated that he was not denied a shower "too many times," [21] and that he was aware that in order to get a shower, he was required to ask at the appropriate time. (Pl.'s Dep. at 66–67). He maintained that he asked for a shower properly, but was still denied. (*Id.*) Defendant Rivers/Schuyler states in her affidavit that she has no specific recollection of denying plaintiff a shower, but notes that it was her practice to afford all inmates a shower, who made their requests by 8:00 a.m. (Rivers/Schuyler Aff. ¶ 3).

### C. Religious Services

Plaintiff claims that on December 19, 2010, he was denied the opportunity to attend Bible Study by Officer Neil Hafner. (Compl. at 28, ¶ 1 (bottom of page)). On January 8, 2011, plaintiff was allegedly denied the right to attend his religious service by Officer Richard Minor. [22] (Compl. at 28, ¶ 2 (bottom of page)). Plaintiff states that defendant

R. Minor told him that "religious service is considered a program," and therefore, he did not have to let plaintiff attend. (*Id.*) Plaintiff asked to speak with a Sergeant, and defendant Minor called Sergeant Lascar, who also told plaintiff that "religious service" was considered a program, and he was not required to let plaintiff attend. (Compl. at 28, ¶ 3 (bottom of page)).

**\*11** Defendant Hafner states in his affidavit that he does not "have a specific recollection" of denying plaintiff the ability to attend Bible Study. (Hafner Aff. ¶ 5). However, defendant Hafner states that plaintiff intentionally ignored numerous orders and announcements for a number of programs, only later to request to attend them. (*Id.*) In those circumstances, plaintiff was denied attendance because of his late responses. He was instructed that in order to attend any of the WCJ programs, including Bible Study, he would have to promptly respond to the CO's request for participation. Defendant states that after plaintiff was denied access to the programs, he would threaten to file a lawsuit for discrimination, leading defendant to believe that plaintiff was acting intentionally to fabricate legal claims. (*Id.*)

Plaintiff filed grievances regarding all of his claims, and defendants have filed those grievances as exhibits, together with any appeals taken by plaintiff. The court notes that the final step in the grievance process for WCJ was to send the grievance to the Citizens' Policy and Complaint Review Council ("CPCRC"). In several of plaintiff's appeals, the CPCRC requested that the WCJ submit further evidence in support of its denial. The CPCRC letters and the evidence submitted in response to those letters have also been filed with defendants' exhibits. In all but one case, after reviewing the additional evidence, the CPCRC sustained the denial of the plaintiff's grievances.

## II. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56*; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor

of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.1994).*

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).* If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord, 467 F.3d at 273.* In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).* However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. ., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Salahuddin v. Goord, 467 F.3d at 272.*

## III. *Excessive Force*

### A. Legal Standards

**\*12** Although the parties have analyzed the excessive force and the conditions of confinement issues under the Eighth Amendment, plaintiff was a pretrial detained while he was incarcerated in WCJ. The right of a pretrial detainee to be free from excessive force *amounting to punishment,* is protected by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment, which relates only to convicted prisoners. *Murray v. Johnson No. 260, 367 F. App'x 196, 198 (2d Cir.2010); Vazquez v. Curcione, No. 11–CV–443, 2013 WL 5408858, at \*3 (W.D.N.Y. Sept.25, 2013) (citing inter alia Caiozzo v. Koreman, 581 F.3d 63 (2d Cir.2009)).*

Even though pretrial detainees are protected by Due Process, the Second Circuit has equated the legal standard for excessive force claims brought by pretrial detainees under the Fourteenth Amendment with the standard used to analyze convicted inmates' Eighth Amendment claims. *Id.* (citing *United States v. Walsh, 194 F.3d 37 (2d Cir.1999)).* The Second Circuit has held that a pretrial detainee may also set forth a constitutional due process violation by showing that the defendants conduct constituted "pre-conviction 'punishment' " or involved an

'intent to punish.' " *Id.* (quoting *Benjamin v. Fraser,* 264 F.3d 175, 188 (2d Cir.2001)).

In *Murray v. Johnson,* the Second Circuit stated that the due process inquiry is articulated in the excessive force analysis under the Eighth Amendment in *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). *Id. Hudson* provides that both an objective and a subjective element must be satisfied to establish an excessive force claim. *Id.* at 49. To satisfy the objective element, the plaintiff must show that the resulting harm or deprivation was sufficiently serious. *Id.* (citing *Walsh,* 194 F.3d at 50). With respect to this element, the law is clear that "a claim of excessive force may be established even if the victim does not suffer 'serious' ... or 'significant' injury, ... provided that the amount of force used is more than 'de minimis,' or involves force that is 'repugnant to the conscience of mankind.' " *Walsh,* 194 F.3d at 47–48 (quoting *Hudson,* 503 U.S. at 7–10) (citations omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000) (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id* . (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

## B. Application

### 1. Cell Incident—November 10, 2010

**\*13** After considering plaintiff's deposition, the affidavits of all the defendants involved, the exhibits, and the five factors outlined in *Hudson, supra,* this court finds that no rational jury could find that defendants used excessive force during the November 10, 2010 incident. There are no genuine issues of material fact in dispute. With respect to the defendants' mental state, they allege that plaintiff bumped defendant VanArnum twice with his shoulder and was warned after the first bump that a second bump

would be considered "aggression." (VanArnum Aff. ¶ 5; Elliott Aff. ¶ 6). Plaintiff stated in his complaint, and admitted at his deposition, that he bumped defendant VanArnum, even though he claims he only accidentally bumped the defendant once. (Compl. at 20, ¶ 4). Plaintiff admittedly was unhappy about being directed to move back to a cell that he did not like. He admits that he initially questioned the move. (Compl. at 19, ¶ 2). Even if defendant VanArnum mistook plaintiff's initial bump as being aggressive, [23] given plaintiff's initial expression of displeasure at moving to another cell and his history of difficult behavior, [24] the resulting conduct was justified because defendant VanArnum "reasonably" perceived a threat, and defendants wanted to prevent any potentially violent conduct by plaintiff.

Defendants' perception is further justified by plaintiff's statement that, as defendants were trying to take him to the floor, he was trying to back out of the cell so that the incident would be "captured" on video. (Compl. at 20, ¶ 6). Plaintiff states that defendant Fisher pulled plaintiff back into the cell. (*Id.*) The defendants could reasonably have perceived plaintiff's conduct in trying to back out of the cell as resistance, or worse, as an attempt to escape the officers. Plaintiff then states that as he was being pulled back into the cell, he

> turned and *fell on someone's foot,* and fell to the floor. As plaintiff fell, plaintiff struck his back on the cell's seat, Sergeant VanArnum fell to the floor also at the same time, causing plaintiff extreme pain.

(*Id.*) (emphasis added). Plaintiff claims that the defendants did not wait for him to apologize after he bumped into defendant VanArnum, however, given the perceived threat, the defendants would not have been unreasonable in failing to wait for plaintiff to "apologize," as he later claimed that he intended to do. [25]

With respect to the amount of force used, defendants state that the extent of the force was only enough to bring plaintiff to the floor in an effort to gain control of a potentially violent situation. Plaintiff states that the defendants "took him" to the floor, but also claims to have tripped over someone's foot on the way down. Plaintiff alleges that after he and defendant VanArnum fell, defendant VanArnum placed his knee on plaintiff's

chest and placed his hand on plaintiff's neck, causing him to choke. (*Id.*) Defendant Elliott and Fisher do not recall seeing defendant VanArnum with his knee on plaintiff's chest or his hand on plaintiff's neck. (Elliott Aff. ¶ 5; Fisher Aff. ¶ 4). Even assuming that somehow when defendant VanArnum fell, he hit plaintiff with his knee or his hand went to his neck, plaintiff admitted at his deposition, that when he told defendant VanArnum that he was choking, the defendant let plaintiff go.

**\*14** Plaintiff also admitted struggling and cursing at the officers, but that when he calmed down, he was let up off the floor and continued moving his belongings without further incident. Defendants Elliott and Fisher were only alleged to have held plaintiff as he fell. Thus, all the evidence suggests that the defendants used only the amount of force necessary to take plaintiff to the ground and only to maintain order.[26] They did not maliciously intend to harm the plaintiff, and they ceased any use of force when plaintiff agreed to calm down.

While plaintiff still claimed that he was denied the opportunity to see the nurse immediately, he admitted that he was examined within a few hours of the incident, and that, other than his alleged back pain, and some alleged "throat" pain, there were no bruises or other injuries sustained as a result of the incident. The medical examination showed two scratches on plaintiff's neck, and no bruises on his back or his body. He was prescribed Motrin and later, Flexiril. By his own admission, plaintiff's back injury, or the exacerbation of his pre-existing back injury,[27] was caused by striking the chair on the way down to the floor in what he admits was a small cell, not by defendants' allegedly "malicious" conduct .[28] Defendant Fisher suffered a knee injury as a result of the incident.

As this incident is described by the defendants, they were simply responding to what they believed was an aggressive act by plaintiff, and they applied the force necessary to maintain order. At worst, even assuming many of the facts as alleged by plaintiff, the defendants' actions could be considered negligent.[29] A correction officer who negligently causes an unintended injury to an inmate has not engaged in the type of wanton or malicious conduct necessary to support an Eighth Amendment excessive force claim. *Daniels v. Williams,* 474 U.S. 327 (1986) (a state official's negligent act causing unintended

loss of or injury to life, liberty, or property does not support a Section 1983 claim). *See also Epps v. City of Schenectady,* 1:10–CV–1101 (MAD/CFH), 2013 WL 717915, at \*6 (N.D.N.Y. Feb. 27, 2013) (negligence cannot be a basis for liability for constitutional torts); *Cicio v. Graham,* 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at \*13 (N.D.N.Y. Mar. 15, 2010) (citing *Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (liability in a § 1983 excessive force action cannot be founded on mere negligence) (collecting cases)). Thus, plaintiff's claim of excessive force on November 10, 2010 may be dismissed.

### 2. Law Library Incident—December 22, 2010

Plaintiff's argumentative nature precipitated the law library incident, and the same analysis applies as that used for the November 10, 2010 incident. Plaintiff was told that he had to leave the law library, even though his time was not up. Plaintiff admits arguing with defendant Peck about whether plaintiff could bring the JLM back to his cell, causing defendant Peck to call Sergeant Little .[30] When plaintiff became disruptive, defendant Little called for the "rovers" to help escort plaintiff back to his housing unit.

**\*15** Defendants allege that plaintiff refused to move, and then he intentionally dropped to the ground when the defendants tried to stand him up, while plaintiff claims that he tripped because the defendants made him walk too fast with leg restraints. There is no issue of excessive force at the beginning of the incident. The fact that plaintiff was "dragged" a short distance and then carried back to his cell also does not rise to the level of excessive force. The defendants' conduct in dragging/carrying plaintiff was directly related to plaintiff's actions and was no more forceful than necessary to get him back to his cell.[31]

Plaintiff alleges that when he and defendants White, Little, M. Minor, and Jannson arrived at his cell, defendant White stood plaintiff up with his face against the bars in order to take off the handcuffs. While plaintiff states that defendant White gave him "a little stiff punch in the back," defendant White states that plaintiff snapped his head back, and White had to place his forearm against plaintiff's head while he was removing the handcuffs so that neither White, nor another officer, would be injured. (White Aff. ¶ 7). White denies punching plaintiff in any way, and defendant Little stated that she did not see defendant White strike plaintiff. Defendant Rivers/

Schuyler, who was not involved in this incident states that she was monitoring the control room on December 22 and witnessed plaintiff's escort from the law library to his holding cell, but never saw defendant White strike or punch plaintiff. (Rivers/Schuyler Aff ¶ 4).

In *Vasquez v. Curcione,* No. 11–CV–443, 2013 WL 5408858, at *4–5 (W.D.N.Y. Sept.25, 2013), plaintiff, also a pretrial detainee, refused to leave the visitation room when directed to do so by the defendants. *Id.* at *2. In light of the plaintiff's refusal to leave the area, the court found that the defendants were required to use reasonable force to remove plaintiff. *Id.* at *4. Plaintiff suffered moderate bruising and a "hurt back" as a result of the defendants' conduct, but the court found that these injuries were "de minimis" and did not result in anything more than short-term pain. *Id.* at *5. The court also found that plaintiff had not articulated facts from which it could be concluded that the force used by the defendants was gratuitous.[32] *Id.* at *5. The court granted summary judgment for the defendants on the excessive force claim.

In this case, in plaintiff's memorandum in opposition to defendant summary judgment motion, he has now embellished his allegations to include "shoving, punching, and swinging," but does not indicate to which alleged excessive force incident he is referring. (Pl.'s Mem. at 6) (Dkt. No. 37). Plaintiff never mentioned these actions in his complaint, or more importantly, during his deposition when he had the opportunity to testify regarding these incidents and was questioned closely about the actions taken by defendant White. Although plaintiff now states that he received medical treatment from the facility which would specifically show that he was "attacked" by the officers at WCJ, he never alleged an "attack" by officers, and a review of the medical evidence shows that plaintiff had no bruises, some small scratches and was prescribed medication for back pain that could have been exacerbated by falling to the floor during the first incident. (*See* Def.s' Ex. M at 8 (report of "recurrent back pain" on admission to WCJ), 10–11 (prescriptions), 19 (nurses' notes of the 11/10/10 incident)).

**\*16** The only part of plaintiff's factual statement and deposition testimony that could even approach "gratuitous" conduct, as the term was used in *Vasquez,* is the allegation that defendant White gave plaintiff "a little stiff punch" in the lower part of his back.[33] The rest of the evidence and plaintiff's inconsistent statements

about the incident negates any suggestion that defendant White "punched" plaintiff. No reasonable fact finder could conclude that defendant White used force beyond that necessary to hold plaintiff's head still while plaintiff's handcuffs were being removed in order to prevent injury to himself and/or another officer. Defendants' actions show that they did not act maliciously or sadistically to cause plaintiff harm, but that they took actions that were directly related to plaintiff's behavior, using only force that was necessary to get plaintiff back to, and then into, his cell .[34] Plaintiff's excessive force claims may be dismissed.[35]

## IV. *Conditions of Confinement*

### A. Legal Standards

As stated above, plaintiff was a pretrial detainee at the time of the incidents in this case. As such, he was protected from unconstitutional living conditions by the Due Process Clause of the Fourteenth Amendment, but the standards for his due process protection are the same as those that protect convicted inmates from Cruel and Unusual Punishment under the 8th Amendment. *LaRock v. Amato,* No. 9:12–CV–503, 2013 WL 5466410, at *9 (N.D.N.Y. Sept.30, 2013) (citations omitted).

The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Prison officials "must 'take reasonable measures to guarantee the safety of inmates.' " *Farmer v. Brennan,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway,* 37

F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. at 298). A defendant must have known of a substantial risk to inmate safety that he or she could have easily prevented but did not. *Hall v. Bennett,* 379 F.3d 462, 464 (7th Cir.2004).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Wilson v. Seiter,* 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer,* 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway,* 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

**\*17** The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Carlson v. Parry,* No. 06–CV–6621, 2012 U.S. Dist. LEXIS 44292, at \*20–21, 2012 WL 1067866 (W.D.N.Y. March 29, 2012) (collecting cases). "A risk can be so obvious that a jury may reasonably infer actual knowledge on the part of the defendant[ ] sufficient to satisfy the subjective component of the deliberateindifference standard. *Id.* (citing *Farmer,* 511 U.S. at 842; *Proffitt v. Ridgeway,* 279 F.3d 503, 506 (7th Cir.2002); *Bagola v. Kindt,* 131 F.3d 632, 646 (7th Cir.1997)). Common sense is relevant to deciding the obviousness of the risk. *See Hall v. Bennett,* 379 F.3d at 465 (citing *Fruit v. Norris,* 905 F.2d 1147, 1150–51 (8th Cir.1990)).

A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511

U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

A plaintiff fails to state a valid Eighth Amendment claim when he does not allege that defendant was personally aware of a dangerous condition or that defendant was deliberately indifferent to the alleged conditions. *Spencer v. Sylvester,* No. 97–CV–5491, 1999 U.S. Dist. LEXIS 1098, at \*8–9, 1999 WL 61644 (E.D.N.Y. Feb 2, 1999) (Eighth Amendment claim was dismissed when plaintiff did not allege defendant was personally aware of slippery conditions on stairs or that the defendant was deliberately indifferent to the conditions). A plaintiff states a claim where he alleges that he informed the defendant of a dangerous condition and the defendant ordered plaintiff to ignore it. *See Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (inmate who fell off a ladder during a work assignment stated an Eighth Amendment claim when a defendant correction officer ordered plaintiff to continue working on the latter after being informed that the ladder was unsafe); *see also Baumann v. Walsh,* 36 F.Supp.2d 508, 513–15 (N.D.N.Y.1999) (differing accounts as to whether defendant had notice of an unsafe work condition and whether a ladder was available for plaintiff to use created genuine issues of fact that defeated defendants' motion for summary judgment).

## B. Application

**\*18** Plaintiff alleges that he was housed in unconstitutional conditions because defendants moved him back to D–11, which was "extremely" cold, and he was denied an extra blanket. Plaintiff also claims that he was denied a shower once, and that on December 14, 2010, he was moved from SHU C–6 to C–10 that was cold and "extremely dirty," but was denied cleaning supplies. (Compl. ¶ 1 at 26). Plaintiff alleges that after Sergeant Jamieson refused to give plaintiff cleaning supplies, he turned off the water to plaintiff's sink and toilet. At one point, plaintiff alleged that he was without water for two weeks.

### 1. Cell Conditions

Plaintiff claims that cell D–11 was extremely cold, and that he was denied an extra blanket. Plaintiff filed at least three grievances regarding the temperature in his

cell. (Def.'s Exs. E–G). The first grievance was filed the day after plaintiff was moved from D–8 ***back to*** D–11 on November 10, 2010. [36] (Def.s' Ex. E at 2) (Dkt. No. 34–6). The grievance was investigated, and denied after the maintenance department checked and determined that the temperature in D–11 was "adequate" and "within normal limits." (*Id.* at 2). The investigation documents also indicate that there were no issues of temperature in "one particular cell" as being different than the other cells on the unit. [37] (*Id.*) The CPCRC denied plaintiff's appeal. (*Id.* at 7).

Plaintiff's second grievance was filed on December 6, 2010, one month after his first grievance regarding the temperature and four days before he was moved to C–6. (Def.s' Ex. F at 2). Plaintiff states that no other inmate in D pod was complaining about the cold in his cell. [38] (*Id.*) On December 9, 2010, the grievance investigator stated that the temperature in plaintiff's cell had been "measured by maintenance" and was in "compliance." (*Id.* at 3). Once again, it was noted that plaintiff was attempting to get his cell moved closer to the television. (*Id.* at 5). Plaintiff's grievance was denied at the facility level and on December 14, 2010, was sent to the CPCRC. (*Id.* at 5, 6). The appeal was denied. (*Id.* at 7).

On December 10, 2010, plaintiff was moved to C–6. (Def.s' Ex. H at 9). Plaintiff did not mention asking for an extra blanket until his third grievance, dated December 16, 2010, after he was moved from C–6 to C–10 on December 14, 2010 for disciplinary reasons. (Def.s' Ex. G and H). In this grievance, plaintiff complained that when he got to C–10, at approximately 9:30 to 10:00 p.m., this cell was cold. (Def.'s Ex. G at 2). Plaintiff stated that he asked Officer Jackson for an extra blanket, but the officer would not give him one. (*Id.*) Plaintiff also claimed that C–10 was dirty, and that he asked to clean it, but was denied cleaning supplies. Plaintiff stated in his grievance that the cell was "no were [sic] near clean," and that his sink and toilet water had been shut off. (*Id.*)

**\*19** The grievance investigator indicated that he spoke with staff, and that plaintiff complained about the temperature in every cell. (*Id.* at 4). The investigator also stated that second blankets were only issued if "medically necessary." (*Id.*) It was later determined that this response was incorrect, and plaintiff was issued a second blanket according to the SHU rules, which provide for a second

blanket to be issued during the winter months. (*Id.* at 3; *see id.* at 11 (SHU Rule # 8)) (notation signed by Lt. Breeyear on December 28, 2010). (*Id.* at 3) Plaintiff appealed the decision, without noting that the blanket issue had been resolved, and the appeal was sent to the CPCRC. (*Id.* at 6).

On February 2, 2011, the CPCRC asked the facility for more information, explaining the denial of the extra blanket, [39] explaining why plaintiff's request for grievance documents was delayed, explaining why the request to clean his cell was denied, and why his cell did not have water. (*Id.* at 7). In response, Officer Jackson submitted a statement, explaining that plaintiff was moved from C–6 to C–10 because he was yelling at, and threatening, the inmates housed in the minimum security dormitory. (*Id.* at 8). During his deposition, plaintiff stated he never threatened other inmates, merely that he had a "verbally ... disrespectful conversation with an inmate saying FU, A hole, and things like that to each other." (Pl.'s Dep. at 70). Although plaintiff stated that he was arguing with only one inmate, the fact that he was cursing at anyone justified moving him for disciplinary purposes.

Defendant Jackson further stated that plaintiff's belongings were moved from C–6 to C–10 while he was getting a haircut. (Def.s' Ex. G at 8). Defendant Jackson states that he inspected C–10 and found that it was clean. When plaintiff was escorted to C–10, he was agitated and continued to yell at inmates and officers. He then began to yell that he wished to clean his cell, but was told that the cell was checked and found clean prior to the move, and that while he was continuing to be disruptive, he would not be allowed to clean the cell. (*Id.*) Defendant Jackson states that a short time later, plaintiff asked to use a typewriter, but Sergeant Jamieson denied the request based upon plaintiff's disruptive behavior. (*Id.*) The shift log entry confirms that plaintiff's request for the typewriter at 9:30 p.m. was denied "for the night" because of his disruptive behavior. (*Id.* at 10).

Sergeant Jackson stated at approximately 10:45 p.m., he noticed water running into the hallway in front of C–10. Plaintiff had plugged his toilet causing a flood in his cell and hallway. Officer Jackson contacted Sergeant Jamieson, who ordered that plaintiff's water be turned off "until further notice." (*Id.* at 8). The only reason that plaintiff's water was turned off was because he was flooding his cell with the toilet. The shift log entry confirms these statements. (*Id.* at 9). This response

was even more reasonable, given plaintiff's conduct on December 12, 2010, which included flooding his cell by filling cups of water from his sink and throwing them under the door. (*See* Lascar Aff. ¶ 6). After considering the additional information, on July 27, 2011, the CPCRC denied plaintiff's appeal, noting only that the facility rules did not require medical approval for an extra blanket, and that the grievance coordinator either misunderstood the rules or lacked interest in addressing the grievance properly. (*Id.* at 18).

**\*20** Plaintiff filed another grievance on December 17, 2010, relative to the move to C–10. In the second grievance he complained about his property, the cleanliness of the cell, and the water. (Def.s' Ex. H at 2). The grievance investigator interpreted the grievance as a complaint about moving plaintiff to C–10 while he was not present.[40] (*Id.* at 4). The grievance was denied because plaintiff had engaged in "uncooperative behavior," and housing assignments are at the discretion of facility staff. (*Id.* at 4). The CRCPC responded by outlining plaintiff's five separate issues and requesting additional information because "the grievance officer's response is illustrative of an incomplete understanding of the grievant's complaint and the range of subjects that are not grievable...." (*Id.* at 7–8). The CRCPC then outlined the additional information that it sought. (*Id.*)

Defendants submitted the additional information as requested, including shift log entries from the date in question, reporting plaintiff's yelling threatening remarks to inmates in the minimum security dormitory, and indicating that he was moved to "limit his contact to min[imum security] inmates." (*Id.* at 10–12). Sergeant Jamieson submitted a statement, confirming that plaintiff was moved because of his disruptive behavior, his belongings were placed on the bunk, not on the floor, and the cell was clean. (*Id.* at 13). Finally, Sergeant Jamieson stated that the water to plaintiff's toilet was turned off because plaintiff flooded the cell. (*Id.*)

Sergeant Jamieson also stated that Sergeant Lascar had informed him on December 15, 2010, that plaintiff wanted an extra blanket, and that plaintiff was given the second blanket. Plaintiff advised Sergeant Lascar that "the grievance was over." Sergeant Jamieson also stated that plaintiff's drinking water was never turned off because the jail staff only has the ability to turn off the water to the toilet. (*Id.* at 13). Sergeant Jamieson did not recall

plaintiff asking to have his water restored on December 18, 2010 because Sergeant Jamieson did not know that the water was off at that time. (*Id.*) At his deposition, plaintiff admitted that the water was turned on so that he could flush the toilet every couple of days. (Pl.'s Dep. at 63). Although he states that he did not drink for a couple of weeks, there is no mention of drinking in his grievances. It would have been reasonable for plaintiff to have included that in one of his many grievances regarding these incidents. He would presumably have been able to drink at meals.

Sergeant Lascar also submitted a statement to the CRCPC. (*Id.* at 14). He explained the decision to move plaintiff to C–10 based upon his behavior. Defendant Lascar stated that he spoke with the minimum security inmates and with plaintiff and ordered them to stop yelling at each other. Although the minimum security inmates complied with this order, plaintiff would not be reasonable. (*Id.*) After considering the additional information, the CRCPC voted to deny plaintiff's appeal.

**\*21** The Second Circuit has held that proof that an inmate was subjected "for a prolonged period to bitter cold" will raise a triable issue of fact relative to the objective prong of the constitutional analysis. *Gaston v. Coughlin,* 249 F.3d 156, 164–65 (2d Cir.2001) (citing *inter alia Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (inmate deliberately exposed to bitter cold in his cell block for three months); *Wright v. McMann,* 387 F.2d 519, 527 (2d Cir.1967)). However, summary judgment is appropriate when the inmate has not been exposed to bitter cold for "a prolonged period." *Louis–Charles v. Courtwright,* No. 9:11–CV–147, 2014 WL 457951, at \*7–8 (N.D.N.Y. Feb.4, 2014) (adopting Rep't Rec.) (sua sponte dismissing claims in which the inmate testified that on three occasions, he was subjected to cold conditions for, at most, ten hours) (citing *Trammell v. Keane,* 338 F.3d 155, 159, 165 (2d Cir.2003) (plaintiff was deprived of his clothing and confined to his cell for a few weeks, but the temperature was not such as to pose a threat to his health and safety of the sort that would prevent summary judgment in defendants' favor).

In this case, plaintiff was in the WCJ for approximately five months from July of 2010 until January of 2011. During this time, he was housed in various cells, all in the SHU. Plaintiff was moved to D–11 for the first time on October 30, 2010, and he only stayed there

until November 4, 2010. He was moved to D–8 for "reorganization" purposes because prison officials needed D–11 for other inmates. He was then taken back to D–11 and remained there for approximately one month. He claims that D–11 was the only cold cell on the unit because he stated that none of the other inmates had trouble with the temperature. [41]

When he was moved to C–6 on December 10, 2010, he could not behave himself and was disruptive with other inmates, thus, he was moved to C–10. He then complained that C–10 was cold and dirty. Every time he was moved to a cell that he did not like, he complained about the temperature. The defendants have also shown that when plaintiff asked for a blanket, the request was initially denied, but he was ultimately given another blanket. The temperature in plaintiff's cell was checked twice by the maintenance department according to the grievance documents, and each time, it was noted that the temperature was in compliance with the proper standards. Plaintiff has not shown that he was subjected to "bitter cold" for a "prolonged" period of time or that the temperature in his cell posed a threat to his health. *See also Borges v. McGinnis,* No. 03 Civ. 6375, 2007 WL 1232227, at *5 (W.D.N.Y. April. 26, 2007) (an inmate may not establish a constitutional violation merely by showing that he was uncomfortably cold for a short period of time).

Finally, although plaintiff testified that he never flooded his cell, the unit log books contradict plaintiff's allegation. Plaintiff does not contest the accuracy or veracity of the log book entry that clearly shows that plaintiff's water was turned off "due to inmate flooding cell." (Def.s' Ex. H at 12). Plaintiff's conclusory allegations are insufficient to defeat the defendants' motion for summary judgment. *See Inesti v. Hogan,* No. 11 Civ. 2596, 2013 WL 791546, at *23 & n. 39 (S.D.N.Y. March 5, 2013) (although it is unlikely that prison log books would reflect the wrongful denial of a constitutional right, plaintiff did not contest the accuracy of the log books, and his conclusory allegations were insufficient to defeat the defendants' motion for summary judgment), Rep't Rec. *adopted by* 2013 WL 5677046 (S.D.N.Y. Sept.30, 2013); *Headly v. Fisher,* No. 06 Civ 6331, 2010 WL 2595091, at *4 (S.D.N.Y. June 28, 2010) (contemporaneous log book entries eliminate any genuine issue of material fact that plaintiff was not deprived of opportunities to shower or go to recreation while under keeplock status).

*22 It has been held that chronic exposure to unsanitary conditions and prolonged cold may establish a constitutional violation. *See Gaston v. Coughlin,* 249 F.3d 156, 165 (2d Cir.2001). In *Gaston,* however, mice were constantly entering the cell, and for several consecutive days, the area in front of plaintiff's cell was filled with human waste, and sewage water, there were broken windows in Gaston's cell block, and despite numerous complaints, the windows were not fixed the entire winter, exposing inmates to *sub-zero temperatures. Id.* In this case, as stated above, plaintiff was given an extra blanket; his cells seemed to be the only ones having a temperature problem (a highly unlikely situation); [42] and he admits that his water was turned on every couple of days so that he could flush the toilet. [43] Plaintiff alleges no ill effects as the result of the allegedly unsanitary or unhealthy condition of his cell.

Plaintiff's inconsistent allegations do not create material issues of fact sufficient to defeat defendants' summary judgment motion. *See Scott v. Harris,* 550 U.S. 372, 379–81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (when opposing parties tell two different stories, one of which is blatantly contradicted by the record evidence, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment); *McKinney v. Dzurenda, supra; Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account"); *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case"). Thus, plaintiff's claim of cold and unsanitary cell conditions may be dismissed. [44]

## 2. Shower

In his complaint, plaintiff alleges only that he was denied a shower once by defendant Rivers/Schuyler and Sergeant VanArnum. (Compl. ¶¶ 1–3 at 28 (top of page)). At

his deposition, plaintiff stated that he was not denied a shower "too many times." (Pl.'s Dep at 66). Even assuming that plaintiff was denied the shower once, this circuit has rejected claims of shower deprivation, lasting up to two weeks. *See Williams v. Ramos,* No. 13 CV 826, 2013 WL 7017674, at *6 (S.D.N.Y. December 23, 2013) (deprivation of shower for nine days) (citing *Banks v. Argo,* No. 11 Civ. 4222, 2012 WL 4471585, at *4 (S.D.N.Y. Sept.25, 2012) ("[E]ven assuming prison officials denied Plaintiff shower access for the entire time alleged in his complaint-thirteen days-his claim still fails as a matter of law.") (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) ("[A] two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs.' ")).

**\*23** The court notes that plaintiff's first grievance regarding shower privileges was dated December 16, 2010[45] and stated that "at or around 8:30—9:00 I ask [sic] the officer Ms. 'Rivers' can I get a shower." (Def.'s' Ex. K at 2) (Dkt. No. 34–11). Plaintiff states that he was refused his shower because Sergeant VanArnum said that plaintiff was not getting anything. (*Id.*) Plaintiff stated that he had not had a shower in four days.[46] (*Id.*) Plaintiff's grievance was denied because he did not follow the SHU rules for requesting a shower which required plaintiff to be at his cell door at 8 a.m. to request a shower. (*Id.*) A copy of the SHU rules was included in the grievance documents. (*Id.* at 6). Rule No. 2 of the "Special Housing Rules for All Inmates" provides that "ALL INMATES WHO WISH TO SHOWER AND SHAVE WILL BE AT THEIR CELL DOOR AT **8 AM** AND REQUEST TO DO SO TO THE UNIT OFFICER." (*Id.*) (emphasis added). By plaintiff's own admission, he was half an hour late to request a shower, thus, even if defendant Rivers/Schuyler did deny plaintiff a shower, she did so according to facility rules.[47] Plaintiff's shower claim may be dismissed. This is the only allegation remaining[48] against defendant Rivers/Schuyler, and thus, the complaint may be dismissed in its entirety as against this defendant.

## V. *Religious Services*

### A. Legal Standards

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure

of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). The right is not extinguished simply because the inmate is in SHU or keeplock. *Id.* (citing *Salahudin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993)). However, the right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04–CV–57, 2007 WL 3046703, at *4 (N.D.N.Y. Oct.17, 2007).

To succeed on a claim under the Free Exercise Clause, the plaintiff must show at the threshold, that the defendants' conduct "substantially burdens his sincerely held religious beliefs." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 (S.D.N.Y.2008) (quoting *Salahuddin,* 467 F.3d at 274– 75 (citing *Ford,* 352 F.3d at 591). The issue of whether a "substantial burden" is required has been discussed at length, and although not specifically decided, recent cases still apply the requirement to Free Exercise cases. *See Walker v. Artus,* No. 9:10–CV–1431(MAD/DEP), 2013 WL 564909, at *8–9 (N.D.N.Y. Sept. 30, 2013) (citing *Salahuddin,* 467 F.3d at 274–75).

The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects inmates' religious rights.[49] RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000cc-l(a). For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith. In addition, this interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at * 14 (S.D.N.Y. Apr.22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

### B. Application

**\*24** In this case, plaintiff can not establish the first prong of either the Free Exercise or the RLUIPA standard.

Plaintiff claims that on two occasions, he was denied the ability to attend a bible study class. First, plaintiff never mentions what religion he follows. While this is not conclusive, plaintiff also does not allege how this denial substantially burdened the exercise of his religion. Plaintiff was incarcerated in WCJ from July of 2010 until late January of 2011, and he only complained of missing his bible study on two occasions, once on December 14, 2010 [50] by defendant Hafner, and the second time on January 8, 2011 by defendants R. Minor and Lascar. Neither defendant Hafner, nor defendant R. Minor recall denying plaintiff the ability to go to Bible Study on December 14, 2010. (Hafner Aff. ¶ 5; R. Minor Aff. ¶ 6).

The grievance plaintiff filed regarding the December 14, 2010 incident did not indicate which officer denied plaintiff the ability to attend Bible Study, and there is no indication that an investigation was conducted or that any officer was interviewed regarding the incident. (Def.s' Ex. L at 2). Plaintiff was more specific in his second grievance and alleged that R. Minor and defendant Lascar denied plaintiff the ability to attend the Bible Study because it was considered "a program" and thus, plaintiff did not have to go. (*Id.* at 3). The only investigation document states that the grievance was denied because plaintiff caused a disturbance on the date in question. (*Id.* at 4). Although plaintiff's grievance was granted regarding this issue, it is not indicative of a constitutional violation on its own.

The court notes that, according to Officer Marion Bassett, plaintiff attended "WCJ's Bible Study Program" on December 5, 2010. (Bassett Aff. ¶ 3) (Dkt. No. 34–15). Officer Bassett remembers this because on his way back from bible study, plaintiff punched the window in front of the control room where Officer Bassett was standing "and then flipped [her] his middle finger," and yelled at her " ' you know where I live, come and get me.' " (*Id.*) (emphasis in original).

The court will assume that plaintiff was denied the ability to attend Bible Study on two occasions. In *Gill v. DeFrank,* the court held, agreeing with those courts in the Second Circuit which hold, [51] that missing one religious service does not constitute a substantial burden on an inmate's right to the free exercise of his religion. 2000 WL 897152, at *2 (citing *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622, at *15 (S.D.N.Y. Oct.15, 1999); *Boomer v. Irvin,* 963 F.Supp. at 15). *See also Hanton v. Mathiau,* 29 F. App'x 772, 773 (2d Cir.2002) (affirming district court granting summary judgment based on a denial of religious services on two separate occasions); *Smith v. Graziano,* No. 9:08–CV–469(GLS/RFT), 2010 WL 1330019, at *9 (N.D.N.Y. March 16, 2010) (cancellation of two religious services which appeared to be isolated occurrences, rather than a systemic policy of denying religious services constituted a de minimis or insubstantial burden on plaintiff's ability to freely exercise his religion).

**\*25** This court agrees that based on the facts in this case, plaintiff's inability to attend two bible study classes in the six months that he was incarcerated at WCJ did not substantially burden the ability to practice his religion. There is no indication that plaintiff was not able to study the bible on his own during the two incidents in question. Thus, plaintiff's first amendment claim, and to the extent the court reads a RLIUPA claim into the complaint, may be dismissed.

## VI. *Municipal Liability*

### A. Legal Standards

The court notes that Judge D'Agostino dismissed the "Washington County Sheriff's Department as a defendant in her July 16, 2012 decision and ordered the Clerk to replace the Sheriff's Department with "Washington County" in the caption of the complaint. (Dkt. No. 7 at 6 n. 3). Judge D'Agostino also discussed the standard for municipal liability which requires that the municipality adopt a "custom" or "policy" which is the moving force behind plaintiff's constitutional violation. *Id.* at 5 (citing *Zappala v. Albicelli,* 980 F.Supp. 635, 639 (N.D.N.Y.1997) (citing *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 659, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). A municipality may not be held liable on the basis of respondeat superior alone, and a single incident alleged in a complaint, particularly if it involves only actors below the policymaking level, will not suffice to raise an inference of the existence of a custom or policy. *Id.* (citing *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)). In addition, plaintiff may not simply allege that there was a failure to train municipal employees or assert in a conclusory manner that the municipality has a custom or policy. *Id.*

### B. Application

Because this court has found no constitutional violations, there is no need to discuss municipal liability, and

the complaint may be dismissed as against Washington County. The court would note that plaintiff's assertions of "custom" or "policy" at the end of many of his claims were entirely conclusory. *See e.g.* Compl. at 23, ¶ 5) (stating that it was the WCJ's "policy or custom regarding lack of basic necessities" that caused the violation of plaintiff's Fourteenth Amendment due process rights).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 34) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST ALL REMAINING DEFENDANTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**\*26** Filed Feb. 21, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1289582

Footnotes

1　Judge D'Agostino dismissed the complaint in its entirety as against defendants Trip and Breeyear and as against the Washington County Sheriff's Department. (Dkt. No. 7 at 19–20). She ordered the Clerk to replace the Washington County Sheriff's Department with Washington County in the caption. (Dkt. No. 7 at 6 n. 3).

2　Although Judge D'Agostino dismissed plaintiff's other claims without prejudice and with the opportunity to amend, (Dkt. No. 7 at 7 n. 5), plaintiff did not attempt to file an amended complaint. Rather, in his response to defendants' motion for summary judgment, plaintiff simply added the old claims back into his argument. This is not sufficient to revive the dismissed claims.

3　At his deposition, plaintiff was asked to identify which defendants were associated with each of plaintiff's remaining claims. With respect to excessive force, plaintiff named defendants Elliott, Little, M. Minor, White, Tripp, and VanArnum. (Pl.'s Dep. at 93, 95–97, 99). Although the complaint is clear that defendant Fisher participated in one of the incidents, at his deposition, plaintiff testified that he was not too sure why he sued Fisher. (*Id.* at 100).

4　The court will cite to the complaint by its CM/ECF page number, together with the number that plaintiff has assigned to the paragraph on the page. The reason for the double citation is that plaintiff has numbered each claim beginning with paragraph 1. Thus, there are multiple paragraphs with the same number.

5　For ease of identification, the court will refer to the cells with the letter identifying the "Pod" and then the number of the cell (i.e. "D–8" refers to cell number 8 in D–Pod).

6　The citations are to the original page numbers at the top right-hand corner of the deposition pages. The pages are not all numbered consecutively because defendants filed only excerpts of the deposition.

7　This detail was not in the complaint.

8　Plaintiff did not mention this detail either in his complaint or during the deposition. According to the plaintiff, his reason for wanting to stay in cell D–8 was that D–11 was too cold.

9　Plaintiff did not mention the knee on his chest during the deposition.

10　Defendant Elliott also filed a contemporaneous report regarding the incident. (Def. s' Ex. C; Dkt. No. 34–4 at 11). In that report, defendant Elliott also noted that plaintiff had been told that his stay in D–8 would only be temporary, and that he would be moved back to D–11 after other inmates had been moved out. (*Id* .) This is consistent with the statement in the complaint that plaintiff was told that he was initially moved to D–8 "to make room for Protective Custody Inmates." (Compl. at 19, ¶ 1).

11　Defendant Jansson was the third officer who arrived at the law library and was involved in carrying plaintiff back to his cell. (Jansson Aff. ¶ 3) (Dkt. No. 34–22). The complaint does not mention this defendant in its description of the law library incident.

12　During his deposition, plaintiff testified that when Officer Peck refused to allow plaintiff to borrow the JLM, plaintiff left Peck's office and went back to sit down at the computer to look up more cases, and it was then that Peck came out of his office, and the other officers arrived to help take plaintiff back to his cell. (Pl.'s Dep. at 54). The exact details of the

incident regarding who showed up and when are not material. All parties agree that plaintiff argued about going back to his cell, and defendant Little called the rover guards to assist her in getting plaintiff back to his unit.

13   Plaintiff never mentions anyone putting ankle restraints on him, and there is no indication that he had ankle restraints on prior to the arrival of the other officers.

14   During his deposition, after denying that he called Sergeant Little a "fat slob" and Officer Minor a "bitch with a badge," plaintiff admitted that he called Officer White a "faggot" and an "A hole." (Pl.'s Dep. at 57–58).

15   In the complaint, plaintiff states that about *10–15 minutes* after he was locked in, Officers Minor, White and Little came to his cell with a nurse so that plaintiff could be examined. (Compl.¶ 15).

16   Defendant "M." Minor is a female officer (Michele).

17   This defendant "A. Rivers" has submitted an affidavit explaining that her name is now "Schuyler," and that Rivers is her maiden name. (Schuyler Aff. ¶ 1) (Dkt. No. 34–29).

18   Plaintiff testified at his deposition that the defendants associated with the unconstitutional conditions of confinement were: Officers Jackson and Sergeant Lascar. (Pl.'s Dep. at 101, 104). His complaint indicates that he was denied the shower by Officer Rivers/Schuyler and Sergeant VanArnum. (Compl. at 28, ¶ 8 (top of page)). The complaint also alleges that the individuals responsible for denying him extra blankets were: Officers Jackson, R. Minor, M. Minor; A. Rivers, and Sergeants Dougherty, Jamieson (plaintiff misspelled this defendant's name, but the court will refer to him by the correct spelling—"Jamieson"), and Lascar.

19   The court notes that any personal property and access to court claims were dismissed by Judge D'Agostino.

20   Plaintiff subsequently filed a grievance complaining about the deprivation of his property during this incident.

21   The complaint only alleges the denial of a shower on one date by two defendants. (Compl. at 28, ¶ 1 (top of page)).

22   This is a different "Minor" that the defendant discussed above. M. Minor is Officer Michele Minor, and R. Minor is Officer Richard Minor.

23   Plaintiff stated that his shoulder was lowered in order to maneuver around defendant VanArnum, due to the size of the cell, however, the lowering of plaintiff's shoulder could also have been interpreted as an aggressive posture.

24   Defendant Gene McKenna, the WCJ administrator has submitted an affidavit, in which he states that plaintiff spent most of his time in SITU while incarcerated in WCJ. (McKenna Aff. ¶ 5) (Dkt. No. 34–25). Defendant McKenna indicates that the disciplinary infractions causing plaintiff's confinement to SITU included numerous counts of disobeying staff; numerous counts of insolence toward corrections officers; numerous counts of disruptive conduct; numerous counts of making threats toward others; and numerous counts of engaging in violence or threats of violence. (*Id.*) Plaintiff also admitted that he had many disciplinary problems, and that he was ultimately transferred to Mid–State SITU because he had too many disciplinary tickets. (Pl.'s Dep. at 105).

25   This is assuming that plaintiff only bumped defendant VanArnum once as plaintiff claims. The court is making no such finding as all the evidence generated contemporaneously to the incident supports the defendants allegation that plaintiff bumped defendant VanArnum twice.

26   Defendant VanArnum's warning to plaintiff was clearly an effort to avoid the use of any force at all.

27   The medical records indicate that plaintiff complained of "recurrent back pain" when he was admitted to the facility in July of 2010, contrary to plaintiff's allegation that he never had back pain before the November 10, 2010 incident. (Def.s' Ex. M at 8, 15) (Dkt. No. 34–14).

28   During his deposition, he stated that he "inadvertently" hit the stool. (Pl.'s Dep. at 83).

29   None of the defendants recall plaintiff hitting the chair on the way to the floor, and defendant VanArnum states that he did not put his knee on plaintiff's chest. The court is not making any factual finding, nor do I need to make any factual finding regarding the details of the fall.

30   Whether defendants Peck was incorrect about the JLM or whether the defendants were incorrect in forcing plaintiff to go back to his cell is not relevant. An inmate is required to follow officers' orders regardless of whether the inmate may believe that he is correct and the officers are wrong.

31   During his deposition, plaintiff stated that the "dragging and carrying was the force used," but it was not "that long," only 3–5 feet, and he was not injured by the dragging. (Pl.'s Dep. at 80–81). Plaintiff also admitted that the defendants "took" plaintiff's actions "as me just trying to like sit down or lay down. Like come on." (*Id.* at 56). He also stated that, while he was not struggling or resisting, he was cursing at the defendants and telling them to "get the F off me." (*Id.*)

32   The court recognized that less serious injuries could support a claim of excessive force where the force used was excessive and gratuitous. *Vazquez,* 2013 WL 5408858, at *4 (citing *Lemmo v. McKoy,* No. 08–CV–4264, 2011 WL 843974, at *5 (E.D.N.Y. March 8, 2011)* (twisting of plaintiff's thumbs was entirely gratuitous); *Davenport v. County of Suffolk,* No. 99–CV–3088, 2007 WL 608125, at *11 (E.D.N.Y. Feb.23, 2007)* (denying summary judgment where

defendant allegedly hit plaintiff's head against the car intentionally and unnecessarily); *Wilkins v. Gaddy,* 559 U.S. 34, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010) (an inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury).

33 The court notes that both plaintiff and defendant White state that White's left forearm was against plaintiff's head. While plaintiff alleges that White gave him a stiff little punch with his right hand, it is clear that defendant White was assisting the other officers in the removal of the handcuffs. The hand cuffs would probably have been at the level of plaintiff's low back. Thus, it is possible that plaintiff felt pressure in that area while defendants were trying to remove the handcuffs so that plaintiff could be locked back in his cell. Defendant Jansson made a statement in connection with the disciplinary charges against plaintiff resulting from this incident. Defendant Jansson states that he was the officer who began to take the restraints off plaintiff, but that plaintiff was "resisting," and plaintiff was "restrained" by officers White and Minor, while defendant Jansson finished removing his restraints. (Def.'s Ex. B at 40). Sergeant Little and Officer White also made a statement in connection with the disciplinary charges. (*Id.* at 41, 42). The defendants all noted in their statements that plaintiff was verbally abusive during this incident and told defendant White that plaintiff would " 'fuck him up.' " (*See id.* at 41, 44).

34 Finally, defendant McKenna points out that when plaintiff appealed the grievance relating to the law library incident, the New York State Commission of Correction Citizens Policy and Complaint Review Council ("CPCRC") viewed video evidence of the incident, but found that it did not substantiate plaintiff's claims. The CPCRC requested the video taped evidence. (Def. s' Ex. D at 9 (letter from CPCRC requesting additional evidence regarding the incident)). That video taped evidence has not been found. (*See* McKenna Aff. ¶ 7; Def.'s Ex. D at 21 (affirmance of denial of grievance), 22 (letter from counsel for the Commission on Correction, stating that the Commission did receive copies of the video footage, but "[u]nfortunately, said copies have since been lost or misplaced and are no longer maintained in the Commission's files."). The absence of the video footage does not change this court's findings because plaintiff's allegation of excessive force is contradicted by all the evidence, including his own statements. The court also notes that in *McKinney v. Dzurenda,* No. 13–1901, 2014 WL 642572, at *1 (2d Cir. Feb.20, 2014), the Second Circuit reaffirmed the holding that when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no jury could possibly believe it, the court should not adopt that version for purposes of ruling on a motion for summary judgment.

35 The court would point out that plaintiff only alleges that defendant White used any force on him during the law library incident. Defendant Peck did not leave the law library and was not present for the alleged "punch." Defendant Little states that she did not see White strike plaintiff, and plaintiff testified that M. Minor never used any force during the incident. (Pl.'s Dep. at 94). Plaintiff never mentioned the third rover. In order for any officers present at the use of force to be held liable for "failure to intervene," they would have to have had the opportunity to stop the unconstitutional conduct. If at worst plaintiff alleges one "little" punch, none of the other officers would have had the opportunity to stop that conduct because it was over as soon as it happened. Thus, even if the case were to proceed on the law library incident, it would proceed only as against defendant White.

36 Defendants have also filed a "Cell Movement Log," showing the dates that plaintiff was housed in a particular cell for the entire time that plaintiff was incarcerated at WCJ. (Def.s' Ex. H at 9). Plaintiff was only housed in D–11 for approximately one month. (*Id.*)

37 The investigator also found that plaintiff did not like D–11 because it was further away from the television and from other inmates. (Def. s' Ex. E at 5).

38 Specifically plaintiff stated: "I asks [sic] every inmate in D pod is they [sic] cell cold [sic] they tell me no and always tell me its [sic] cold in your cell I can feel it over here (meaning) out side of my cell...." (Def.s' Ex. F at 2).

39 Apparently the CPCRC was not aware that plaintiff was given an extra blanket long before the appeal was sent on January 3, 2011. Officer Jamieson stated that plaintiff was given a blanket on December 15, 2010, even before he filed the grievance on December 16, 2010. (Def.s' Ex. H at 13).

40 Plaintiff's belongings were presumably moved while he was not in his cell in order to avoid another incident like the one on November 10, 2010.

41 In his grievance, plaintiff alleged that he asked "every inmate in D Pod." (Def. s' Ex. F at 2).

42 Defendant Jamieson states that "all WCJ housing units are controlled by central thermostat, which is regularly monitored by maintenance and set and maintained at temperatures prescribed by New York state law." (Jamieson Aff. ¶ 6). Thus, it is highly unlikely that only one cell on the unit was so unbearably cold.

43 Defendants do not concede that plaintiff's water was turned off for an extended period of time. As defendant Jamieson stated, he did not recall plaintiff asking to have his water turned on December 18, nor was defendant Jamieson aware that the water was off because the jail staff did not have access to turn the drinking water off, only the toilet water. (Def.s'

Ex. H at 13). In defendant Jamieson's affidavit, he states that as a result of plaintiff's repeated attempts to flood his unit, his water was turned off for short periods of time. During those *short* intervals, plaintiff could request to have his water temporarily turned back on by making this request to the corrections officer who was making rounds to allow him to use the facilities in his cell. (Jamieson Aff. ¶ 7). Defendant Dougherty's affidavit also states that plaintiff's water was never turned off for more than a few hours at a time, and was turned back on so that plaintiff could "use the toilet and/or drinking fountain under direct supervision." (Dougherty Aff. ¶ 7).

44    In any event, the only defendants that were involved in the plaintiff's challenged conditions of confinement were defendants Lascar; Jamieson; and Jackson.

45    Plaintiff indicated in the grievance that the denial of the shower happened on December 15, but that he was not given the grievance form until the next day. (Def. s' Ex. J at 2).

46    As stated above, the deprivation of a shower for up to two weeks has been rejected as the basis for a constitutional violation. Thus, defendant Rivers/Schuyler did not violate plaintiff's constitutional rights when she denied him a shower on December 15, 2010.

47    On December 22, 2010, the same day as the law library incident described above, plaintiff filed another grievance regarding the denial of a shower. (Def.'s Ex. K at 2) (Dkt. No. 34–12). However, in that grievance, plaintiff admitted being late, but argued that he went to the law library and missed the shower call, not that he failed to get up in time. He stated that he had been told he would get the shower when he got back, but CO "Peck" and Sergeant "Little" "made a problem in the law library because I was right by the Facility Rules...." (*Id.*) Plaintiff requested his shower if that was possible. (*Id.*) The grievance was denied at the facility level and ultimately on appeal to the Commission on Correction. (*Id.* at 4–7). It is clear from the documents that plaintiff concedes that he was not at his cell at the appropriate time in order to request the shower, and he then became disruptive at the law library causing the incident described above. Clearly, the subsequent denial of a shower was justified under the rules and did not violate plaintiff's constitutional rights. In any event, plaintiff did not challenge this denial in his complaint.

48    At plaintiff's deposition, he testified that he was not sure why he sued Officer Rivers/ Schuyler. (Pl.'s Dep. at 99). He stated that he thought he named defendant Rivers/Schuyler because she denied him the ability to type up a motion, and he could not recall whether she ever denied him a shower. (*Id.*) The complaint does allege that this defendant denied him a shower on one occasion. Judge D'Agostino has dismissed any claims regarding access to courts. Thus, any claim that Rivers/Schuyler denied plaintiff the ability to type a motion has already been dismissed, and I am recommending dismissal of plaintiff's shower claim.

49    Plaintiff did not mention RLUIPA in his complaint. However, in his memorandum in opposition to defendants' motion, plaintiff has included a random article from "Wikipedia" discussing RLUIPA. (Pl .'s Ex. H) (Dkt. No. 37 at 45–50). Plaintiff does not make any arguments relative to this article. He only includes it as an exhibit with much of the article underlined, most of which has nothing to do with this case. However, in an attempt to interpret plaintiff's claims as liberally as possible, this court will also analyze plaintiff's religion claim under RLUIPA. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")).

50    Although the complaint states that the date of the first incident was December 19, 2010, the grievance plaintiff filed states that the date was December 14, 2010, and was filed on December 20, 2010. (Def.s' Ex. L at 2). In this grievance, plaintiff never specified who denied him the ability to go to bible study.

51    There is a split of authority regarding whether missing one religious service can be a substantial burden on an inmate's right to practice his religion. *Robinson v. Jimminez,* No. 08–CV902, 2012 WL 1038917, at *6 (E.D.N.Y. March 6, 2012) (citing *Page v. Breslin,* No. 02–CV–6030, 2004 WL 2713266, at *6 (E.D.N.Y. Nov.29, 2004) (citing cases)), *Rep't Rec. adopted,* 2012 WL 1039825 (E.D.N.Y. March 8, 2012).

---

End of Document      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 5975027
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jonathan HENRY, Plaintiff,

v.

James F. DINELLE, Corrections Officer; Russell
E. Duckett, Corrections Officer; Alfred J. Deluca,
Corrections Officer; Donald L. Broekema,
Sergeant; and Jean Norton, Nurse, Defendants.

No. 9:10–CV–0456 (GTS/DEP).
|
Nov. 29, 2011.

**Attorneys and Law Firms**

Sivin & Miller, LLP, Edward Sivin, Esq., of Counsel, New York, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Timothy P. Mulvey, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this prisoner civil rights action filed by Jonathan Henry ("Plaintiff") against the five above-captioned employees of the New York State Department of Corrections and Community Supervision ("Defendants"), is Defendants' motion for partial summary judgment. (Dkt. No. 24.) For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint alleges that, between approximately January 29, 2009, and January 31, 2009, at Ulster Correctional Facility in Napanoch, New York, Defendants violated Plaintiff's following rights in the following manner: (1) Defendants Nurse Jean Norton, Corrections Officer James F.

Dinelle, Corrections Officer Russell E. Duckett and Corrections Officer Alfred J. DeLuca violated Plaintiff's rights under the First Amendment by filing retaliatory false misbehavior reports against him, and subsequently providing false testimony against him at administrative disciplinary hearings, which resulted in his spending time in the Special Housing Unit ("SHU"); (2) Defendant Dinelle violated Plaintiff's rights under the Eighth Amendment by assaulting him on two occasions, and Defendants DeLuca and Duckett violated Plaintiff's rights under the Eighth Amendment by assaulting him once; (3) Defendant Sergeant Donald L. Broekema violated Plaintiff's rights under the Eighth Amendment by failing to intervene to prevent one of these assaults from occurring; (4) Defendant Norton violated Plaintiff's rights under the Eighth Amendment by harassing him almost immediately before he was subjected to the above-described assaults; and (5) Defendants Norton, Dinelle, Duckett and DeLuca violated Plaintiff's rights under the Fourteenth Amendment by performing the aforementioned acts, which constituted atypical and significant hardships in relation to the ordinary incidents of prison life. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Familiarity with the factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

### B. Undisputed Material Facts

At all times relevant to Plaintiff's Complaint, Plaintiff was an inmate and Defendants were employees of the New York Department of Corrections and Community Supervision at Ulster Correctional Facility. On January 30, 2009, Defendant Dinelle took Plaintiff to the medical ward, because Plaintiff was experiencing a foul odor and oozing from a wound on his leg. After Defendant Norton treated Plaintiff, she filed an inmate misbehavior report against Plaintiff based on (1) Plaintiff's harassing behavior toward Defendant Norton and Defendant Dinelle, and (2) Plaintiff's disobedience of a direct order to be quiet. The misbehavior report was signed by Defendant Dinelle as an employee witness.

At his deposition, Plaintiff testified, while leaving the infirmary, he was punched and kicked by Defendant Dinelle and two unknown prison officials. Plaintiff was then taken to the SHU, where he waited with Defendants Dinelle and Duckett, and up to three more individuals, for a sergeant to arrive. When Defendant Broekema (a

sergeant) arrived at the SHU, Plaintiff was taken to a frisk room, where a frisk was conducted. During the frisk, Defendants Dinelle, Duckett and (Plaintiff suspected) DeLuca used force to bring Plaintiff to the ground. Plaintiff testified that, during the use of force, he was simultaneously punched in the nose by two officers while their supervisor watched.

**\*2** After the use of force, Plaintiff stated to Defendants Dinelle, Broekema and Duckette, "I will be contacting my attorney," or "I will be calling a lawyer." [1] Plaintiff never used the term "grievance" when addressing Defendants Dinelle, Broekema and Duckette (or Defendant Norton). [2] Subsequently, Defendant Duckett filed an inmate misbehavior report against Plaintiff based on his disobedience of frisk procedures and a direct order. Defendant DeLuca signed this report as a witness to the events.

Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts, as set forth in the parties' Rule 7.1 Statement and Rule 7.1 Response, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties. (*Id.*)

### C. Defendants' Motion

Generally, in support of their motion for partial summary judgment, Defendants argue as follows: (1) Plaintiff's claim that Defendants issued false misbehavior reports should be dismissed because Plaintiff has no constitutional right to be free of false misbehavior reports; (2) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (a) engaged in protected activity, or (b) suffered adverse action as a result of engaging in protected activity; (3) Plaintiff's Fourteenth Amendment substantive due process claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants deprived Plaintiff of his liberty rights; (4) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she (a) used force against Plaintiff, or (b) was in a position to prevent the use of force from occurring, yet failed to do so; (5) Plaintiff's Eighth Amendment excessive-force claim

against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"; (6) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Broekema had a realistic opportunity to intervene to prevent or stop the assault, yet failed to do so; and (7) Defendants are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].). [3]

In Plaintiff's response to Defendants' motion for partial summary judgment, he argues as follows: (1) his retaliation claims should not be dismissed because there are triable issues of fact as to whether Defendants retaliated against him for stating that he would be contacting an attorney; (2) his failure-to-intervene claim against Defendant Broekema should not be dismissed because there are triable issues of fact as to whether Defendant Broekema failed to prevent excessive force from being used against him; (3) his excessive-force claim against Defendant DeLuca should not be dismissed because there are triable issues of fact as to whether Defendant DeLuca used excessive force against him; and (4) Defendants are not protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].) [4]

**\*3** In their reply, Defendants essentially reiterate their previously advanced arguments. (*See generally* Dkt. No. 29, Attach. 1 [Defs .' Reply Memo. of Law].)

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga Cnty. Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at \*2–3 (N.D.N.Y. Sept.29, 2009) (Suddaby, J.), which accurately recites that legal standard.

## B. Legal Standards Governing Plaintiff's Claims

### 1. First Amendment Retaliation Claim

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak, 389 F.3d 379, 380–81 (2d Cir.2004).* Central to such claims is the notion that, in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of his First Amendment rights. *See Gill, 389 F.3d at 381–383.* Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983).* As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).*

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that (1) the speech or conduct at issue was "protected", (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.

*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Gill, 389 F.3d at 380* (citing *Dawes v. Walker, 239 F.3d 489, 492* [2d Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996).*

**\*4** In determining whether an inmate has established a prima facie case of a causal connection between his protected activity and a prison official's adverse action, a number of factors may be considered, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir.1996); Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y.2002).* Even where the inmate has established such a prima facie case, the prison official may be entitled to judgment as a matter of law on the inmate's retaliation claim where the prison official has satisfied his burden of establishing that the adverse action would have been taken on proper grounds alone. *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir.1994); Jordan v. Garvin, 01–CV–4393, 2004 WL 302361, at \*6 (S.D.N.Y. Feb.17, 2004).*

### 2. Eighth Amendment Claims of Excessive–Force and Failure–to–Intervene

To establish a claim of excessive-force under the Eighth Amendment, a plaintiff must satisfy two components: "one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord, 554 F.3d 255, 268 (2d Cir.2009).* In consideration of the subjective element, a plaintiff must allege facts which, if true, would establish that the defendant's actions were wanton " 'in light of the particular circumstances surrounding the challenged conduct.' " *Id.* (quoting *Blyden v. Mancusi, 186 F.3d 252, 262* [2d Cir.1999] ). The objective component asks whether the punishment was sufficiently harmful to establish a violation "in light of 'contemporary standards of decency.' " *Wright, 554 F.3d at 268* (quoting *Hudson v. McMillian, 503 U.S. 1, 8* [1992] ).

Generally, officers have a duty to intervene and prevent such cruel and unusual punishment from occurring or continuing. *Curley v. Village of Suffern, 268 F.3d 65, 72*

(2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). "It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers." *Cicio v. Lamora,* 08–CV–0431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb.24, 2010) (Peebles, M.J.). A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation. *Id.* at *8. To establish a claim of failure-to-intervene, the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Generally, officers cannot be held liable for failure to intervene in incidents that happen in a "matter of seconds." *Parker v. Fogg,* 85–CV–177, 1994 WL 49696 at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.).

### 3. Fourteenth Amendment Substantive Due Process Claims

**\*5** The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125–126 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations

omitted], *aff'g,* 91–CV–1196, Memorandum–Decision and Order (N.D.N.Y. filed Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).

"An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes 'an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Whitaker v. Super,* 08–CV–0449, 2009 WL 5033439, at *5 (N.D.N.Y. Dec.14, 2009) (Kahn, J. adopting Report–Recommendation by Lowe, M.J.) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 [1995] ). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). When evaluating whether an inmate's confinement in SHU violates his substantive due process rights, the issue, then, is whether his keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 64.

"In the Second Circuit, determining whether a disciplinary confinement constituted an 'atypical and significant hardship' requires examining 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement.' " *Whitaker,* 2009 WL 5033439, at *5 (quoting *Palmer,* 364 F.3d at 64). "Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an 'atypical and significant hardship' only if 'the conditions were more severe than the normal SHU conditions.' " *Id.* (quoting *Palmer,* 364 F.3d at 65). [5]

### 4. Qualified Immunity Defenses

**\*6** The qualified immunity defense is available to only those government officials performing discretionary functions, as opposed to ministerial functions. *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would

have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d Cir.2004), *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007).

In determining the second issue (i.e., whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). [6] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007). [7] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). [8] As the Supreme Court has explained,

> [T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable

competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. [9]

## III. ANALYSIS

### A. Plaintiff's Retaliation Claim Under the First Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that he (1) engaged in protected activity, or (2) suffered adverse action as a result of engaging in protected activity. More specifically, Defendants argue that the claim should be dismissed because (1) the statement of an inmate's intent to contact an attorney is not protected conduct, (2) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Norton knew of Plaintiff's intention to contact an attorney, and (3) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' actions were retaliatory. (Dkt. No. 24, Attach.10.) [10]

**\*7** After carefully considering the admissible record evidence adduced in this case, and carefully reviewing the relevant case law, the Court has trouble finding that an inmate's one-time making of an oral statement (immediately after the use of force against him) that he would be "contacting [his] attorney," or "calling a lawyer" at some unidentified point in the future constitutes engagement in activity that is protected by the First Amendment—especially where, as here, the inmate did not reference the prison grievance process in his statement.

Representation by a lawyer is certainly not necessary to file an inmate grievance in the New York State Department of Corrections and Community Supervision, nor does such representation necessarily result in the filing of a grievance. Rather, such representation is most typically associated with the filing of a civil rights action in federal court (as is clear from the motions for appointment of counsel typically filed in federal court actions). As a result, the statement in question does not reasonably imply that Plaintiff would be filing a grievance as much as it implies that he was going to consult an attorney as to whether or not to file a civil rights action in federal court.

Here, such a statement is problematic. This is because, generally, the filing of the prisoner civil rights action in federal court in New York State must be preceded by the prisoner's exhaustion of his available administrative remedies (or his acquisition of a valid excuse for failing to exhaust those remedies). Any filing without such prior exhaustion (or acquisition of a valid excuse), under the circumstances, would be so wholly without merit as to be frivolous. Of course, filing a court action that is frivolous is not constitutionally protected activity. [11]

Moreover, to the extent that Plaintiff's statement could be construed as reasonably implying that he was going to consult an attorney as to whether or not to file a grievance, the Court has trouble finding that such a vague statement is constitutionally protected. [12] As one district court has stated, "[h]oping to engage in constitutionally protected activity is not itself constitutionally protected activity." [13] The Court notes that a contrary rule would enable a prisoner who has committed conduct giving rise to a misbehavior report to create a genuine issue of material fact (and thus reach a jury) on a retaliation claim (alleging adverse action based on the issuance of that misbehavior report) simply by uttering the words, "I'm calling a lawyer," after he commits the conduct in question but before the misbehavior report is issued.

In any event, even assuming, for the sake of argument, that Plaintiff's statement was constitutionally protected, the Court finds, based on the current record, that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that his statement to Defendants Dinelle, Duckett, and Broekema that he would be contacting an attorney was a substantial or motivating factor for the issuance of the misbehavior report by Defendant Norton (which was signed by Defendant Dinelle as a witness), and the misbehavior report by Defendant Duckett (which was signed by Defendant DeLuca as a witness). The Court makes this finding for two alternate reasons.

**\*8** First, with regard to the misbehavior report issued by Defendant Norton, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that she was aware Plaintiff would be contacting an attorney. In addition, with regard to the report made by Defendant Duckett (which was signed by Defendant DeLuca as a witness), although there

is record evidence that Defendant Duckett had knowledge of Plaintiff's statement that he would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident.

Second, even assuming that Defendant Duckett or Defendant Norton had reason to believe Plaintiff would contact an attorney, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Duckett or Defendant Norton would not have issued the misbehavior report anyway, based on Plaintiff's actions. Indeed, at Plaintiff's disciplinary hearings, evidence was adduced that he in fact committed most of the misconduct alleged in the misbehavior reports, which resulted in the hearing officer finding multiple violations and sentencing Plaintiff to SHU. [14] Furthermore, those convictions were never subsequently reversed on administrative appeal. [15] As a result, no admissible record evidence exists from which a rational factfinder could conclude that Plaintiff has established the third element of a retaliation claim—the existence of a causal connection between the protected speech and the adverse action.

For each of these alternative reasons, Plaintiff's retaliation claim under the First Amendment is dismissed.

### B. Plaintiff's Claims Under the Eighth Amendment

As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of Plaintiff's Eighth Amendment claims because (1) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Norton used any force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so, (2) Plaintiff has failed to adduce any admissible evidence from which a rational factfinder could conclude that Defendant Broekema had a reasonable opportunity to intervene and prevent the alleged assault by Defendants Dinelle, DeLuca and Duckett, yet failed to do so, and (3) Plaintiff's identification of Defendant DeLuca is "very tentative."

As an initial matter, because Plaintiff did not oppose Defendants' argument that his excessive-force claim against Defendant Norton should be dismissed, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou v. S.U.N.Y. Inst. of Tech.,* 08–CV–0444, 2011 WL 4344025, at *11 (N.D.N.Y. Sept.14, 2011) (Suddaby, J.). After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, the Court can find no record evidence to support the claim that Defendant Norton used force against Plaintiff, or was in a position to intervene to prevent the use of force against Plaintiff, yet failed to do so. As a result, Plaintiff's Eighth Amendment claim against Defendant Norton is dismissed.

**\*9** Turning to Plaintiff's failure-to-intervene claim against Defendant Broekema, it is undisputed that it was Defendants Duckett, Dinelle and DeLuca who used force against Plaintiff. Plaintiff testified that, while Defendant Broekema was in the room at the time, Defendant Broekema was standing behind Defendant Dinelle on his "immediate right." In addition, Plaintiff testified that Defendant Duckett's threat of physical force against Plaintiff was conditioned on Plaintiff's continued failure to comply with (what Plaintiff perceived to be) conflicting instructions by Defendants Duckett and Dinelle during the frisk. (Dkt. No. 24, Attach. 4, at 97–99.) Furthermore, Plaintiff testified that it was only after he failed to put his hands in his pockets (rather soon after being warned by Defendant Duckett) that either Defendant Duckett or Defendant Dinelle punched him *one time* with a "closed fist" in the side of his nose, causing him to immediately fall to the ground. (*Id.* at 98–99.) Finally, Plaintiff testified that the kicks that he suffered soon after falling to the ground were limited in nature, having occurred only "a couple of times," and indeed having only *possibly* occurred. (*Id.* at 99.)

While the Court in no way condones the conduct alleged in this action, the Court is simply unable to find, based on the current record, that Plaintiff has adduced sufficient admissible record evidence to reach a jury on his Eighth Amendment claim against Defendant Broekema. Rather, based on the evidence presented, a rational factfinder could only conclude that the use of force was simply too uncertain for a reasonable person in Defendant Broekema's position to expect; and it was too brief in nature to give Defendant Broekema a realistic opportunity to intervene in it, so as prevent the one punch and possibly few kicks that Plaintiff presumably experienced. [16]

Finally, based on the current record, the Court rejects Defendants' third argument (i.e., that Plaintiff's excessive-force claim against Defendant DeLuca should be dismissed because Plaintiff's identification of Defendant DeLuca is "very tentative"). Defendants argue that Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant DeLuca was present during the use of force against Plaintiff (let alone that Defendant DeLuca used force against Plaintiff). This is because Plaintiff's basis for bringing his excessive-force claim against Defendant DeLuca is that he remembered being assaulted by three individuals, including Defendants Dinelle and Duckett, whose last names began with the letter "D." While this fact is undisputed, it is also undisputed that Defendant DeLuca was interviewed by the Inspector General's Office regarding his involvement in the incidents giving rise to Plaintiff's claims, [17] and that both Defendant Broekema's use-of-force report, and Defendant Broekema's Facility Memorandum, state that Defendant DeLuca participated in the use of force against Plaintiff. [18] Based on this evidence, a rational factfinder could conclude that Defendant DeLuca violated Plaintiff's Eighth Amendment rights. As a result, Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca survives Defendants' motion for summary judgment. The Court would add only that, although it does not construe Plaintiff's Complaint as alleging that Defendant DeLuca failed to intervene in the use of force against Plaintiff, assuming, (based on Plaintiff's motion papers) that Plaintiff has sufficiently alleged this claim, the claim is dismissed because the entirety of the record evidence as it pertains to Defendant DeLuca establishes that he used force against Plaintiff.

## C. Plaintiff's Claim Under the Fourteenth Amendment

**\*10** As stated above in Part I.C. of this Decision and Order, Defendants seek the dismissal of this claim because Defendants did not deprive Plaintiff of his liberty rights. As stated above in note 2 of this Decision and Order,

Plaintiff failed to address Defendants' argument that his substantive due process claim should be dismissed. As a result, as stated above in Part III.B. of this Decision and Order, Defendants' burden with regard to this claim "is lightened such that, in order to succeed, they need only show the facial merit of their request, which has appropriately been characterized as a 'modest' burden." *Xu–Shen Zhou,* 2011 WL 4344025, at *11.

After carefully considering the matter, the Court finds that Defendants have met this modest burden, for the reasons stated by them in their memoranda of law. The Court would add only that, based on its own independent review of the record, although the record evidence establishes that Plaintiff was confined in SHU for 150 days as a result of the misbehavior reports issued by Defendants Norton and Duckett, Plaintiff has failed to adduced admissible record evidence from which a rational factfinder could conclude that the conditions of his confinement during this 150–day period were more severe than normal SHU conditions. [19] As a result, Plaintiff's substantive due process claim is dismissed.

### D. Defendants' Defense of Qualified Immunity
As stated above in Part I.C. of this Decision and Order, Defendants seek dismissal of Plaintiff's claims on the alternative ground that they are protected from liability, as a matter of law, by the doctrine of qualified immunity, under the circumstances.

### 1. Retaliation
The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [1982] ). Here, even assuming that Plaintiff's statement that he would contact an attorney regarding the use of force he experienced constitutes engagement in protected activity, and even also assuming that the only reason Defendant Norton and/or Duckett issued Plaintiff a misbehavior report was because he made this statement, these Defendants are, under the circumstances, entitled to qualified immunity. This is because the Court finds that the right to make this statement (without experiencing any resulting adverse action) was not a clearly established during the time in

question (January 2009), based on a review of the relevant case law. *See, supra,* notes 12 and 13 of this Decision and Order.

As a result, Plaintiff's retaliation claim is dismissed on the alternate ground of qualified immunity.

### 2. Excessive Force
There is no doubt that the right to be free from the use of excessive force was "clearly established" at the time of the incidents giving rise to Plaintiff's claims. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Moreover, with regard to whether it was objectively reasonable for Defendants to use the alleged amount of force that they used, the Second Circuit has made clear that, "[w]here the circumstances are in dispute, and contrasting accounts present factual issues as to the degree of force actually employed and its reasonableness, a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." *Mickle v. Morin,* 297 F.3d 114, 122 (2d Cir.2002) [internal quotation marks omitted].

 **\*11** Here, after carefully reviewing the record, and construing it in the light most favorable to Plaintiff, the Court finds that, even if Defendants Dinelle, DeLuca and Duckett genuinely feared being assaulted by Plaintiff, and even if those three Defendants genuinely perceived Plaintiff's words and movements to constitute an attempt to resist a frisk, admissible record evidence exists from which a rational jury could conclude that those perceptions were not objectively reasonable under the circumstances. As the Second Circuit has observed, it is impossible to "determine whether [Defendants] reasonably believed that [their] force was not excessive when several material facts [are] still in dispute, [and therefore,] summary judgment on the basis of qualified immunity [is] precluded." *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999). [20] For these reasons, the Court rejects Defendants' argument that Plaintiff's excessive-force claim should be dismissed on the ground of qualified immunity as it relates to Defendants Dinelle, DeLuca and Duckett.

However, the Court reaches a different conclusion with regard to Plaintiff's failure-to-intervene claim against Defendant Broekema: the Court finds that, at the very least, officers of reasonable competence could disagree on

the legality of Defendant Broekema's actions, based on the current record. As a result, Plaintiff's failure-to-intervene claim against Defendant Broekema is dismissed on this alternative ground.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 24) is *GRANTED* in part and *DENIED* in part in the following respects:

(1) Defendants' motion for summary judgment on Plaintiff's First Amendment claim is *GRANTED;*

(2) Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment substantive due process claim is *GRANTED;*

(3) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton is *GRANTED;*

(4) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema is *GRANTED;* and

(5) Defendants' motion for summary judgment on Plaintiff's Eighth Amendment excessive-force claim against Defendant DeLuca is *DENIED;* and it is further

**ORDERED** that the following claims are *DISMISSED* **with prejudice** from this action:

(1) Plaintiff's First Amendment claim;

(2) Plaintiff's Fourteenth Amendment substantive due process claim;

(3) Plaintiff's Eighth Amendment excessive-force claim against Defendant Norton; and

(4) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Broekema; and it is further

**ORDERED** that Defendants Norton and Broekema are *DISMISSED* from this action; and it is further

**ORDERED** that, following this Decision and Order, the following claims remain pending in this action: Plaintiff's Eighth Amendment excessive-force claim against Defendants DeLuca, Dinnelle and Duckett; and it is further

**\*12 ORDERED** that counsel are directed to appear on **JANUARY 4, 2012 at 2:00 p.m.** in chambers in Syracuse, N.Y. for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than **DECEMBER 16, 2011,** and the parties are directed to engage in meaningful settlement negotiations prior to the 1/4/12 conference.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5975027

Footnotes

1    (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 100, 102–03 [attaching pages 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo .].)

2    (*Compare* Dkt. No. 24, Attach. 9, at ¶ 17 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 27, Attach. 3, at ¶ 17 [Plf.'s Rule 7 .1 Response]; *see also* Dkt. No. 24, Attach. 4, at 59–60, 100, 102–03 [attaching pages 175, 176, 216, 218 and 219 of Trans. of Plf.'s Depo.]; Dkt. No. 33, at 2–3 [attaching pages 228 and 229 of Trans. of Plf.'s Depo.].)

3    In their motion, Defendants do not challenge the evidentiary sufficiency of Plaintiff's Eighth Amendment excessive-force claim against Defendants Dinelle or Duckett. (*See generally* Dkt. No. 24, Attach. 10 [Defs.' Memo. of Law].)

4    Plaintiff does not oppose Defendants' arguments that (1) Plaintiff's excessive-force claim against Defendant Norton should be dismissed, and (2) Plaintiff's substantive due process claim should be dismissed. (*See generally* Dkt. No. 27, Attach. 5 [Plf.'s Response Memo. of Law].)

5    Generally, " '[n]ormal' SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week." *Whitaker,* 2009 WL 5033939, at *5 n. 27 (citing *Ortiz v. McBride,* 380 F.3d 649, 655 [2d Cir.2004] ).

6  *See also* *Pena v. DePrisco*, 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer*, 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York*, 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse*, 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Div. of Parole*, 999 F.2d 647, 654 (2d Cir.1993).

7  *See also* *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' "); *Davis v. Scherer*, 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

8  *See also* *Malsh v. Corr. Oficer Austin*, 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes*, 921 F.Supp. 204, 211 (S.D.N.Y.1996).

9  *See also* *Hunter v. Bryant*, 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks omitted].

10 Defendants also argue that Plaintiff's First Amendment claim should be dismissed to the extent that it is based solely on the fact that misbehavior reports against him were *false* (as opposed to being false *and retaliatory* ). The Court agrees that Plaintiff has no general constitutional right to be free from false misbehavior reports. *See* *Boddie v. Schneider*, 105 F.3d 857, 862 (2d Cir.1997). As a result, to the extent that the Plaintiff's Complaint may be construed as asserting a claim based solely on the issuance of false behavior reports, that claim is dismissed.

11 *See* *Wade–Bey v. Fluery*, 07–CV–117, 2008 WL 2714450 at *6 (W.D.Mich. July 8, 2010) ("Although it is well established that prisoners have a constitutional right of access to the courts ..., the filing of a frivolous lawsuit would not be protected activity.") [citation omitted].

12 The Court notes that numerous cases exist for the point of law that even *expressly threatening* to file a *grievance* does not constitutes protected activity. *See, e.g., Bridges v. Gilbert*, 557 F.3d 541, 554–55 (7th Cir.2009) ("[I]t seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance.") [emphasis in original]; *Brown v. Darnold*, 09–CV–0240, 2011 WL 4336724, at *4 (S.D.Ill. Sept.14, 2011) ("Plaintiff cannot establish that his threat to file a grievance against Defendant Darnold is a constitutionally protected activity."); *Koster v. Jelinek*, 10–CV–3003, 2011 WL 3349831, at *3, n. 2 (C.D.Ill. Aug.3, 2011) ("The plaintiff does not seem to be asserting that he had a First Amendment right to threaten the facilitators with lawsuits and grievances, nor does the Court believe that he has such a right."); *Ingram v. SCI Camp Hill*, 08–CV–0023, 2010 WL 4973302, at *15 (M.D.Pa. Dec.1, 2010) ("Stating an intention to file a grievance is not a constitutionally protected activity."), *aff'd*, No. 11–1025, 2011 WL 4907821 (3d Cir. Oct.17, 2011); *Lamon v. Junious*, 09–CV–0484, 2009 WL 3248173, at *3 (E.D.Cal. Oct.8, 2009) ("A mere threat to file suit does not rise to the level of a protected activity...."); *Miller v. Blanchard*, 04–CV–0235, 2004 WL 1354368, at *6 (W.D.Wis. June 14, 2004) ("Plaintiff alleges that defendants retaliated against him after he threatened to file a lawsuit against them. Inmates do not have a First Amendment right to make threats.").

13 *McKinnie v. Heisz*, 09–CV–0188, 2009 WL 1455489, at *11 (W.D.Wis. May 7, 2009) ("Hoping to engage in constitutionally protected activity is not itself constitutionally protected activity. At most, petitioner's actions could be construed as a 'threat' to assert his rights but that is not enough.").

14 *See* *Hynes v. Squillance*, 143 F.3d 653, 657 (2d Cir.1998) (holding that defendants met their burden of showing that they would have taken disciplinary action on valid basis alone where the evidence demonstrated that plaintiff had committed "the most serious, if not all, of the prohibited conduct"); *Jermosen v. Coughlin*, 86–CV–0208, 2002 WL 73804, at *2 (N.D.N.Y. Jan.11, 2002) (Munson, J.) (concluding, as a matter of law, that defendants showed by a preponderance of the evidence that they would have issued a misbehavior report against plaintiff even in the absence of his complaints against correctional department personnel, because they established that the misbehavior report resulted in a disciplinary conviction, "demonstrat[ing] that plaintiff in fact committed the prohibited conduct charged in the misbehavior report.").

15 For these reasons, the Court finds to be inappoite the case that Plaintiff cites for the proposition that the Court must accept as true his sworn denial that he committed any of the violations alleged in the misbehavior reports issued against him. *See* *Samuels v. Mockry*, 142 F.3d 134, 135–36 (2d Cir.1998) (addressing a situation in which a prisoner was placed in a prison's "Limited Privileges Program," upon a finding rendered by the prison's Program Committee, that he had refused to accept a mandatory work assignment, *"without a hearing or a misbehavior report"* ) [emphasis added]. The

Court would add only that, even if it were to accept Plaintiff's sworn denial as true, the Court would still find that he has failed to establish that Defendants Duckett and Norton would not have issued the misbehavior reports against him anyway, based on their subjective belief that he was acting in a disturbing, interfering, harassing and disobedient manner at the time in question (as evident from, *inter alia,* their misbehavior reports, the disciplinary hearing testimony of three of the Defendants, and admissions made by Plaintiff during his deposition regarding the "confusion" and "misunderstanding" that occurred during his examination by Defendant Norton, his persistent assertions about his prescribed frequency of visits, and his unsolicited comments about his proper course of treatment).

16    *See O'Neill v. Krzeminski,* 839 F.2d 9, 11–12 (2d Cir.1988) (noting that "three blows [that occurred] in such rapid succession ... [is] not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator"); *Blake v. Base,* 90–CV–0008, 1998 WL 642621, at *13 (N.D.N.Y. Sept.14, 1998) (McCurn, J.) (dismissing failure-to-intervene claim against police officer based on finding that the punch to the face and few body blows that plaintiff allegedly suffered "transpired so quickly ... that even if defendant ... should have intervened, he simply did not have enough time to prevent plaintiff from being struck"); *Parker v. Fogg,* 85–CV–0177, 1994 WL 49696, at *8 (N.D.N.Y. Feb.17, 1994) (McCurn, J.) (holding that an officer is not liable for failure-to-intervene if there "was no 'realistic opportunity' to prevent [an] attack [that ends] in a matter of seconds"); *see also Murray–Ruhl v. Passinault,* 246 F. App'x 338, 347 (6th Cir.2007) (holding that there was no reasonable opportunity for an officer to intervene when one officer stood by while another fired twelve shots in rapid succession); *Ontha v. Rutherford Cnty., Tennessee,* 222 F. App'x 498, 506 (6th Cir.2007) ("[C]ourts have been unwilling to impose a duty to intervene where ... an entire incident unfolds 'in a matter of seconds.' "); *Miller v. Smith,* 220 F.3d 491, 295 (7th Cir.2000) (noting that a prisoner may only recover for a correction's officer's failure to intervene when that officer "ignored a realistic opportunity to intervene").

17    (Dkt. No. 27, Attach. 2, at 19–20.)

18    (Dkt. No. 27, Attach. 2, at 10, 14.)

19    *See Spence v. Senkowski,* 91–CV–0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (finding that 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217–19 (W.D.N.Y.1998) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353–56 (W.D.N.Y.1997) (161 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96–CV–2003, 1997 WL 137448, at *4–6 (S.D.N.Y.1997) (192 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116–17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94–CV–4094, 1996 WL 487951, at *4–5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y.1995) (270 days in SHU under numerous conditions of confinement that were more restrictive than those in general population).

20    *See also Robison v. Via,* 821 F.2d 913, 924 (2d Cir.1987) ( "[T]he parties have provided conflicting accounts as to [who] initiated the use of force, how much force was used by each, and whether [the arrestee] was reaching toward [a weapon]. Resolution of credibility conflicts and the choice between these conflicting versions are matters for the jury and [should not be] decided by the district court on summary judgment.").

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2708468
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Marquez MACK, Plaintiff,
v.
Sheriff Timothy HOWARD, individually
and in his official capacity as Sheriff of Erie
County; Sergeant Robert Dee; Deputy Daniel
Buziak; [1] Deputy Brian O'leary; Deputy
Jerome Recktenwalt; Deputy Michael Vail;
and Deputy Jefrey Wagner, Defendants.

No. 11–CV–00303–A (F).
|
Signed June 16, 2014.

**Attorneys and Law Firms**

Lipsitz & Ponterio, LLC, John N. Lipsitz, and Nan Lipsitz
Haynes, of Counsel, Buffalo, NY, for Plaintiff.

Webster Szanyi, LLP, Charles E. Graney, Jeremy A.
Colby, and Michael P. McClaren, of Counsel, Buffalo,
NY, for Defendants.

## DECISION AND ORDER

RICHARD J. ARCARA, District Judge.

 **\*1** This case arises out a 2010 incident at the Erie County
Holding Center involving the Plaintiff, Marquez Mack,
and several of the Defendants, Deputy Sheriffs at the
Erie County Sheriff's Office. The Plaintiff alleges that the
Defendants violated his Fourteenth Amendment rights by
using excessive force against him while he was a pre-trial
detainee at the Holding Center.

The Court referred the case to Magistrate Judge Leslie
G. Foschio pursuant to 28 U.S.C. § 636(b)(1). Dkt.
No. 40. The Defendants moved for summary judgment
and, on March 3, 2013, Judge Foschio filed a Report
and Recommendation (R & R), which recommends that
the Defendants' motion be denied. Dkt. No. 86. The
Defendants filed objections to the R & R, see Dkt. No.
89, and responses were filed. See Dkt. Nos. 90 & 91. Oral
argument was held on May 29, 2014.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must
review de novo the portions of the R & R to which
objections have been made. Upon de novo review, and
after reviewing the submissions and hearing argument
from the parties, the Court adopts the R & R in its entirety
with modification only to address additional case law
which was unavailable at the time that Judge Foschio
issued the R & R.

### Discussion

The Supreme Court recently reemphasized the importance
of properly applying the long-settled standard for
summary judgment. In *Tolan v. Cotton,* 134 S.Ct. 1861
(2014), the Court considered an excessive force claim
brought against a police officer who had shot the plaintiff
during a confrontation which was precipitated by the
officer's mistaken belief that the plaintiff had stolen a
car. *Id.* at 1863–65. The District Court held that the
officer's use of force "was not unreasonable" and granted
the defendant's motion for summary judgment. *Id.* at
1865. The Fifth Circuit affirmed, but held instead that
summary judgment was appropriate on the issue of
qualified immunity. *Id.*

However, the Supreme Court issued a *per curiam* opinion
vacating the Fifth Circuit's decision. According to the
Court, "[i]n articulating the factual context of the case, the
Fifth Circuit failed to adhere to the axiom on a motion for
summary judgment, '[t]he evidence of the nonmovant is to
be believed, and all justifiable inferences are to be drawn
in his favor.' " *Id.* at 1863 (quoting *Anderson v. Liberty
Lobby, Inc.,* 477 U.S. 242, 255 (1986)).

*Tolan* has great relevance here. The parties' arguments
in this case revolve around a five-minute surveillance
video of the incident at the Holding Center. While the
Defendants are correct that, at least in some instances, "a
video permits a court to rule as a matter of law whether
or not the use of force was objectively reasonable and/or
whether it constituted a de minimis use of force," Dkt.
No. 89 at 4, Tolan is a reminder that even when there is a
video, courts must still draw reasonable inferences in the
non-moving party's favor.

*Scott v. Harris,* 550 U.S. 372 (2007), cited by the
Defendants, supports this conclusion. In *Scott,* the

Supreme Court was presented with a videotape of the underlying events in an excessive force claim. The Court held that, based on the facts of the case, the District Court had improperly denied summary judgment. However, the Court in no way suggested, as the Defendants do, that a videotape should always be dispositive on summary judgment. Instead, the Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted *by the record,* so that no reasonable jury could believe it, a court should not adopt the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380 (emphasis added). The italicized language is the key to reconciling *Scott* with *Tolan* . Where a videotape "blatantly contradict[s]" the remainder of the record, inferences drawn in the non-movant's favor would not be "justifiable." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). In such cases, there is no genuine issue of material fact and summary judgment may be appropriate.

**\*2** However, while there may be differences between the video and the remainder of the record in this case, those differences are not so extreme and one-sided as to justify taking the matter from the jury. Accordingly, the Court must draw justifiable inferences in the non-movant's-here, the Plaintiff's-favor. Doing so, the Court cannot find that the Defendants' use of force was objectively reasonable or *de minimis,* as would be required for the Court to grant summary judgment on the objective element of the Plaintiff's excessive force claim. [2]

For example, in his deposition the Plaintiff claims that some of the Defendants punched and kicked him. *See* Dkt. No. 68–5, 30:5–9; 36:1–38:12. If true, the Plaintiff's allegations might mean that the Defendants' use of force was objectively unreasonable. While, as the Defendants note, the video does not show the all-out melee that the Plaintiff describes in his deposition testimony, neither does it completely contradict his side of the story. There are several moments in the video during which a number of the Defendants are on top of the Plaintiff, making it difficult to determine what, if anything they did to him. Indeed, the Plaintiff testified that he was punched in the upper body and possibly in the neck and face. *Id.* at 36:13–16. There are significant portions of the video during which the Plaintiff's torso, face, and neck are obscured by the Defendants' bodies, making it impossible for the Court to tell what, if anything, is happening to the Plaintiff. Where, as here, there is no clear contradiction between the

Plaintiff's testimony and the surveillance video, the Court must draw justifiable inferences in the Plaintiff's favor.

Likewise, there are genuine factual disputes on the subjective element of the Plaintiff's excessive force claim. The subjective element of an excessive force claim considers, among other things, "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson v. McMillian,* 503 U.S. 1, 7 (1992). Thus, if the Plaintiff were resisting the Defendants, then the Defendants' use of force might be subjectively reasonable and summary judgment might be appropriate.

However, once again, the Plaintiff's version of events is not "blatantly contradicted" by the video. The Plaintiff testified that he was not resisting the officers, *see* Dkt. No. 68–5, 30:22–31:3, a claim that is not discredited by the video. This is not, for example, *McKinney v. Dzurenda,* 2014 WL 642574 (2d Cir. Feb. 20, 2014), cited by the Defendants. In that case, the court was "clear[ly] able to see on a surveillance video that, "[w]ithout any aggressive moves from any of the [corrections officers], [the plaintiff] assumed a boxing stance and made clear his willingness to fight." *Id.* at \*1. Unlike *McKinney,* the video in this case does not clearly indicate that the Plaintiff was challenging the Deputies' authority. As Judge Foschio aptly noted in his R & R, "[a]lthough it may be that the sheriffs deputies are not slamming Plaintiff around the ... cell but, rather, may simply be attempting to restrain Plaintiff, who may be struggling against the deputies, such determination involves a factual determination the court is prohibited from making on summary judgment." Dkt. No. 86 at 13.

**\*3** Similarly, the Plaintiff testified in his deposition that one Defendant told the Plaintiff during the incident that "I should kill you" and that "you probably f-cking deserve it." Dkt. No. 68–5, 57:20; 58:12–14. If true, such statements might be clear evidence of "a wanton state of mind," satisfying the subjective element of the Plaintiff's excessive force claim. However, because it lacks audio, there is no way that the video can contradict Plaintiff's testimony. Accordingly, on summary judgment, the Court is required to credit the Plaintiff's version of events.

Finally, the Defendants argue that they are entitled to qualified immunity. "The doctrine of qualified immunity

protects government officials from liability for civil damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Wood v. Moss,* No. 13–115, slip op. at 11–12 (2014) (internal quotation marks omitted). The parties do not dispute that the right to not be subjected to excessive force existed at the time of this incident. *See* Dkt. No. 89 at 18. [3] Thus, as the Defendants note, this is a case where issues of qualified immunity and excessive force "converge on one question: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed would be lawful." *Cowan ex rel. Cooper v. Breen,* 352 F.3d 756, 764 n. 7 (2003).

However, as Judge Foschio stated in his R & R, "[w]here ... the objective reasonableness of an officer's actions depends on disputed facts, as in the instant case, summary judgment based on qualified immunity is properly denied. As such, the same material issues of fact precluding summary judgment on Plaintiff's excessive force claims also preclude summary judgment on Defendant's qualified immunity defense." Dkt. No. 86 at 18 (citation omitted). To defeat this conclusion, the Defendants argue that the R & R did not consider that the surveillance video "was reviewed by the Undersheriff, Superintendent, and others," all of whom apparently agreed that the force used in the case was not excessive. Dkt. No. 89 at 20. The Defendants, however, cannot bootstrap their way to qualified immunity by relying solely on their own internal review of the incident. While that review might have relevance to the ultimate determination of qualified immunity, the Court would abdicate its duty on summary judgment if it were to simply rely on the Defendants' supervisors' review of the video.

### *Conclusion*

In its present posture, this case boils down to two credible interpretations of the same video. "[W]here, as here, conflicting inferences may be drawn from such evidence ... summary judgment may not be granted." *Holdeen v. United States,* 186 F.Supp. 76, 78 (S.D.N.Y.1960). Indeed, the fact that both parties are able to offer almost second-by-second interpretations of the same video, both of which are credible, is proof that summary judgment is inappropriate. *Compare* Dkt. No. 89 at 11–14

(Defendants' interpretation of the video) *with* Dkt. No. 90 at 7–9 (Plaintiff's interpretation of the video).

**\*4** By moving for summary judgment, the Defendants have asked the Court to credit their spin on the facts, rather than the Plaintiff's. That is not the purpose of summary judgment; that is the role of a jury. "A judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan,* 134 S.Ct. 1866 (internal quotation marks omitted).

Accordingly, for the reasons set forth in Judge Foschio's R & R, as well as those set forth above, the Defendants' motion for summary judgment is denied. This case is referred back to Judge Foschio for further proceedings.

**SO ORDERED.**

**SO ORDERED.**

MARQUEZ MACK,

Plaintiff,

v.

THE COUNTY OF ERIE, NEW YORK, ROBERT KOCH, Individually and in his official capacity as Superintendent of the Erie County Holding Center, SHERIFF TIMOTHY HOWARD, Individually and in his official capacity as Sheriff of Erie County, Deputy Sheriff, Sergeant Robert Dee, One or More John Does, Deputy Daniel Buziak, Deputy Brian O'Leary, Deputy Jerome Recktenwalt, Deputy Mark Scanlon, Deputy Michael Vail, and Deputy Jeffrey Wagner,

Defendants.

### REPORT and RECOMMENDATION

LESLIE G. FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This action was referred to the undersigned by Honorable Richard J. Arcara on March 9, 2012, for all pretrial matters including Report and Recommendation on dispositive motions. The case is presently before the court

on Defendants' motion for partial summary judgment (Doc. No. 68), filed October 5, 2012.

## BACKGROUND

On April 8, 2011, Plaintiff Marquez Mack ("Plaintiff"), commenced this civil rights action pursuant to 42 U.S.C. § 1983 alleging that on January 29, 2010, while in the custody of the Erie County Sheriff's Department ("Sheriff's Department"), Plaintiff was maliciously and wantonly beaten by Defendants, all of whom are employees of the Sheriff's Department. After filing three amended complaints, Plaintiff filed his Fourth Amended Complaint (Doc. No. 56) ("Fourth Amended Complaint"), on June 5, 2012, naming as Defendants Erie County Sheriff Timothy Howard ("Sheriff Howard"), Sergeant Robert Dee ("Sergeant Dee"), and Deputy Sheriffs Daniel Buziak ("Buziak"), Brian O'Leary ("O'Leary"), Jerome Recktenwalt ("Recktenwalt"), Michael Vail ("Vail"), and Jeffrey Wagner ("Wagner") (collectively, "Defendant Deputies"), on whom Plaintiff served interrogatories on June 11, 2012 (Docs.Nos.57–63). Plaintiff asserts as claims for relief a claim against Defendant Sheriff Howard for failure to train and supervise Defendant Deputies, Fourth Amended Complaint, First Claim for Relief, and excessive force against Defendant Sergeant Dee and Defendant Deputies, Fourth Amended Complaint, Second Claim for Relief. Defendants' answer was filed on June 19, 2012 (Doc. No. 64) ("Answer"), and asserts, *inter alia,* qualified immunity as an affirmative defense.

**\*5** On October 5, 2012, Defendants filed the instant motion seeking partial summary judgment (Doc. No. 68) ("Defendants' Motion"), attaching the Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Doc. No. 68–1) ("Defendants' Memorandum"), Defendants' Statement of Undisputed Material Facts Pursuant to Rule 56.1 of the Local Rules of Civil Procedure (Doc. No. 68–2) ("Defendants' Statement of Facts"), the Declaration of Anthony Giglio in Support of Defendants' Motion for Summary Judgment (Doc. No. 68–3) ("Giglio Declaration"), the Declaration of Mark N. Wipperman in Support of Defendants' Motion for Summary Judgment (Doc. No. 68–4) ("Wipperman Declaration"), and exhibits A to D (Doc. No. 68–5), and E to K (Doc. No. 68–6) (Defendants' Exh(s). ___"). In opposition, Plaintiff filed the Affidavit of Nan L. Haynes

Setting Forth Facts Unavailable to Nonmoving Party Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure (Doc. No. 75) ("Haynes Affidavit"), attaching exhibits A through F (Docs. Nos. 75–1 through 75–6) ("Plaintiff's Exh(s). ___"), Plaintiff's Opposing Statement of Undisputed Material Facts Pursuant to Rule 56.1 of the Local Rule of Civil Procedure (Doc. No. 76) ("Plaintiff's Statement of Facts"), attaching exhibits 1 through 5 (Docs. Nos. 76–1 through 76–5) ("Plaintiff's Statement of Facts Exh(s). ___"), Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 77) ("Plaintiff's Memorandum"), and the Affirmation of Steven Lakomy, MD (Doc. No. 78) ("Dr. Lakomy Affirmation"), attaching exhibits A and B (Docs. Nos. 78–1 and 78–2) ("Dr. Lakomy Affimation Exh(s). ___"). On December 12, 2012, Defendants filed the Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment (Doc. No. 82) ("Defendants' Reply"), and the Reply Declaration of Jeremy A. Colby, Esq., in Further Support of Defendants' Motion for Summary Judgment (Doc. No. 82–1) ("Colby Reply Declaration"). Oral argument was deemed unnecessary.

Based on the following, Defendants' Motion should be DENIED.

## FACTS [1]

On January 29, 2010, while being held as a pretrial detainee at the Erie County Holding Center ("the Holding Center"), Plaintiff Marquez Mack ("Plaintiff" or "Mack"), while being escorted at 11:26 A.M., with 13 other Holding Center residents from Erie County Court, following court proceedings, to the Holding Center, walked in single file formation along the left side of a hall. Plaintiff's hands were cuffed and the handcuffs were tethered to a belt encircling Plaintiff's waist, which Plaintiff maintains is standard when being transported between the Holding Center and court. When Plaintiff momentarily drifted from the left side to the middle of the hall, Defendant Deputy Sheriff Brian O'Leary ("O'Leary"), instructed him to move further to the left and Plaintiff complied. O'Leary then pulled Plaintiff from the line and O'Leary and Deputy Sheriff Jeffrey Wagner ("Wagner"), took Plaintiff to a court hold cell ("the court hold cell"), where Plaintiff maintains Defendant Deputies repeatedly kicked, choked, and spit on him, slamming

Plaintiff's head into the wall, and referred to Plaintiff with an ethnic slur. Defendants maintain their use of force against Plaintiff was limited to that necessary to restore order to the Holding Center. It is undisputed that as a result of the altercation, Plaintiff sustained a right knee effusion (build-up of fluid).

**\*6** Following the incident, Plaintiff was observed pacing about the court hold cell in no apparent pain, and kicking the door to the cell with his left foot. When Plaintiff complained of pain in his right leg and knee, he was examined at 1:00 P.M. on January 29, 2010, by a physician who diagnosed "contusion/sprain to knee; multiple very superficial 'brush burns' and mild pre-patellar effusion." Plaintiff's Medical Records, [2] COE–MACK 00037–38. Plaintiff was placed on "no work" status, and "no recreation" status, prescribed ibuprofen for pain, and advised to follow-up in 72 hours. *Id.* COEMACK 00038. Two days later, on January 31, 2010, Plaintiff was examined again for right knee, leg, and ankle pain. *Id.* COE–MACK 00178. Right leg contusion was diagnosed and crutches were ordered. *Id.* X-rays of Plaintiff's right knee taken on February 1, 2010 at Erie County Medical Center ("ECMC"), showed "right knee effusion." *Id.* COE–MACK 00371–72, 00374. Plaintiff was again examined on February 2, 2010, diagnosed with "contusion," prescribed crutches and Motrin, and his work and recreation restrictions were continued. *Id.* COE–MACK 00015–16. On Feburary 4, 2010, Plaintiff was examined for "worsening r[ight] knee pain", *id.,* COE–MACK 00013–14, and, on Plaintiff continued to complain of right knee pain on Feburary 10, 18, and 23, 2010, describing the pain on February 10 and 23, 2010, as "excrutiating." *Id.* COEMACK 00076, 00215, and 00217. Although a knee cartilage tear was suspected, a further X-ray taken March 8, 2010, and an MRI of Plaintiff's right knee on May 11, 2010, were normal. *Id.* COE–MACK 00373074.

*DISCUSSION*

**1. Summary Judgment**

Defendants move for summary judgment as to the objective element of Plaintiff's excessive force claim, asserting that unless Plaintiff can establish the claim's objective element, there is no need to address the subjective element. Defendants' Memorandum at 1. In support of their motion, Defendants extensively rely

on two videos depicting the events that transpired in the Holding Center's hall as Plaintiff was being escorted back from court ("first video"), [3] and the subsequent altercation between Plaintiff and Defendant Deputy Sheriffs that ensued in the court hold cell following Plaintiff's placement there ("second video"), [4] as establishing the force Defendants used against Plaintiff was not objectively unreasonable, maintaining the video is inconsistent with Plaintiff's description of the assault given during his deposition. *Id.* Defendants also reserve their right to further move for summary judgment on the excessive force claim should the instant motion be denied and additional discovery taken. *Id.* Defendants also maintain that granting summary judgment on Plaintiff's excessive force claim will necessarily require granting summary judgment on the failure to train and failure to supervise claims against Defendants Sheriff Howard and Sergeant Dee, as well as the failure to intercede claim against Sergeant Dee. *Id.* at 17. Finally, Defendants argue there are qualifiedly immune from liability on all claims. *Id.* at 18.

**\*7** In opposition to summary judgment, Plaintiff maintains that Defendants' Motion is not supported by sworn statements of any Defendant, and the motion was filed despite Defendants' refusal to answer Plaintiff's interrogatories requesting each Defendant Deputy Sheriff describe the nature and extent of physical contact with Plaintiff during the alleged assault, thereby interfering with Plaintiff's ability to depose such Defendants. Plaintiff's Memorandum at 1–2. According to Plaintiff, the video shows the force Defendants used against him was more than *de minimus,* thereby establishing the objective element of his excessive force claims, *id.* at 11–12, and issues of fact on the subjective element preclude summary judgment. *Id.* at 12. Plaintiff further argues there are material issues of fact as to the reasonableness of Defendants' use of physical force against Plaintiff, who was handcuffed and, thus, posed no threat to Defendants, precluding qualified immunity. *Id.* at 18.

In further support of summary judgment, Defendants assert Plaintiff has ignored most of Defendants' authorities, cited in Defendants' Memorandum, regarding the objective prong of Plaintiff's excessive force claims because Plaintiff cannot refute them, Defendants' Reply at 1, relying instead on whether the subjective element of the claims is satisfied for summary judgment purposes, an argument which is irrelevant should the court accept

Defendants' argument on the objective prong. *Id.* at 6. Defendants also contend the video establishes Defendants are entitled to qualified immunity because their use of force was objectively reasonable and no reasonable juror could conclude otherwise. *Id.* at 8. Further, Defendants maintain Plaintiff has failed to demonstrate a specific need for discovery to oppose summary judgment. *Id.* at 9.

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(a) and (b)*; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003). The court is required to construe the evidence in the light most favorable to the non-moving party. *Collazo v. Pagano,* 656 F.3d 131, 134 (2d Cir.2011). The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment. *Celotex,* 477 U.S. at 322; *see Anderson,* 477 U.S. at 247–48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). "A fact is material if it 'might affect the outcome of the suit under governing law.' " *Roe v. City of Waterbury,* 542 F.3d 31, 35 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248).

**\*8** "[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester,* 863 F.2d 205, 211 (2d Cir.1988)). A defendant is entitled to summary judgment where " 'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' " an essential element of a claim on which the plaintiff bears the burden of proof. *In re Omnicom Group, Inc., Sec. Litig.,* 597 F.3d 501, 509 (2d Cir.2010) (quoting *Burke v. Jacoby,* 981 F.2d 1372, 1379 (2d Cir.1992)). Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.

*Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 619 (2d Cir.1996).

Insofar as Defendants are alleged to have violated Plaintiff's civil rights, pursuant to 42 U.S.C. § 1983, an individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. Section 1983, "allows an action against a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.' " *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting 42 U.S.C. § 1983). Section 1983, however, " 'is not itself a source of substantive rights.' " *Patterson,* 375 F.3d at 225 (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)). Rather, § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred'...." *Id.* The elements of a § 1983 claim include (1) the deprivation of a federal constitutional or statutory right, and (2) by a person acting under color of state law. *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (citing *Gomez v. Taylor,* 466 U.S. 635, 640 (1980)). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394 (1989); and *Baker,* 443 U.S. at 140).

Here, Plaintiff alleges Defendants subjected him to excessive force by assaulting Plaintiff on January 29, 2011, while Plaintiff was a pretrial detainee at the Holding Center. Because Plaintiff was, at the time of the alleged assault, a pre-trial detainee, rather than a convicted prisoner, Plaintiff's excessive force claim is analyzed as a denial of due process in violation of the Fourteenth Amendment, rather than as cruel and unusual punishment in violation of the Eighth Amendment. *Caiozzo v. Koreman,* 581 F.3d 63,69 (2d Cir.2009) ("a person detained prior to conviction receives protection against mistreatment at the hands of prison official under the Due Process Clause ... of the Fourteenth Amendment if held in state custody."). Nevertheless, whether brought under the Fourteenth Amendment by a pre-trial detainee

or under the Eighth Amendment by a convicted prisoner, the same analysis applies to an excessive force claim. *United States v. Walsh,* 194 F.3d 37, 48 (2d Cir.1999).

**\*9** Specifically, a plaintiff asserting an excessive force claim must establish both an objective and a subjective element. *Hudson v. McMillan,* 503 U.S. 1, 7 (1992). The objective test, requiring that the force applied was "sufficiently serious" to establish a constitutional violation, is "context specific, turning upon 'contemporary standards of decency.' " *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (quoting *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999)). Although "some degree of injury is ordinarily required to state a claim" of excessive force, *United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999), the "core judicial inquiry" is based on the "nature of the force rather than the extent of the injury...." *Wilkins v. Gaddy,* 559 U.S. 34, 34 (2010). *De minimis* force that "is not of a sort repugnant to the conscience of mankind" will not violate the Constitution. *Hudson,* 503 U.S. at 9–10 (internal quotation marks and citation omitted). "To meet the subjective requirement, the inmate must show that the prison officials involved " 'had a 'wanton' state of mind when they were engaging in the alleged misconduct.' " *Griffin,* 193 F.3d at 91 (quoting *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994)). In making this determination, the court may consider "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials' and 'any efforts made to temper the severity of a forceful response.' " *Hudson,* 503 U.S. at 7 (quoting *Whitley v. Albers,* 475 U.S. 312, 321 (1986)).

As stated, Defendants argue in support of summary judgment that Plaintiff cannot establish the objective component of his excessive force claims, thereby rendering it unnecessary to discuss the subjective component and requiring summary judgment in favor of Defendants on all claims. Defendants' Memorandum at 1. In support of this argument, Defendants rely on numerous cases in which summary judgment was granted based on video evidence establishing the challenged use of force against an inmate was, objectively, not excessive. *Id.* at 4–5 (citing cases). Each of the cases Defendants cite, however, is readily distinguishable from the instant case in that either there was no evidence of any force, *see, e.g., Chambliss v. Rosini,* 808 F.Supp.2d 658, 668 (S.D.N.Y.2011) (nothing in prison security video supported pre-trial detainee

plaintiff's characterization of defendant's pulling on waist chain attached to inmate's handcuffs as a "violent yank") or there was indisputable evidence that the force used objectively reasonable to counter some force or resistance by the inmate, *see, e.g., Kalfus v. New York & Presbyterian Hospital,* 476 Fed.Appx. 877, 880–81 (2d Cir. Apr. 13, 2012) (hospital security video and plaintiff's own audio recording of arrest showed defendant hospital patrolmen's use of force to arrest plaintiff, including turning plaintiff onto his stomach and pulling his arms behind his back to handcuff plaintiff, was objectively reasonable given plaintiff's resistance to arrest); and *Allaway v. McGinnis,* 473 F.Supp.2d 378, 382–83 (W.D.N.Y.2007) (security video showed use of force by six-man extraction team wearing helmets, transparent plexiglass shields of their arms, and body armor, was reasonably necessary to remove inmate who refused corrections officer's order to exit outdoor exercise pen, and who "charged" and "lunged" at the extraction team as soon as the door was opened, causing extraction team members to deliver four "softening blows" to coerce inmate's compliance with the officers' orders). In contrast, in the instant case, a plain review of the first and second videos establishes significant issues of fact as to both the objective and subjective elements of an excessive force claim.

**\*10** In particular, the first video includes video from seven different video security cameras in the Holding Center, showing Plaintiff walking single file in a line with 13 other inmates being led from court back to their cells at the Holding Center. As the inmates pass from the view of one security camera, they are seen on the next security camera from a different vantage point. Because the first video depicts video from seven different security cameras, each video in a separate frame, the picture in each frame is relatively small, rendering it difficult to discern subtle detail. One of the security videos shown in the first video is from the security camera trained on the court hold cell in which Plaintiff was placed after being removed from the hallway. The second video contains the same feed from the court hold cell security camera, but because it is the only video shown, it is much larger and provides a better view of detail. Neither the first nor the second video provides any audio and it is thus not possible to determine what dialogue is exchanged between Plaintiff and Defendants.

Because Defendants have moved for summary judgment on only the objective component of Plaintiff's excessive force claims, Defendants focus on what occurred inside

the court hold cell, which is shown in the second video. The court hold cell is a small, rectangular-shaped cell with the door depicted in the lower right-hand corner. A bench is located along the wall at the top of the frame. Across from the bench and to the right is a toilet separated from the rest of the cell by a low privacy wall. It appears in the second video that in placing Plaintiff into the court hold cell, four sheriff deputies slam Plaintiff's face against the door jamb, and then push Plaintiff toward the bench, slamming his face into the wall behind the bench, before pulling Plaintiff away from the bench, turning Plaintiff around 180 degrees, and slamming Plaintiff's right side into the privacy wall. Although it may be that the sheriff deputies are not slamming Plaintiff around the court hold cell but, rather, may simply be attempting to restrain Plaintiff who may be struggling against the deputies, such determination involves a factual determination the court is prohibited from making on summary judgment. *Redd v. New York Division of Parole,* 678 F.3d 166, 174 (2d Cir.2012) ("The court's role in deciding a motion for summary judgment 'is to *identify* factual issues, *not to resolve them.'* " (italics in original and quoting *Jasco Tools, Inc. v. Dana Corp.,* 574 F.3d 129, 156 (2d Cir.2009)). Nevertheless, should the trier of facts determine that Plaintiff was not resisting the Defendant Deputies' attempts to subdue Plaintiff, then anything more than a *de minimus* use of force would be excessive. *See Sims v. Artuz,* 230 F.3d 14, 22–23 (2d Cir.2000) (holding complaint describing more than *de minimus* force, which was unnecessary and without provocation, stated excessive force claim).

 **\*11** Nor is there any merit to Defendants' argument, Defendants' Memorandum at 12–13, that "blatant" differences between Plaintiff's description of the force Defendant Deputies used against him in the court hold cell, provided during Plaintiff's deposition, and the use of force depicted in the second video, requires granting Defendants' motion. Although it cannot be disputed that Plaintiff's recollection of the melee during his deposition includes statements that Plaintiff was kicked and punched numerous times, Plaintiff's Dep. Tr.,[5] *passim,* Plaintiff also clearly maintains that he does not recall the exact number of times he was struck and attributes his lack of precise recall to the confusion caused by the commotion. *See, e.g.,* Plaintiff's Dep. Tr. at 48 (stating the blows were "coming from everywhere, so I don't know who exactly delivered what blow. But I was slapped and I was punched. You can't pinpoint every one."). Defendants' assertion

that the number of blows Plaintiff maintains he sustained is not supported by the video is further undermined that for much of the video, Plaintiff is underneath several deputy sheriffs, their bodies obscuring the view of Plaintiff, and it is difficult to determine exactly what is transpiring, although there is movement of the deputy sheriff's arms and feet that could be the delivery of punches and kicks. Plaintiff's assertions that upon being taken into the court hold cell, Defendant Wagner "rammed me into the wall," *id.* at 57, and his knee was kicked into the bench, *id,* at 36, are supported by the second video. It is not possible to tell from the video whether, as Plaintiff alleges, Fourth Amended Complaint ¶ 17, anyone spat on Plaintiff. That Plaintiff's medical treatment following the incident included a right knee effusion, requiring Plaintiff be off work and recreation for several weeks is consistent with, although not determinative of, a use of excessive force. *See Wilkins,* 559 U.S. at 39 (extent of injury not determinative of whether force used was excessive).

Further, although the second video does show Plaintiff pacing in the court hold cell and kicking the door after the deputy sheriffs have exited, the kicks are delivered with Plaintiff's left leg, rather than the right leg Plaintiff maintains was injured, and Plaintiff has submitted an affidavit from emergency physician Dr. Lakomy who explains that following the physical altercation in the court hold cell, Plaintiff may have experienced an adrenaline rush that would have temporarily masked the pain from his right knee effusion, allowing Plaintiff to walk seemingly unharmed. Lakomy Affirmation ¶ 11. Dr. Lakomy further states that the effusion Plaintiff sustained on his right knee is consistent with the type of blows to Plaintiff's knee seen on the second video, such that "the physical impacts on [Plaintiff's] right leg and knee on January 29, 2010, were more likely than not the cause of plaintiff's right knee effusion and persistent discomfort." *Id.* ¶ 14.

 **\*12** Accordingly, there are issues of fact precluding summary judgment on the objective prong of Plaintiff's excessive force claims, *i.e.,* whether Plaintiff is, in fact, resisting the deputy sheriff's orders and struggling against their attempts to have Plaintiff kneel on the court hold cell bench facing the wall, or whether Defendant deputy sheriffs are aggressively dragging and pushing Plaintiff around, slamming Plaintiff into the walls of the court hold cell. Although Defendants have not moved with regard to the subjective element of Plaintiff's excessive

force claims, the first video showing the events in the hallway prior to Plaintiff's placement in the court hold cell raises questions as to the necessity for the use of any force against Plaintiff, a determination that cannot be made on summary judgment. *Redd,* 678 F.3d at 174.

In particular, the first video shows the events in the Holding Center's hallway through which Plaintiff was escorted from court back to his assigned cell, including, Plaintiff, third in line, temporarily wandering from the left side of the hallway to the center, before complying with a deputy sheriff's direction to return to the left side of the hallway. After resuming his place along the left side of the hallway, another deputy sheriff walks alongside Plaintiff and words are exchanged between the two. Although it is not clear from the silent video who initiated the conversation nor its contents, the deputy sheriff proceeds to pull Plaintiff from the line and brings Plaintiff to the court hold cell. In other words, although Defendants maintain Plaintiff was removed from the court escort line to the court hold cell for disobeying a deputy sheriff's direction to stay in line against the left-hand side of the hallway, the first video indicates Plaintiff returned to the left-hand side of the hallway as directed, but was then pursued, for reasons not clear from the record, by a deputy sheriff who removed Plaintiff from the line. Accordingly, the events depicted on the first video are susceptible to more than one reasonable interpretation including, *i.e.,* whether Plaintiff returned to the left-hand side of the hallway either in response to the deputy sheriff's direction or on his own initiative, as well as whether the deputy sheriff's decision to remove Plaintiff from the court escort line was in response to some verbal expression of defiance by Plaintiff, or motivated by some malicious intent of the deputy sheriff, resulting in an unwarranted physical attack by Defendant Deputies. That the video contains no audio makes this determination, on Defendants' Motion, impossible and the unresolved issues of fact would prevent summary judgment on the subjective component of Plaintiff's excessive force claims, had Defendants so moved. If the incident were instigated by Defendants, as Plaintiff maintains, the subsequent force could not have been used "in a good-faith effort to maintain or restore discipline." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009).

**\*13** Because summary judgment should not be granted in favor of Defendants on Plaintiff's excessive force claims, Defendants' request for summary judgment must also be denied as to Plaintiff's claims against Defendant Sheriff Howard and Sergeant Dee for failure to train, failure to supervise, and failure to intercede, asserted only against Defendant Dee. Defendants' argument in support of summary judgment on these claims is predicated on successfully moving for summary judgment on the excessive force claims. Defendants' Memorandum at 17. *See Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) (absent an underlying constitutional violation, there can be no liability for failure to properly train employees). As such, Defendants essentially have conceded that summary judgment cannot be granted with regard to the additional claims asserted against Defendants Sheriff Howard and Sergeant Dee if summary judgment is not granted on the objective prong of Plaintiff's excessive force claims. Accordingly, Defendants' Motion should be DENIED with regard to the additional claims asserted against Defendants Sheriff Howard and Sergeant Dee.

Summary judgment should thus be DENIED as to the objective element of Plaintiff's excessive force claims, as well as Plaintiff's remaining claims asserted against Defendants Sheriff Howard and Sergeant Dee. Nevertheless, should Plaintiff eventually succeed on his excessive force claim, "the relatively modest nature of his alleged injuries will no doubt limit the damages he may recover." *Wilkins,* 559 U.S. at 40.

### 2. *Qualified Immunity*

Nor should summary judgment be granted with regard to Defendants' affirmative defense that they are qualifiedly immune from liability on Plaintiff's claims, as Defendants assert. Defendants' Memorandum at 8–22. Qualified immunity shields law enforcement officials who perform discretionary functions from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable prison official would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 806 (1982); *Washington Square Post No. 1212 v. Maduro,* 907 F.2d 1288, 1291 (2d Cir.1990). Even if the right at issue were clearly established, if it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity. *Saucier v. Katz,* 533 U.S. 194, 201–02 (2001); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996). "The availability of the defense depends on whether a reasonable officer could have believed his action to

be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst,* 101 F.3d 845, 858 (2d Cir.1996) (internal quotation marks and citation omitted).

In the instant case, the parties do not dispute that Plaintiff's constitutional right to remain free from excessive force was clearly established as of January 29, 2010, the date of the incident in question. Accordingly, whether Defendants are entitled to qualified immunity depends on whether their use of force was objectively reasonable, Where, however, the objective reasonableness of an officer's actions depends on disputed facts, as in the instant case, summary judgment based on qualified immunity is properly denied. *Rivera v. United States,* 928 F.2d 592, 607 (2d Cir.1991). As such, the same material issues of fact precluding summary judgment on Plaintiff's excessive force claims also preclude summary judgment on Defendant's qualified immunity defense.

### CONCLUSION

**\*14** Based on the foregoing, Defendants' motion for summary judgment (Doc. No. 68), should be DENIED.

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

***Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.*** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

Filed March 3, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2708468

Footnotes

1    The captions for both the Fourth Amended Complaint and the Report and Recommendation list Daniel Buziak as a defendant. Dkt. Nos. 56 & 86. The Defendants' objections to the R & R do not list Buziak as a defendant. Dkt. No. 89. However, the Plaintiff's response continues to list Buziak as a defendant. Dkt. No. 90. The parties are directed to advise the Court on whether Buziak remains a party to this case.

2    To prevail on a claim of excessive force, the Plaintiff must prove that the force used against him was both objectively and subjectively unreasonable. *See Hudson v. McMillan,* 503 U.S. 1, 7 (1992). In general terms, the objective element requires that the Plaintiff prove that the force used against him was "sufficiently serious." *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The subjective element requires that the Plaintiff prove that the Defendants "had a wanton state of mind when they were engaged in the alleged misconduct." *Id.* (internal quotation marks omitted).

3    The Defendants argue that the R & R "simply identifie[d] the generalized protection against excessive force" and did not address whether the right to remain free of excessive force was "clearly established in a more particularized sense." Dkt. No. 89 at 19–20 (internal quotation marks omitted). However, the Defendants do not propose the more "particularized" right that might be at issue and do not point to any facts that should cause the Court to view this case as anything different than a struggle between a detainee and his guards.

1    Taken from the pleadings and motion papers filed in this action.

2    Filed as Defendants' Exh. E and Dr. Lakomy Affirmation Exh. B, each page separately Bates stamped.

3    Filed as Defendants' Exh. B, and separately as Doc. No. 69.

4    Filed as Defendants' Exh. C, and separately as Doc. No. 70.

5    References to "Plaintiff's Dep. Tr." are to pages of the transcript of Plaintiff's deposition, a copy of which is filed as Defendants' Exh. A.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.